IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 3:19-cr-00458-MO-1 |
| v. | ) | |
| JOHNL JACKSON, | ) | March 9, 2022 |
| Defendant. | ) | Portland, Oregon |

**Jury Trial - Day 3**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT SENIOR JUDGE

APPEARANCES

FOR THE PLAINTIFF: Ms. Pamela Paaso
Ms. Ashley Cadotte
Ms. Suzanne A. Miles
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

FOR THE DEFENDANT: Mr. Per C. Olson
Ms. Megan McVicar
Hoevet Olson, PC
1000 S.W. Broadway, Suite 1740
Portland, OR 97205

COURT REPORTER: Bonita J. Shumway, CSR, RMR, CRR
United States District Courthouse
1000 S.W. Third Ave., Room 301
Portland, OR 97204
(503) 326-8188
bonita_shumway@ord.uscourts.gov

# I N D E X

(Jury Trial Day 3 - March 9, 2022)

GOVERNMENT'S WITNESSES

KEONTE SCOTT
Direct Examination by Ms. Cadotte 376
Cross-Examination by Mr. Olson 399
Redirect Examination by Ms. Cadotte 437

DIANA PETROVIC
Direct Examination by Ms. Cadotte 441
Cross-Examination by Mr. Olson 497
Redirect Examination by Ms. Cadotte 533

YONSOO LEE
Direct Examination by Ms. Paaso 536
Cross-Examination by Mr. Olson 577
Redirect Examination by Ms. Paaso 587

Government Rests 588

(P R O C E E D I N G S)

(March 9, 2022; 9:00 a.m.)

* * * * *

(Open court; the jury is not present.)

(The witness takes the witness stand.)

THE COURT: Anything to cover before we bring the jury in for the United States?

MS. CADOTTE: No, Your Honor.

THE COURT: For the defense? For the defense?

MR. OLSON: No, Your Honor. Thank you.

THE COURT: Please bring in the jury.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Folks, I want to thank you for being on time this morning. Yesterday I neglected to ask you the pop quiz question I told you I'm going to ask you. Now I'm going to ask you one by one if you'd had a chance -- I shouldn't put it that way. If you have read the instructions that I sent home with you.

Juror No. 1?

JUROR NO. 1: Yes.

THE COURT: Two?

JUROR NO. 2: Yes.

THE COURT: Three?

JUROR NO. 3: Yes.

THE COURT: Four?
JUROR NO. 4: Yes.
THE COURT: Five?
JUROR NO. 5: No, sorry.
THE COURT: You'll do it tonight for me? I want honest answers, so I appreciate that.
Six?
JUROR NO. 6: Yes.
THE COURT: Seven?
JUROR NO. 7: Yes.
THE COURT: Eight?
JUROR NO. 8: No, but I will tonight.
THE COURT: Thank you.
Nine?
JUROR NO. 9: Yes.
THE COURT: Ten?
JUROR NO. 10: Yes.
THE COURT: 11? You, sir -- it's 12. You're renumbered. So 12?
JUROR NO. 12: Yes.
THE COURT: And 13?
JUROR NO. 13: Yes.
THE COURT: All right. Great. You know your reading assignment then tonight.
All right. You may call your next witness.

MS. CADOTTE: The government calls Keonte Scott.

THE COURT: Go ahead.

THE COURTROOM DEPUTY: Please stand and raise your right hand.

KEONTE SCOTT

called as a witness in behalf of the Government, being first duly sworn, is examined and testifies as follows:

THE COURTROOM DEPUTY: Go ahead and have a seat. Please remove your mask.

Go ahead and state your name for the record and spell it.

THE WITNESS: Keonte Scott. K-e-o-n-t-e, Scott, S-c-o-t-t.

THE COURT: If you could back up maybe six inches or so. Right there would be great. Thank you.

Go ahead.

DIRECT EXAMINATION

BY MS. CADOTTE:

Q. Good morning, Mr. Scott.

You're here today pursuant to a government subpoena, correct?

A. Yes, ma'am.

Q. And it appears that you are in custody currently?
A. Yes, ma'am.
Q. And do you have an attorney?
A. Yes, ma'am.
Q. And is she here in the courtroom today?
A. Yes, ma'am.
Q. So if at any point you need to confer with her, you can let us know.
A. Yes, ma'am.
Q. Mr. Scott, how old are you?
A. Twenty-three years old.
Q. What's your date of birth?
A. 4-16-98.
Q. Where are you from?
A. Vancouver, Washington.
Q. Born and raised?
A. Born in Olympia, raised in Vancouver.
Q. And do you know anyone by the name of Johnl Jackson?
A. Yes, ma'am.
Q. And do you see him in the courtroom today?
A. Yes, ma'am.
Q. Can you briefly describe what he's wearing, where he's sitting?
A. Sitting to the right of me, pink shirt, gray suit.
Q. And do you know him to go by any other name?

A. By Nelly.
Q. Just Nelly?
A. Johnl Jackson.
Q. And is Nelly shorter for a longer street name or moniker?
A. Yes, ma'am.
Q. And what is that?
A. Say what?
Q. Is it Nelly and then something else or just Nelly?
A. Just Nelly.
Q. And do you go by any other name?
A. Yes, ma'am.
Q. What is that?
A. Tae Gunna, G-u-n-n-a.
Q. And when did you first meet the defendant?
A. I'd say roughly early 2017, but no later than 2018.
Q. And when you met him, were you dating someone at the time?
A. Yes, ma'am.
Q. And who was that?
A. Diana Petrovic.
Q. When did you start dating her?
A. December 2nd of 2016.
Q. And was that actually the day you guys met?
A. Yeah.
Q. Did you introduce her to the defendant?
A. Yes, ma'am.

Q. Were you and the defendant close?
A. Yes, ma'am.
Q. What was your relationship like?
A. He was like an older brother to me.
Q. An older -- was he quite a bit older than you?
A. Yes, ma'am.
Q. Are you aware of how much older?
A. Roughly probably around ten years.
Q. And would you guys hang out often?
A. Yes, ma'am.
Q. Daily?
A. Yes, ma'am.
Q. And did you look up to him?
A. Yes, ma'am.
Q. Respect him?
A. Yes, ma'am.
Q. And Ms. Petrovic, were you hanging out with her daily as well during this time?
A. Yes, ma'am.
Q. So was it fair to say those were the two closest people in your life?
A. Yes, ma'am.
Q. Did you have a job at that point in time?
A. No, ma'am.
Q. Were you living at home?

A. No.
Q. How were you making money?
A. Doing different kind of acts.
Q. And can you clarify what type of acts?
A. Those kind of acts resulted in prostitution acts, dealing drugs, things of that sort of nature.
Q. And was there anyone that was mentoring you or guiding you in regards to making money?
A. Yes, ma'am.
Q. And who was that?
A. Nelly.
Q. Can you explain how that came about?
A. Came about approximately a little after I met him. I wanted to -- at the time I was getting money, but I seen how much money he was getting or spending, so I wanted to find out how he was getting money. So I asked him kind of like to teach me the ropes on how to get more money.
Q. And did he advise you on how to get more money?
A. Yes, ma'am.
Q. And what was that advice?
A. He told me that just to -- he told me that to -- he told me that just to, you know, focus on -- focus on what you got around you, that to make -- Can you repeat that for me? Sorry.
Q. Yes. What -- how did he advise you on how to make more money?

A. Well, he advised me and he showed me -- he showed me a lot on how to get money from different kind of acts, so that mean to say, like, he basically kind of sort of brought me under his wing. He was teaching me how to get more money out of a female, if that's regarding to prostitution. He told me how to be able to bring money home and put it in my pocket.
Q. Okay. Can you explain how he was helping you in regards to prostituting women?
A. You know, he would give me the ropes. He would tell me -- he would tell me, look, like, a lot of so-called what we call tricks, they don't really like black women, so they really like white women.
Q. Okay. And when you say "tricks," can you explain what that means.
A. A "trick" is somebody that tends to pay the proceeds for sexual acts.
Q. Like a customer?
A. Like a customer, yeah.
Q. What else did he teach you?
A. He just taught me -- he taught me how to benefit, get more money by committing these acts, places you got to invest in your woman to make her do what she's going to do and where she's going to get more money.
Q. Was there any discussion on how to not get caught?
A. He just told me -- he said to me, he said, don't worry --

don't worry about what's going on. He said when you -- when you answer a phone, you don't want nothing in your name, you don't want to buy nothing in your name. And he said everything -- all the posting -- all the posting, all the meetings, you don't want it to be on your phone, you want it to be on the prostitute's phone, if that makes sense.
Q. And were there different levels of prostitutes that were more reliable than others?
A. There were. And, you know, like one thing that was really big at the time was white women. Tricks love the white women. So, you know, that's what we would do. That's where our eyes would be set for.
Q. Did he introduce you to any customers or location?
A. I mean, he's introduced me to locations, yes.
Q. Can you explain some of those locations.
A. One of those places, I would say across the bridge in Portland, the house on the corner across the street from a park. I believe that the street is called Lombard. There's a stop sign right in the front yard.
Q. Would you recognize that location if you saw it?
A. Yes, ma'am.
MS. CADOTTE: Pull up Government's Exhibit 11, please.
BY MS. CADOTTE: (continuing)
Q. Do you recognize that location?

A. Yes, ma'am.
Q. Is that the location you're referring to?
A. Yes, ma'am.
MS. CADOTTE: Please publish to the jury.
BY MS. CADOTTE: (continuing)
Q. And what does this location provide?
A. This provided multiple tricks seeking more and different kind of women for benefiting off of prostitution benefits.
Q. So were you making money sexually exploiting women?
A. Yes, ma'am.
Q. Did you feel that was in large part to the guidance you were receiving from the defendant?
A. Yes, ma'am.
Q. And were you grateful to him for that guidance?
A. Yes, ma'am.
Q. Would you publicly show your appreciation to him?
A. Yes, ma'am.
Q. In the form of posting on public platforms?
A. Yes, ma'am.
Q. Social media?
A. Yes, ma'am.
MS. CADOTTE: If we could pull up Government's Exhibit 19 for the witness, please.
BY MS. CADOTTE: (continuing)
Q. Do you recognize that?

A. Yes, ma'am.

Q. Can you explain what this is.

A. It's a picture of me and Johnl taking a picture at the house, at the trap house.

Q. And where -- is this posted on some type of forum?

A. Yes, ma'am.

Q. What forum?

A. Instagram.

Q. And looking at the top of this photo, what is the name at the top?

A. Tae_Gunna98.

Q. And was that your social media profile name?

A. Yes, ma'am.

Q. And can you please explain what the purpose of this post was.

A. The purpose of it, a lot of it states in the caption, "Just a lifestyle me and my big bro live. You're all money in when you fucking with the flight crew." Hashtag Teamflight, hashtag Teamnelly, Teamgunna, tgntm bitch, hashtag Ganglandfreedaguys.

That's me stating the fact that the money that we get was due to prostitution fees.

Q. And is there a date at the bottom of that post?

A. Yes, ma'am.

Q. Can you read that date, please.

A. March 12th, 2018.
Q. And is that when this photo was posted?
A. Yes, ma'am.
Q. And was that photo taken during this time frame, during the March 12th, 2018 time frame?
A. Yes, ma'am.
MS. CADOTTE: Move to admit and publish to the jury at this time.
THE COURT: Any objection?
MR. OLSON: As previously stated, Your Honor.
THE COURT: Thank you. Objection is overruled. I receive the exhibit.
You may publish.
MS. CADOTTE: And if we could pull up Government's Exhibit 20 for the witness, please.
BY MS. CADOTTE: (continuing)
Q. Do you recognize this photo?
A. Yes, ma'am.
Q. Is it another post from your social media profile?
A. Yes.
Q. And can you explain the contents of that.
A. As it states in the caption, "All it took was guidance." Hashtag Moneymaker, hashtag TGNTM, hashtag Flight, hashtag Teamflight, hashtag Lil Bro runitinthatsom.
Q. When you're referring to "Lil Bro" and "Big Bro," what

does that mean?
A. Being as young as I am, they would all call me Lil Bro, so I would refer to him as my big bro, so I would say Big Bro.
Q. And can you read us the date at the bottom of that post.
A. February 22nd, 2019.
Q. And is that around when that photo was taken and that was posted?
A. Yes, ma'am.
MS. CADOTTE: Move to admit and publish to the jury.
THE COURT: Same objection?
MR. OLSON: Yes, Your Honor.
THE COURT: Received.
You may publish.
BY MS. CADOTTE: (continuing)
Q. Mr. Scott, was the majority of the people that you hung out with your age?
A. Not typically, no. I probably hung around probably five people my age, then the rest of them are mostly older.
Q. Mr. Scott, I'm showing you Government's Exhibit 6 at this time. Do you recognize this person?
A. Yes, ma'am.
Q. And who do you recognize her to be?
A. Madelynn Taylor.
MS. CADOTTE: If we could publish to the jury, please.

BY MS. CADOTTE: (continuing)
Q. And how do you know Madelynn Taylor?
A. I know her from -- I know her from my social media. We had conversations back and forth, and when I first actually got to have an in-person visit with her, I was at Vancouver Mall when I first ran into her and I got to speak with her a little bit. And then I asked her if she wanted to get money; in other words, as if she wanted to turn a trick.
Q. Okay. And looking at that photo, was that how she presented or how she looked when you met with her in person?
A. No, ma'am.
Q. How did she look?
A. She looked more as if she was more younger. She looked like she was -- had not attained the age of 18, and she looked pretty young at her age.
Q. So she clearly did not appear to be 18?
A. No, ma'am.
Q. And did you meet her early 2018?
A. Yes, ma'am.
Q. Did she ever tell you her age?
A. No, ma'am.
Q. So were there discussions with anyone else about having Madelynn engage in sexual activities for money?
A. Yes, ma'am.
Q. And who were those discussions with?

A. Those discussions were with Johnl Jackson.
Q. Anyone else?
A. Diana Petrovic.
Q. And what was said in those discussions?
A. I spoke to Diana about Madelynn turning a trick, and so what we did is we took her back to the trap house on Mill Plain.
Q. And I'm sorry, can you explain what a trap house is.
A. A trap house is basically a house where nothing but illegal content go on there.
Q. Okay. Thank you.
So you took her back to a trap house?
A. Yes, ma'am.
Q. And what occurred there?
A. What occurred there was me and Mr. Jackson, we were sitting there, I believe at the time smoking -- snorting cocaine, and Diana and Madelynn were sitting there, and I told Diana about if she wants to take Madelynn to go turn a trick. And then me and Nelly, we were just sitting around, we were basically just sitting around, and then Diana called her over, and so I believe that they took her over to Portland.
Q. So they left the trap house, and did you and the defendant stay behind?
A. Yes, ma'am.
Q. Did they return at some point?

A. Yes, ma'am.
Q. Was there money?
A. Yes, ma'am.
Q. Who was provided that money?
A. Diana.
Q. And did the money go to someone else other than Diana?
A. Myself.
Q. And did Madelynn Taylor end up leaving at some point in time?
A. Yes, ma'am.
Q. And did you ever see her again after that in person?
A. No, ma'am.
Q. Now, sometime after that incident, were you arrested?
A. Yes, ma'am.
Q. Was that May of 2018?
A. Yes, ma'am.
Q. And have you been in custody ever since?
A. Yes, ma'am.
Q. Were you -- since you were in custody, were you then charged federally with crimes involving sex trafficking of minors?
A. Yes, ma'am.
Q. When you were taken into custody, did you still keep in contact with Diana?
A. I believe it was about twice, like maybe once or twice,

maybe three.
Q. Was that by telephone or did she come visit?
A. By telephone.
Q. And what about the defendant?
A. Yes, ma'am.
Q. And was that by telephone?
A. Yes, ma'am.
Q. How about in-person visits?
A. No, ma'am.
Q. At some point in time were you made aware that they had started working together?
A. Yes, ma'am.
Q. Who made you aware of this?
A. I remember one day I had contacted Diana and somebody else had picked up the phone, and I asked her if I could talk to Diana, and then she stated that she's not here right now, that she's with Nelly.
Q. Did you ever have conversations --
MR. OLSON: Your Honor, I move to strike that testimony as hearsay.
THE COURT: Your response?
MS. CADOTTE: Not offered for the truth of the matter asserted but the effect on the listener.
THE COURT: I sustain the objection.

BY MS. CADOTTE: (continuing)

Q. Mr. Scott, did you ever have a conversation with the defendant about Diana?

A. Yes, ma'am.

Q. When did that occur?

A. I mean, we were incarcerated together at Inverness County Jail.

Q. And based on your suspicion that they were already working together, did you ask the defendant about that?

A. Yes, ma'am.

Q. And can you explain that conversation.

A. I had -- I remember we were walking by the unit, and I pulled him aside and I started talking to him, and I asked him, I said, "Why am I hearing that you are sleeping with my girl?" You know, sort of speak kind of thing like that. I asked him why he was sleeping with my girl, and that if it was true, that I didn't -- that I didn't respect it on my behalf because there was a time where we were in a hotel room and there was a girl that he had as, like, a side piece but he really cared for that went and crawled into bed with me. And I let him know, "Look man, I love you like you're my bro and I'm not going do you like that," and I said, "but she's over here trying to sleep with me." And I said, "At the end of the day, you're my big bro, so I show you respect, I went out of my way to show you respect that I'm not like that." And so I took it and I felt

some kind of way about him sleeping with Diana, because at the time Diana was my everything.
Q. You cared deeply for Diana?
A. Yes, ma'am.
Q. And did you feel that it was disrespectful that she fell in with him?
A. Yes, ma'am.
Q. And while you were both lodged together, did you two discuss the charges that you'd been charged with?
A. Yes, ma'am.
Q. What was that conversation?
A. That conversation, we both looked at the paperwork, both looked at the paperwork which stated sex trafficking of minors.
Q. Can I ask a question? "The paperwork," are you referring to the charges?
A. The charges.
Q. Okay. Thank you.
A. So we brought those up, and then so we started walking laps again and we started talking -- basically we're trying to contemplate on really, like, what happened, like why -- like what are they trying to say that we did, who was trying to say what we did, and so we started walking laps together.
Q. Did he at some point tell you what he thought his charges were about?
A. Yes, ma'am.

Q. And what did he say?

A. He stated that him and Diana, they were -- they had -- they had -- was with some girls that were committing sexual acts, but he had told me, he's, like -- he's, like, yeah, that Diana -- said that Diana brought the girls around him and they were committing sexual acts, and he's, like -- he's, like, she ain't even attained the age of 18.

Q. And then the girls that came around were not 18?

A. Correct.

Q. Did he say whether he went with Diana to pick these girls up?

A. No -- yeah, that's what I stated, that he was -- that's what he said, that he was with Diana when they basically recruited her -- the girls.

Q. And did he say where they got these girls from?

A. Eugene.

Q. What about where the girls were taken to?

A. Yeah. He said that he had gone to a -- he stated that they went to a tire shop, said that they went to a tire shop and that Diana was trying to, you know, force her way on to some tricks -- for the tricks to come, and that's with the hope of, like, to see the girls that they had brought in, and then one of the tricks -- one of the girls that were supposed to be getting seen told one of the tricks, like, hey, I'm not comfortable with this, I don't like this, I'm underage, and so

he started tripping about the girl being underage, because now that the girl left with the trick, she ain't coming back.
Q. Did he tell you how many girls there were?
A. No.
Q. Did he tell you names of the girls that were with them?
A. Yes, ma'am.
Q. And what were those names?
A. Stephanie Franz and Madelynn Taylor.
Q. Did he tell you about any other girls that were with them?
A. No, ma'am.
Q. So only two?
A. Yes.
Q. Did he tell you how he knew of the shop that they took them to?
A. He just stated that he knew -- he knew somebody that worked there.
Q. Did he express any concern about them cooperating?
A. Yeah. Me and him, we were -- we were locked up together. He told me, he said -- he said that -- 'cause at first he brought the name up to me, and I said, "That name kind of rings a bell."
Q. Which name?
A. Stephanie Franz.
And so I asked him, I said, "What's the girl's last name?"

He gave me the girl's last name, which at the time I had obtained her phone number through some -- through, like, a third party.

And I said, "You know what? Like, hold on. That girl that you're charged with," I said, "I have her phone number." And so I told her that I could -- I said, "Let me see what I can do." I said, "I'll call her and I'm going to see if I could" -- because he wanted me to call her to see if she wouldn't go to court on it. So I was going to try to make it happen to where she just kind of brush it off.

Q. Okay. So you mentioned you received Stephanie's phone number?

A. Yes, ma'am.

Q. So had you already been in contact with her while you were in custody?

A. Yes, ma'am.

Q. What was the purpose of that?

A. Well, the main purpose of it was so that she wouldn't be going to court and testifying against Nelly.

Q. Okay. And I'm asking were you just talking to her as a friend or why did you have her phone number?

A. I was talking to her as a friend.

Q. So did you end up speaking with Ms. Franz?

A. Yes, ma'am.

Q. Can you explain what you said during that call?

A. I told her, I said -- I said -- you know, I started my conversation off with her as if asking her, "Hey, how are you? How you doing? How's everything holding up?" And there was a time in that call that I had with her that I told her, I said, "What are you doing right now?"

And she said, "I'm going to go meet with the detectives."

I said, "With the detectives?" I said, "For what?"

And then she's, like -- she's, like, "Man, I don't know." She's, like, "These detectives want to talk to me."

And at the time -- at the time I was telling her, I'm, like, "Well, you know what? You know, like, put two and two together. Once you put that two and two together, you're going to know why they want to talk to you," is what -- basically what I was trying to tell her is -- is basically without having me having to say it over the phone is, you know, hey, scratch going to meet with the dude. You're going to be taken care of. Just don't go to court on Nelly.

Q. Is that exactly what you said?

A. Yes, ma'am.

Q. Would it help if you listened to that recording again?

A. Yes, ma'am.

MS. CADOTTE: If we could publish Government's Exhibit 15.

(Government's Exhibit No. 15, an audio recording, is

played.)
BY MS. CADOTTE: (continuing)
Q. Was that the call that you were referring to?
A. Yes, ma'am.
Q. And in that call you referenced the code of the streets?
A. Yes, ma'am.
Q. What does that mean?
A. Meaning, in other words, not to go speak on another person involved in that crime.
Q. And at some point in time were you and the defendant moved to different locations?
A. Yes, ma'am.
Q. Have you had any further contact with him since then?
A. No, ma'am.
Q. And what about Diana? Any further contact with her?
A. No, ma'am.
Q. And to be clear, you are currently in custody on charges involving sex trafficking of minors?
A. Correct.
Q. And specifically the sex trafficking of Madelynn Taylor back in early 2018?
A. Yes, ma'am.
Q. And you've pleaded guilty to that?
A. Yes, ma'am.
Q. And you're pending sentencing?

A. Yes, ma'am.
Q. And are you cooperating today in hopes that the government will recommend a lenient or lesser sentence?
A. No, ma'am.
Q. Why are you testifying today?
A. I'm testifying so the truth can be heard.
Q. And the government hasn't made any promises to you, correct?
A. No, ma'am.
Q. Has anybody influenced you to change your testimony or your statement?
A. No, ma'am.
Q. Do you still care about the defendant as a brother?
A. No, ma'am.
Q. And you've met with the FBI and the government three or four separate occasions since you've been arrested, correct?
A. Correct.
Q. In your initial interview, your very first interview, were you forthcoming? Did you tell everything about the defendant's involvement in sex trafficking or guiding in sex trafficking?
A. No, ma'am.
Q. Why is that?
A. Because at the time, you know, I really had love for Mr. Jackson, you know, and I didn't want him to get brought up, you know. I was trying to, you know, kind of trying to play it

off where he didn't really have nothing to do with it so that he could be at home.

Q. And so what made you change your mind then to elaborate on his role?

A. Well, at the time -- at the time I hadn't looked at it like, you know, the truth was going to come out one way or the other, so it's like he got to -- you know, I can't -- I can't save him. I can't save everybody, you know. I got to -- I got to deal to save myself. And, like, being involved with certain -- certain crimes like sex trafficking, drug dealing, you can't save everybody. You got to be able to look for the ones that are around you that care about you, you know. People got family, people got kids. So you got to be able to sit back and think is it really worth it, is it really worth it, letting him go and me have to go doing time. I just knew in my head, I'm, like, man, I just got to come clean and let them know the truth.

MS. CADOTTE: No further questions.

THE COURT: You may inquire.

MR. OLSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. OLSON:

Q. So you're here only for the truth today. Is that your testimony?

A. Yeah, for the truth to be heard, yes, sir.
Q. You have no -- absolutely no expectation of a lighter sentence in return for this testimony?
A. No, sir.
Q. So if the judge gives you 50 years in prison, you're going to be perfectly content with that?
A. Well, I mean, at the end of the day, yes, my fate is in the judge's hands. I'm not coming in here -- I'm not promised nothing. I ain't been told nothing. Like I said, I'm here to speak the truth and nothing but the truth.
Q. But you have been told that the government will consider your cooperation --
A. Correct.
Q. -- at the time of sentencing, correct?
A. Correct.
Q. And so what you're doing here today is cooperating by testifying, correct?
A. Correct.
Q. And you know that the government will consider this testimony and the Court may also consider this testimony in deciding what an appropriate sentence is for you, correct?
A. Correct.
Q. And so it's not all about just the truth, is it? It's about getting some benefit for yourself?
A. No, sir.

Q. So -- so the truth. You testified just a moment ago that you have not had any contact with Diana Petrovic -- How do you pronounce her last name?
A. Petrovic.
Q. You haven't had any contact with Diana Petrovic except for a few phone calls before she went into custody. You just testified to that, correct?
A. Correct.
Q. Do you recall telling Detective Lee on September 9th of 2021 that you spoke to her when you were housed together in Columbia County Jail?
A. No, sir.
Q. Do you remember telling Detective Lee that when you were at the Columbia County Jail, you spoke to her about -- and Petrovic told you who MV5 was?
A. I don't remember that, sir.
Q. So you have been held in custody at the Columbia County Jail, correct?
A. Yes, ma'am -- yes, sir.
Q. And are you aware that Ms. Petrovic also has been housed at the Columbia County Jail?
A. Yes, sir.
Q. And are you telling us that you didn't see her there at all? Did you see her there?
A. Yes, sir.

Q. Okay. And when you saw her there, did you communicate with her?
A. No, sir.
Q. So if Detective Lee wrote in a report that you said you'd talked to her and you asked her about who MV5 was, Detective Lee would be mistaken about that?
A. Could you rephrase that?
Q. If you told Detective Lee that you spoke with Ms. Petrovic while you were at the Columbia County Jail about who MV5 was -- that being Stephanie Franz -- that he would be mistaken in what he wrote in his report. Is that your testimony today?
A. I don't remember that.
Q. You don't remember that. And this is just back in December, so just a couple months ago. You don't remember saying that?
A. No, sir.
Q. Let's go back to the beginning here. You went to jail in May of 2018, correct?
A. Correct.
Q. And you were obviously in jail facing sentencing, correct?
A. Yeah.
Q. So you don't have any personal knowledge of any of the events involved in this case since September of 2018, correct? You weren't there at the barn? You weren't there --
A. Oh, no, sir.

Q. You were in custody the whole time. And you were in custody on some robbery charges, correct?
A. Correct.
Q. What documents have you reviewed today in preparation for your testimony?
A. The documents that I reviewed was, you know, what I know, what I've heard, and what's in my heart.
Q. I'm referring to did you look at any reports of any of your prior interviews, earlier interviews?
A. No, sir.
Q. Did you listen to any recordings of your earlier interviews?
A. No, sir.
Q. Your first statement, this first time you talked to Detective Lee, that was in February of 2020, correct?
A. I believe so.
Q. And you talked to him again in July of 2020, correct?
A. I believe so.
Q. And both of those times you were represented by counsel, correct?
A. I believe so.
Q. And counsel was present, so you could speak with counsel during breaks if you needed, correct?
A. Yes, sir.
Q. And you had opportunities to take breaks if you wanted to?

A. Yes, sir.
Q. So it was a -- it was a noncoercive, voluntary process, correct?
A. Could you rephrase that?
Q. I'm trying to distinguish a situation where a cop didn't just show up in your cell and start grilling you, correct?
A. Oh, correct.
Q. It was pursuant to what's called a proffer agreement, correct?
A. Correct.
Q. Do you remember signing an agreement that said you're required to tell the truth?
A. Correct.
Q. And that agreement also said that nothing you say would be used against you, correct?
A. Correct.
Q. And that agreement -- again, going back to that first meeting you had with Detective Lee on February 10th, 2020, you signed an agreement before you spoke with him, correct?
A. Correct.
Q. And that agreement --
MR. OLSON: Pull up 241, bottom paragraph there. This is just for the witness.
Well, actually pan out a little bit.

BY MR. OLSON: (continuing)
Q. I'm showing you a letter dated February 10th, 2020. At the end of it there's a signature. Is that your signature there where it says "Keonte Desmond Scott"?
A. Correct.
Q. Does it say there that "I have carefully reviewed every part of this agreement with my attorney. I understand and voluntarily agree to its terms"?
A. Correct.
Q. It's dated February 10th, 2020?
A. Correct.
MR. OLSON: Go back up.
BY MR. OLSON: (continuing)
Q. And that's your lawyer's signature below there?
A. Correct.
MR. OLSON: Go back to that paragraph.
BY MR. OLSON: (continuing)
Q. So you are agreeing and promising to abide by the conditions that are set forth in this letter, correct?
A. Correct.
Q. So we're looking at paragraph 3. Can you read the first sentence there.
A. "Your client agrees to provide truthful and complete information, with no material misstatements or omissions of fact relating directly or indirectly to any criminal activity.

Such proffer" --
Q. Okay. Go on.
A. "Such proffer includes producing any and all documents, records, writings, tangible objects or materials in your client's possession or control which relate to that criminal activity. Your client will neither attempt to protect any person or entity who has been involved in criminal activity, nor falsely implicate any person or entity in criminal activity."
Q. Let me stop you there. So that last sentence, you promise to neither protect anyone or falsely implicate anyone. Correct?
A. Correct.
Q. In other words, falsely protect somebody. You promised to do that, correct?
A. No, not falsely.
Q. I mean, you promised that you would not falsely protect -- in other words, withhold information about somebody in order to protect them?
A. Correct.
MR. OLSON: You can take that down.
BY MR. OLSON: (continuing)
Q. Now -- and you understood that agreement that you signed, correct?
A. Correct.

Q. And at the beginning of that first meeting -- they call it proffers -- that was held in this building, correct? In the U.S. Attorney's Office?
A. Yeah, I believe so, yes.
Q. And there was a prosecuting attorney by the name of Jennifer Martin there?
A. Correct.
Q. And a prosecuting attorney by the name of Thomas Ratcliffe there?
A. Correct.
Q. And both of them spoke to you at length about the importance of being honest and truthful, correct?
A. Correct.
Q. And Detective Lee, who was the one questioning you, he also impressed upon you the importance of being honest, correct?
A. Correct.
Q. And again, your attorney was there, so you had an opportunity to speak with her and confer with her.
In that first statement, in that first interview that you had with the government, you said that you -- you said that you didn't think that Mr. Jackson was really a pimp, didn't you?
A. You said what?
Q. You did not describe Mr. Jackson as a pimp, did you?

A. No.
Q. You did not say that -- you -- when asked to describe his role, you described him as basically a bystander with respect to sex trafficking activities, correct? Do you remember that?
A. No, sir.
Q. Okay. Do you remember ranking all of the people -- excuse me. The way you described Mr. Jackson was essentially that he sells powder, and that's really it, correct?
A. Correct.
Q. You portrayed him as basically a drug dealer but not a sex trafficker, correct?
A. Correct.
Q. And Detective Lee asked you to rank in terms of criminal responsibility who you thought was the most criminally responsible and who was the least. Do you recall that question?
A. I believe so.
Q. And you said that Diana was the highest, correct?
A. I don't remember.
MR. OLSON: Would you go to page 133, Exhibit 133.
BY MR. OLSON: (continuing)
Q. Would it be helpful to refresh your recollection by looking at a report of this interview?
A. Yes, sir.
Q. Why don't you go ahead and just read that to yourself

there.
A. (Complies.)
I read it.
Q. Does that refresh your recollection as to saying that -- as to whether you said that Ms. Petrovic was the most culpable?
A. At the time, yes.
Q. At the time that you said this?
A. Yes.
Q. And it was because she did all the recruiting, all the posting of ads and that sort of thing, correct?
A. Yeah.
Q. You said that she did all the work?
A. At the time, yes.
Q. So this is the woman that just today you're saying was the love of your life and you really thought that Mr. Jackson disrespected you by sleeping with her. On this first interview, you're telling Agent Lee that she is the most culpable, correct?
A. Yes.
Q. And in reading that, it said that Mr. Jackson was the least culpable, correct?
A. Correct.
Q. Now, you've testified that you met Diana Petrovic before you met Mr. Jackson, correct?
A. Correct.

Q. And you met -- you met Ms. Petrovic through a person by the name of Lopez Jefferson, correct?
A. Correct.
Q. Now, the way you described it in the first interview was that you described Diana as being a Xanax dealer, correct?
A. Correct.
Q. And she offered you -- she offered to sell you some Xanax, right?
A. Right.
Q. That's how you got to know one another?
A. Right.
Q. So this part of the story is still true?
A. Correct.
Q. And you hung out and -- when you first met, you hung out and did some drugs together, correct?
A. Right.
Q. Got high on cocaine and so forth?
A. Correct.
Q. So did you know or were you aware that she was -- or was she -- was she working at the mall when you first met her?
A. Yes, sir.
Q. So in addition to working at the mall -- was she working at a retail establishment there, or a store?
A. Yes, sir.
Q. So in addition to that, she was also selling Xanax on the

side?
A. Correct.
Q. So after you first met her, you communicated over social media for a while, correct?
A. Yes, sir.
Q. Those first couple weeks that you were with her after you met her, you were not together continuously, correct?
A. I wouldn't say continuously, but, you know, we were with each other quite frequently, but not as much as you would think.
Q. Did you cause her to lose her job or to get -- to stop working?
A. No, sir.
Q. Did you cause her to get hooked on drugs?
A. No, sir.
Q. Did you get her addicted to cocaine?
A. No, sir.
Q. Or any other substance?
A. No, sir.
Q. Now, in that first interview, again, in February of 2020, you told Detective Lee --
MS. CADOTTE: Objection, Your Honor.
THE COURT: The nature of the objection?
MS. CADOTTE: Hearsay.
THE COURT: Your response?

MR. OLSON: I'm asking what he told Detective Lee, what he told Detective Lee in 2020.

THE COURT: Right. That's hearsay unless you have an exception.

MR. OLSON: Let me just ask it this way.

BY MR. OLSON: (continuing)

Q. Isn't it correct that it was Ms. Petrovic that introduced you to the Lombard house, correct?

A. No, sir.

Q. Isn't that what you told Detective Lee back in 2020?

A. In my first initial interview that I didn't come with the truth to the table, yes.

Q. Well, you told Detective Lee a pretty elaborate story about how -- about how Diana Petrovic introduced you to the Lombard house, correct?

A. Could you ask that one more time?

Q. Do you recall what your story was initially about how Ms. Petrovic -- initially you said that Ms. Petrovic was --

MS. CADOTTE: Objection. Hearsay.

THE COURT: I'm going to excuse the jury for a moment.

(The jury leaves the courtroom.)

THE COURT: I want to set the stage before I hear your argument just a little. So one problem here is that the government is haphazardly objecting to this material. So it

comes in 90 percent of the time, and 10 percent of the time there's an objection. So I'd like you to decide are you going to object to this sort of hearsay or not on prior statements that -- so you know the definition, an out-of-court statement offered for the truth of what he said when he wasn't in court here today, what he said on an earlier occasion is an out-of-court statement, and you want to offer it, I think, for the truth. So to just say it's not hearsay won't get you there. Maybe you're not offering it for the truth. There's a starter. What's your theory?

MR. OLSON: Well, Your Honor, it's offered for just the nature of the evolving stories that this witness has given. So it goes to his credibility, to elicit that he's given contradictory stories about the very subject matter that he testified about.

THE COURT: So that sounds like you're not offering it for the truth of the matter asserted, right?

MR. OLSON: Correct.

THE COURT: That's simple enough. I don't need the answer that it's not hearsay. It's not 801. You're aware of that, right?

MR. OLSON: Yeah, Your Honor. I --

THE COURT: It's not a prior inconsistent statement made under oath subject to penalty of perjury, et cetera.

MR. OLSON: Of course.

THE COURT: Okay. So not offered for the truth. And we'll work through it.

You're going to make this objection in the future if you need to unless you know it's not being offered for the truth. And typically when you're trying to go through the evolving stories like this, then it's not offered for the truth. You're not asserting that any one of these stories is true, you're contending that none of them are true, right?

MR. OLSON: That's correct, Your Honor.

THE COURT: Fair enough.

Would you bring the jury in.

MS. CADOTTE: Your Honor, can I clarify?

THE COURT: Just a moment.

Yes.

MS. CADOTTE: I apologize. My recollection is that the witness stated that he did not tell the truth and he didn't remember what he said. Does he have an opportunity to review his statement before defense counsel reads into the record what his statement was, as to whether he can adopt that or refresh his memory? My concern is reading prior statements into the record as if it's testimony and confusing the jury.

THE COURT: Well, what's the nature of the evidentiary concern under the evidence rules? That he's not following proper impeachment or what? I mean, he's being asked --

MS. CADOTTE: He's acknowledged -- I apologize.

THE COURT: He's being asked if he made a prior statement. That's hearsay unless it's not offered for the truth. It's not offered for the truth. So he can say he doesn't remember or he can say yes or no, but there's no -- since it's not an 801 statement, there's no obligation to show it to him in advance.

MS. CADOTTE: Then my objection would just be that it's improper impeachment. He is adopting that he did not give that statement, the consistent statement. So he's acknowledging the impeachment so that it turns cumulative from the government's position.

THE COURT: Thank you very much.

Would you bring in the jury.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Folks, you remember yesterday I talked to you about information not being offered for the truth of the matter asserted. And that's where we are right now. You'll hear some questions in which Mr. Olson is asking about statements, and he's not offering those statements to prove that what was said in those statements is true. So you're just hearing them for some other reason, you know, whether it's to show inconsistencies or whatever you might hear from the defense about their reasons. But the statements are not being offered

to prove they're true.

Go ahead with your question.

MR. OLSON: Thank you, Your Honor.

BY MR. OLSON: (continuing)

Q. And there was a lot about your first interview with Detective Lee that was not true, correct?

A. Correct.

Q. And one of the things that you told him was that Ms. Petrovic was a prostitute at the time that you met her, correct?

A. I believe so.

Q. And you told him that she was -- you told them that she was the one that showed you this so-called Lombard house, correct? You told that to Detective Lee?

A. I don't know.

Q. Do you remember telling him something about how Diana took you over there saying that she was going to go visit her grandpa, and she came out of the house a little while later with some money, saying that she had been given the money from her grandpa?

A. I remember her saying she was going to get money from her grandpa, but it was never at the Lombard house.

Q. Right now I'm just asking what you told Detective Lee. Do you remember telling him something like that?

A. Yeah. Everything but the Lombard house, yes.

Q. Well, do you remember telling Detective Lee that eventually you figured out that what she was doing was engaging in prostitution at the Lombard house?
A. No. Because at the time I didn't know about the Lombard house.
Q. And again I'm just asking you what you recall telling Detective Lee. So maybe you're not recalling everything you told Detective Lee in that interview. Is that it?
A. No, I recall, but you asked me if she had went to go see her grandpa at the Lombard house, and I stated no, because it wasn't the Lombard house. It was a different location.
Q. Okay. I understand.
But what you were telling Detective Lee is that Diana would regularly go to this -- to the Lombard house to make money, right?
A. Right.
Q. And she was there so many times that she made deals there for the guys living there?
A. Correct.
Q. And you yourself went to the Lombard house over 15 times, correct?
A. Give or take, yeah.
Q. Now that part is true, right? You actually did go to the Lombard house about 15 times, correct?
A. I believe so.

Q. And basically you were involved with several girls that were underage, correct?
A. Not several. I mean, two.
Q. Okay. And Maddie Taylor was one of them, correct?
A. Correct.
Q. And another one.
So then -- so basically would it be fair to say that in the first interview, you're putting all the blame on Diana Petrovic, correct?
A. Correct.
Q. Now, you're interviewed again in July 22nd of 2020, correct? At the Columbia County Jail.
A. Right.
Q. This is where Detective Lee came and saw you and talked to you again?
A. Correct.
Q. And your attorney was there for that interview as well?
A. Correct.
Q. Now, were you aware whether Ms. Petrovic had actually pled guilty by that time?
A. You asked if I were aware?
Q. Yes.
A. Yes.
Q. And she, in fact, pled guilty that very same day, correct? Were you aware of that?

A. No.
Q. But you knew that she had pled guilty by the time Detective Lee talked to you that day?
A. No.
Q. Okay. Well, were you aware that she was about to plead guilty; that she'd worked out a deal with the government?
A. I believe so.
Q. Okay. And when you came to kind of find out what the nature of her deal was, did you think that she got a pretty good deal?
A. I don't know, sir.
Q. Do you know what the deal is that she got?
A. I don't know, sir.
Q. Well, at some point in time did it occur to you that there was really not much point in continuing to cooperate and provide information about Diana Petrovic?
A. Could you say that one more time.
Q. Did it occur to you that there was no point in providing cooperation against Diana Petrovic because she had pled guilty?
A. No.
Q. On this day in July 20th -- or July 22nd, 2020, you changed your story, correct?
A. Correct.
Q. And it was at this interview with Detective Lee that you said that Mr. Jackson was actually more responsible than what

you said the first time, correct?
A. Correct.
Q. And this is where you said that he was your mentor and all that sort of stuff, correct?
A. Correct.
Q. And do you recall that in the second meeting, you again said -- and you again said that it was -- Ms. Petrovic was, in fact, a prostitute before you met her?
A. Correct.
Q. And you again said that it was Ms. Petrovic -- and again I'm just asking what you said at the time. But you again said that Ms. Petrovic introduced you to the Lombard house, correct? Do you recall that part?
MS. CADOTTE: Objection. Mischaracterization of the statements.
MR. OLSON: Well --
THE COURT: Why don't you go ahead and display it or use it to refresh if you need to.
MR. OLSON: 134, page 2.
BY MR. OLSON: (continuing)
Q. Actually, it may be most convenient for you to read the paragraph, the whole paragraph that is in the middle of the page there.
A. (Complies.)
THE COURT: I'm going to excuse the jury for a

moment.

(The jury leaves the courtroom.)

THE COURT: Please be seated.

I'm concerned that you're showing the contrary witness a paragraph, asking him to review it that contains information I've excluded from the trial, negative to your client, with no guidance to this witness that he's not supposed to bring up in front of the jury some of the information in the paragraph you've just asked him to read. For example, I don't want the jury to hear that this witness told the officer that your client had pimped a girl named Stephanie Lasley. I guess I've excused the jury just to make sure it doesn't happen.

Anything else in here that you're concerned about?

MR. OLSON: Your Honor, I wasn't -- I don't actually remember you excluding that specific piece, but I mean, I filed the motion in limine to exclude the entire time period. I don't recall it being specific about Ms. Lasley. But in any event, I appreciate that. I think I can ask the questions that don't get into that.

THE COURT: I just want to -- if there's anything that either side -- because it runs in both directions in this paragraph -- that either side doesn't want this witness, who hasn't been told anything about what not to say about this paragraph, not to say in front of the jury, now is the time to do it.

For the United States, is there anything?

MS. CADOTTE: No, Your Honor. I have previously advised the witness not to reference the names of other individuals outside of this case previously.

THE COURT: All right. Thank you very much.

You can bring the jury back in.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Go ahead, Mr. Olson.

BY MR. OLSON: (continuing)

Q. Mr. Scott, have you had an opportunity to read that paragraph while we were sitting here?

A. Yes, sir.

Q. Does it refresh your recollection as to what you were saying to Detective Lee with respect to Ms. Petrovic's relationship to this Lombard house?

A. Yes, sir.

Q. So you started off telling him the same story you told before, that she had introduced you to the Lombard house, correct?

A. Correct.

Q. And then in the middle of the paragraph -- well, then in this same interview, you changed your story, basically to say now it was Mr. Jackson that introduced you to the Lombard house, correct?

A. Correct.
Q. And do you recall how that change of story happened in the midst of that interview with Detective Lee?
A. Would you say that one more time?
Q. Sure. It's not in this paragraph -- which you can take down -- but did Detective Lee tell you something that caused you to change your story?
A. No, sir.
Q. For example, did he tell you that somebody else had told him that Mr. Jackson and another person had introduced you and Ms. Petrovic to the Lombard house?
A. You asked if another person?
Q. Did Detective Lee tell you that another person had told him that Mr. Jackson and another person had introduced you and Ms. Petrovic to the Lombard house?
A. No, sir.
Q. In any event, at this time, July 22nd, 2020, you're aware Mr. Jackson is still fighting his charges, correct?
A. Correct.
Q. So you knew that to be helpful to the government, you had to turn on Mr. Jackson, correct?
A. Correct.
Q. And so you changed your story dramatically in this interview about incriminating Mr. Jackson, correct?
A. You asked me if I did change it?

Q. Yes.
A. To incriminate him?
Q. Yes.
A. No.
Q. Well, you told a new story about Mr. Jackson that was more incriminating of him, correct?
A. Correct.
Q. You said that you and he had acted as security guards for prostitution, correct?
A. Correct.
Q. And is it still the case today that you believe that Ms. Petrovic was a prostitute before you met her?
A. Correct.
Q. When you were turning tricks at the Lombard house and earning money off that, you didn't give any of that money to Mr. Jackson, did you?
A. No, sir.
Q. Mr. Jackson is not a gang member, is he?
A. No, sir.
Q. At the time -- the first time -- the only time you met Madelynn Taylor, you say you met her at the mall, you and Ms. Petrovic met her at the mall and brought her back to this house?
A. Correct.
Q. This house actually has a resident, correct, that lived

there?
A. Correct.
Q. What's her name?
A. You're talking about the one that owned the house?
Q. Yes.
A. Rori Dicker.
Q. Rori Dicker. And she lived there upstairs with a couple kids?
A. Yes.
Q. You said a trap house is something where only illegal activities happen?
A. Correct.
Q. She actually lived there with her kids, correct?
A. Correct.
Q. And this was a place where you all went and hung out, correct?
A. Hung out, do drugs. All that, yes.
Q. Do drugs?
A. Correct.
Q. Party?
A. Correct.
Q. Was there like a music thing set up where you could do rap and that sort of thing?
A. Correct.
Q. When Maddie was brought back, there was another girl that

was there also?
A. Correct.
Q. When she was brought back to the house in preparation for going out, she didn't actually have any conversations with Mr. Jackson, did she?
A. No, sir.
Q. And Mr. Jackson was just there at the time that you and Ms. Petrovic were talking about taking Maddie and this other girl out to prostitute, correct?
A. Correct.
Q. And none of that money from that venture -- none of that money went to Johnl Jackson, correct?
A. No, sir.
Q. So you've described this -- you went into custody, and later you confronted Mr. Jackson when he was in custody about starting this relationship with Diana Petrovic. So I take it, then, it's not the case that when you went into custody, you directed or asked Ms. Petrovic to start going with Mr. Jackson. That's not correct, right?
A. No, sir.
Q. And after you got arrested, you say that you continued to talk to Ms. Diana Petrovic over the phone. You said just a couple times, but wasn't it much more than that?
A. Yes. While I was in county, yes. But when I got to prison, it was just a few times.

Q. So there's a difference there. How long were you in county?

A. I was in county for, like, a year -- like a year and two months, year and three months.

Q. So that was, like, the first year and three months you were in, from May 2018 through May or so 2019 you were in county?

A. Yeah. Well, I got incarcerated in May and pled out in March.

Q. March of the next year. Okay.

During that time you were speaking with Ms. Petrovic quite a bit, correct, by phone?

A. Yeah, correct.

Q. And based on those phone calls, you formed the opinion that she was continuing to pimp out girls on her own, correct?

A. You're asking me if I was under the impression that she was?

Q. Yes.

A. No.

Q. Didn't she tell you in various coded language that she was?

A. No, sir.

Q. Exhibit 133, page 2. I'm showing you an interview report of your first interview, February 10, 2020, to refresh your recollection regarding -- would you read that to yourself,

please.
A. (Complies.)
I read it.
Q. Okay. So does that help refresh your recollection as to whether you had the impression that she was, in fact, continuing to pimp out girls?
A. Yeah. She stated that she was going to grandpa's house.
Q. Grandpa's house. Is grandpa an actual person?
A. No.
Q. Is that code for something?
A. It's code for trick.
Q. Code for a trick.
So was it your understanding that she was doing this independently?
A. No.
Q. Did you think she had a pimp?
A. I thought that when I was incarcerated, she was working for another person.
Q. Who was that?
A. Johnl Jackson.
Q. But didn't you discover -- you claimed to discover that later, correct?
A. Yeah, later on down the road a little bit.
Q. When you were with Diana, she used to -- she used to attempt to recruit prostitutes, correct?

A. Correct.
Q. And she would use Instagram to do that?
A. Correct.
Q. Among other social media tools?
A. Correct.
Q. So that was something that she did on her own?
A. Correct.
Q. And she specifically targeted what was termed squares?
A. Correct.
Q. What is a square?
A. A square is somebody that typically doesn't get into trouble or commit such acts.
Q. Okay. Is there a benefit to targeting a so-called square?
A. Not really. You just -- you mainly targeting squares because they want to -- you know they're not going to tell their mom.
Q. Okay. Mr. Jackson didn't recruit people off Instagram, did he?
A. No, sir.
Q. He didn't look for squares or that sort of thing, did he?
A. No, sir.
Q. Only Diana did that, correct?
A. Correct.
Q. Referring to those Instagram posts that were shown to you of the money, did Mr. Jackson gamble?

A. Yes, sir.
Q. He played video poker?
A. Yes, sir.
Q. Did he make money off that?
A. Not that I seen, no.
Q. Could that money that is depicted in the photograph, could that be earnings that he won from video poker?
A. Some of it could have been, yes.
Q. And you guys said prostitution was not your sole source of income, correct?
A. Yes, it was.
Q. What about robberies?
A. Negative.
Q. Well, you were charged and arrested for a series of robberies. That's what got you in custody, correct?
A. Correct.
Q. So you never made money from that?
A. No, sir.
Q. How about selling drugs?
A. I sold drugs here and there, yes.
Q. So -- okay. All right. So let's talk about this phone call, the September 30, 2019 phone call to Stephanie Franz. You called her, correct? She could not call you, correct?
A. Correct.
Q. Because you're in custody.

Now, you said that this was a warning of some sort. Mr. Jackson didn't tell you to warn Stephanie Franz, correct?
A. No, he did.
Q. He did. And when did he tell you that?
A. When we were walking laps around Inverness.
Q. When you were in Inverness. When were you in Inverness there?
A. We were there for this federal case.
Q. But do you remember when that was, like what time of year?
A. When we got indicted. What, 2019?
Q. There's an exhibit, I don't believe it's been --
MR. OLSON: May I confer with Counsel, Your Honor, for a moment?
THE COURT: Yes.
MR. OLSON: Would you bring up Government Exhibit 22.
BY MR. OLSON: (continuing)
Q. You probably haven't seen this before, have you?
A. No, sir.
Q. I'm going to represent -- and I believe we're going to have a stipulation -- that this is a record from the jail that shows the time period that the two of you were in custody together in the same dorm at Inverness. So what it would appear to show is that you were there from July 26, 2019 through August 6, 2019. Does that sound right?
A. Correct.

Q. And that Mr. Jackson was there from July 27, 2019 through August 31st, 2019. Correct?
A. Yeah, I believe so, but that ain't right.
Q. But as far as the time that the two of you were together -- and I believe we're going to have a stipulation on this -- that the time that you were together was July 26, 2019 to August 6 -- excuse me. July 27, 2019 to August 6, 2019.
Does that sound about right?
A. Sounds about right, but it's right after -- right after -- probably like the 28th, 29th of that same month that I got sent to the hole.
Q. Okay. So maybe you weren't with him the whole time, but that would have been the period of time that you were together, correct?
A. Correct.
Q. All right. So that being the case, that is roughly two months before you placed this call to Stephanie Franz, correct?
A. Correct.
Q. You're saying that Mr. Jackson wanted you to call her, and you waited two months to do that?
A. Correct.
Q. So it must not have been all that urgent, I take it?
A. No, it wasn't.
Q. And when you called her, I mean, the purpose of the call was not to call her up and warn her, right?

A. Well, that's what I was going to be getting to in that conversation I had with her. That was the whole main point in me contacting her.
Q. Well, from the sounds of it -- it's in evidence, I believe -- it sounds like you called up, you say hello, she says hello, and then she says she's going to go talk to a detective, right?
A. Right.
Q. She is the one that introduces the idea that she might be going to talk to the police, correct?
A. Correct.
Q. And your reaction to her was, oh, sort of thing, correct?
A. Correct.
Q. All right. Well, so at that time she herself was not named as a victim in the indictment, correct?
A. I don't remember.
MR. OLSON: If we could show the witness Exhibit 246.
BY MR. OLSON: (continuing)
Q. Would it be helpful to look at the original indictment that you were charged with?
I guess it says superseding indictment, but this was an indictment that was filed on June 5th, 2019. And we can see that file date at the top there. Do you see that?
A. Yes, sir.
Q. That's an indictment, and that names yourself, two other

people, and Mr. Jackson, correct?
A. Correct.
Q. One of those people being Diana Petrovic, correct?
A. Correct.
Q. And if you scroll through that -- and you know that Stephanie Franz through the course of this matter has been referred to as MV5; in other words, Minor Victim 5, correct?
A. I believe so, correct.
Q. Do you have any reason to believe this is not the indictment that was in existence when you were talking to Mr. Jackson at the Inverness Jail?
A. Can you rephrase that for me?
Q. Sure. Given the date on the document here, do you have any reason to think that there was some other indictment that had come along before you spoke to Mr. Jackson? This is the indictment you were charged with at the time, correct?
A. Yeah, that was the one we were charged with, correct.
Q. So if you scroll through there, what I'm asking you is to see if you see any mention of MV5.
So Count 3 mentions MV4. Is he going too fast? Count 4 is MV4, Count 5 is MV3 and MV4. Correct?
A. Correct.
Q. Count 6, MV4, correct?
A. Correct.
Q. And those are some forfeiture counts.

So there's no mention of an MV5 in the indictment, correct?

A. Correct.

Q. So neither yourself or -- obviously you were never charged with MV5, but Mr. Jackson himself had not been charged with an offense regarding MV5 when you were with him at Inverness Jail, correct?

A. Correct.

Q. Now, when you yourself found out about the sex trafficking charges against yourself, you asked Ms. Franz to call a person by the name of Depree Smith and tell him that, correct?

A. No, sir.

Q. You don't recall that?

A. I don't recall.

Q. Okay. Depree Smith was somebody that you were friends with?

MS. CADOTTE: Objection. Relevance.

MR. OLSON: It's going to be a really limited question, Your Honor.

THE COURT: Go ahead.

BY MR. OLSON: (continuing)

Q. You and Mr. Smith were friends, correct?

A. More like an acquaintance.

Q. So it's at least conceivable that in telling Ms. Franz this, remember the rules of the streets, that you were wanting

to also protect Ms. Petrovic, or were you?
A. Like I had stated earlier, you can't save everybody.
Q. I'm sorry?
A. As I have stated earlier, you can't save everybody.
Q. Okay. Because you said you loved her. Do you still love Ms. Petrovic?
A. Correct.
Q. So in telling Stephanie Franz to keep her mouth shut, that would also be protecting Ms. Petrovic, too, as well, correct?
A. I don't believe I knew that she was charged with that victim. I didn't know.
Q. You didn't know that she was charged with that victim?
A. Correct.
Q. And again, she wasn't -- she wasn't yet charged with that victim?
A. Correct.
Q. But you're saying that Mr. Jackson told you this story about how he and Ms. Petrovic went down to Eugene to pick up these girls, correct?
A. Correct.
Q. One of these girls being Stephanie Franz, correct?
A. Correct.
Q. That's MV5, correct?
A. Correct.
Q. So you knew that she had some exposure -- if that's true,

you knew that she also had some exposure with respect to Stephanie Franz, correct?
A. Correct.
MR. OLSON: No further questions, Your Honor.
THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. CADOTTE:
Q. Mr. Scott, you were shown the indictment that you and Mr. Jackson had back when you were lodged together, and the victims weren't named in that indictment, correct?
A. Correct.
Q. The conversation that you had with Mr. Jackson, was that about trying to figure out who these victims could be?
A. Yes, ma'am.
Q. So you didn't know that MV5 equaled Stephanie Franz?
A. Correct.
Q. Or who MV1 was?
A. Correct.
Q. And so were you guys talking about different options that it could have been?
A. Yes, ma'am.
Q. And that's when Ms. Franz's name came up?
A. Yes, ma'am.
Q. And did it take you a period of time to figure out whether

the Stephanie you and Mr. Jackson were talking about was the same Stephanie that you had been talking to on the phone?
A. Yes, ma'am.
Q. And when you figured out that it was, in fact, the same Stephanie --
A. That's when I stopped.
Q. And there was a lot of discussion on cross about everything that Diana Petrovic did in recruiting women. Did she help with posting ads?
A. Correct.
Q. And do you recall who taught her how to post ads?
A. No, ma'am.
Q. Did someone attempt to teach you how to post ads?
A. Yes, ma'am.
Q. And who was that?
A. Johnl Jackson.
Q. Were you able to be successful at that?
A. No, ma'am.
Q. So who in turn ended up posting ads on your behalf?
A. On my behalf, it was one time where Johnl posted one for me, and another time it was Diana doing it herself.
Q. And so was Diana posting ads before Mr. Jackson was teaching you how?
A. Yes, ma'am.
Q. There was also a lot of discussion about your first

interview with Detective Lee and the statements that you provided about Mr. Jackson.

Do you recall -- Let me rephrase that. Did you ever say that Mr. Jackson had nothing to do with anything?

A. No, ma'am.

Q. How did you describe him, do you recall?

A. I don't recall.

MS. CADOTTE: Pull up page 2576, please.

BY MS. CADOTTE: (continuing)

Q. Mr. Scott, if you could just refer towards the bottom of this report when it starts, "When asked by."

A. All right.

Q. Does that help refresh your memory?

A. Yeah.

Q. So how did you initially describe Mr. Jackson's involvement?

A. At first I initiated that really that he didn't have no part in sex trafficking women.

Q. Well, actually didn't you say that it wasn't --

MR. OLSON: Objection. Hearsay.

MS. CADOTTE: Impeachment purposes.

THE COURT: You're impeaching with a prior inconsistent statement? Is that what you're attempting to do? This won't qualify as that.

MS. CADOTTE: Well, he's testifying contrary to what

his prior statement was, so yes.

THE COURT: I sustain the objection.

BY MS. CADOTTE: (continuing)

Q. Can you explain your definition of pimping, please.

A. Gathering women together and either forcing them or coercing them to go commit sexual acts for money.

Q. So was it your understanding at the street level that pimping has to include force?

A. In some occasions, yes.

Q. And in that first interview with Detective Lee, when you were asked to list in order those with criminal liability, did you list Jackson in that?

A. Yes, ma'am.

MS. CADOTTE: No further questions.

THE COURT: Thank you, sir.

We'll take our morning break. We'll take further testimony after about 15 minutes.

(A recess is then taken.)

(The witness takes the witness stand.)

(The jury enters the courtroom.)

THE COURT: Would you tell us who you've called.

MS. CADOTTE: The government would call Diana Petrovic.

THE COURT: Would you swear in the witness.

THE COURTROOM DEPUTY: Please stand and raise your

right hand.

DIANA PETROVIC

called as a witness in behalf of the Government, being first duly sworn, is examined and testifies as follows:

THE COURTROOM DEPUTY: Thank you. Go ahead and have a seat. Please state your name for the record and spell it.

THE WITNESS: I'm sorry, can you repeat that?

THE COURTROOM DEPUTY: Please state your name for the record and spell it.

THE WITNESS: Diana Petrovic. D-i-a-n-a, P-e-t-r-o-v-i-c.

DIRECT EXAMINATION

BY MS. CADOTTE:

Q. Good morning, Ms. Petrovic.

How old are you?

A. Twenty-three.

Q. And when is your birthday?

A. November 10th, 1998.

Q. And were you charged with sex trafficking of minors in federal court?

A. Yes.

Q. Do you know anyone by the name Johnl Jackson?

A. Yes.
Q. Do you see him in the courtroom today?
A. Yes.
Q. Can you describe to us where he's sitting and something he's wearing.
A. He's wearing a gray suit and a pink button-up.
Q. And are you a codefendant of Mr. Jackson?
A. Yes.
Q. Are you represented by an attorney?
A. Yes.
Q. And is she here in the courtroom today?
A. Yes.
Q. And what area do you live in?
A. Portland, Oregon.
Q. Are you currently employed?
A. Yes.
Q. And what do you do?
A. I'm an on-call front desk at a nonprofit organization that helps people with addiction, homelessness, and mental health.
Q. Where did you grow up?
A. I grew up in Vancouver, Washington.
Q. Were you born there?
A. Yes.
Q. And is English the first language that you learned growing up?

A. No.
Q. What was your first language?
A. Slavic, Bosnian, Serbian, Croatian.
Q. And is that what you spoke at home?
A. Yes.
Q. But were you raised in English-speaking schools?
A. Yes.
Q. And do you understand English well?
A. Yes, although sometimes when people do speak fast, I would ask them to speak a little bit slower.
Q. Okay. And please feel free to do that if that happens today. Okay?
Are you comfortable with proceeding in English?
A. Yes.
Q. And going back to your relationship with the defendant, do you recall when you first met him?
A. Yes.
Q. And when was that?
A. I met him in December of 2016.
Q. How did you meet him?
A. I met him through my ex-boyfriend at the time, Keonte Scott.
Q. When did you meet Keonte Scott?
A. I met Keonte Scott when I worked at the mall when I was living at home with my parents.

Q. And do you recall the date that you met Keonte Scott?
A. We started dating on December 2nd of 2016.
Q. And how old were you at the time?
A. I'd just turned 18.
Q. After meeting Mr. Scott, did your relationship progress quickly?
A. Yes, immediately.
Q. Was it early on in your relationship with Mr. Scott that you met Mr. Jackson?
A. Yes.
Q. How was the defendant introduced to you?
A. When I first met my ex-boyfriend, Keonte, I met him at the mall, and I received a Facebook message from this gentleman as I'm at work to come over and smoke at this house a couple blocks away from my house, around -- around the -- December 2nd. And as soon as I got there, I smoked weed and we did drugs. And during that time, as I'm hanging out with the guy that I messaged on Facebook, which during that time, like, we had mutual friends, so I had a feeling I already knew this guy, but we ended up hanging out. And Keonte showed up later that night, and I'd just met him at the mall, and now that I realize years on later, like --
Q. Okay. It's okay. That's how you met him.
And do you recall when you first met the defendant for the first time?

A. Yes.
Q. And how was he introduced to you?
A. He was introduced to me as a big homie, which is somebody who is -- who is known as somebody that's respected in the street.
Q. And is that through Mr. Scott that you were introduced?
A. Yes.
Q. Okay. And were you and Mr. Scott around the same age at the time?
A. He was around a year older than me.
Q. And were you aware of the defendant's age at the time?
A. Yes.
Q. What was that?
A. He was much older.
Q. Did you all spend a lot of time together?
A. Yes.
Q. Did you continue working at the mall after you started dating Mr. Scott?
A. No.
Q. And how long was it between the time you started dating Mr. Scott that you stopped working at the mall?
A. Right away.
Q. Did you get another job?
A. No.
Q. Where were you living at the time?

A. So during the time that I was staying -- that I was -- I met Keonte, the night that I met him, I passed out, and I tried cocaine for the first time, and my -- my car, which was at the time mine and my dad's car -- and I was living at home -- I woke up and the keys were missing. So after that I wasn't able to come back home, and I continued to couch surf with Mr. Scott.
Q. Did Mr. Scott have a job at that time?
A. No.
Q. How were you two making money?
A. When I met Keonte, he was -- he was selling coke.
Q. Okay.
A. Cocaine.
Q. Did you start to engage in using cocaine?
A. I tried cocaine for the first time that night that I met Keonte.
Q. And did you continue using it after that first time?
A. Yes.
Q. Would you use cocaine often?
A. Yes.
Q. Did you become addicted?
A. Yes.
Q. Did you ever make money?
A. Yes.
Q. And can you explain how that occurred.

A. So during the time when I met Keonte, when we were couch surfing, not even a few weeks later, we met Nelly, and --
Q. Okay. One second. When you say "Nelly," who are you referring to?
A. The codefendant, Johnl.
Q. So would Johnl Jackson often go by the name Nelly?
A. Yes.
Q. Okay. Thank you.
So you were just explaining you met the defendant.
A. Yes.
When I met my codefendant, during the -- within the first two weeks that I started dating Keonte. We met at a trap house.
Q. And can you explain what a trap house is?
A. A trap house is a house that -- constant revolving doors, traffic for drugs.
Q. Okay. And so then the initial question was did you start making money? How did that interaction include you making money?
A. During -- during that time, when we met Johnl, when we went over to that trap house, we showed up to the trap house to reup on cocaine. During that time I was not aware of what was going to happen. From there on out --
Q. Can you tell us what happened.
A. During -- during the time that I met Johnl, when we got

there, Keonte met with him at the trap house, and they had -- they came to talking about making money.
Q. And Ms. Petrovic, I want -- were you present for that conversation?
A. Yes.
Q. Okay. Thank you.
Go ahead.
A. When they came to talking about making money, because during that time Keonte didn't really have very much money, and the weeks that we were together, I had the money from my job, and I didn't have a job anymore, so basically that reup was enough to get us high.
Q. Were you desperate for money at that point?
A. Yes.
Q. So did the conversation turn into how you could make money?
A. Yes. And when Keonte got back into his vehicle, he let me know that we were going to go over to a house in Portland called the Lombard house.
Q. So who was in the car at that point?
A. Who was in the car at that point? Me and Keonte, and Johnl was in a separate car.
Q. Okay. And did you end up going to this house that he told you about?
A. Yes.

Q. Did Keonte lead in the drive or did he follow someone?
A. He followed.
Q. Who did he follow?
A. Johnl.
Q. And what was your understanding of why you were going to this location?
A. That we were going to go get some money.
Q. And were you aware of how you were going to get money?
A. Not until I got there.
Q. And what state was this location in?
A. Oregon.
Q. Do you know the city?
A. Portland.
Q. And when you got there, what occurred?
A. When we got there, Keonte explained to me that he loved me, and that whatever that I had to do in there, it wouldn't change how he felt about me, and that he described to me something that I'd never done before, which was exchanging sex for money.
Q. Okay. So then were you clear at that point what you were there to do at the Lombard house?
A. Can you repeat that?
Q. Yes. So was it your understanding at that point you were at the Lombard house to engage in commercial sex, sex for money?

A. Yes.
Q. Can you describe this house, please.
A. It's a two-story house on a corner across from a park.
Q. And do you know how many people reside in that house?
A. Over -- over a few people.
Q. More or less than five?
A. More.
Q. And is it men and women that live there?
A. Men.
Q. I'm sorry?
A. Men.
Q. And was that -- did you, in fact, that night engage in sex for money?
A. Yes.
Q. And where did that money go?
A. To Keonte and Johnl's pockets.
Q. How did you know that it went to the defendant?
A. When I gave Keonte the money, he gave it over to Johnl.
Q. All of it or some of it?
A. Some of it.
Q. And did that location become one that you went to often to make money?
A. Yes.
MS. CADOTTE: Pull up Government's Exhibit 11, please. And you can publish to the jury.

BY MS. CADOTTE: (continuing)
Q. Ms. Petrovic, do you recognize this location?
A. Yes.
Q. Is this the location that you've been referring to?
A. Yes.
Q. Thank you.
Did you continue to prostitute after this initial evening?
A. Yes.
Q. And was that your primary source of money?
A. Yes.
Q. Would you get to keep that money?
A. No.
Q. Where would the money go?
A. The money would go into Keonte or Johnl's pockets, or the money would also go into things like gas or clothing, food, drugs.
Q. Would some of that money that Keonte got, would he use to purchase drugs from the defendant for you?
A. Yes.
Q. Did you enjoy prostituting?
A. Absolutely not.
Q. Why were you engaged in it?
A. I was addicted to the coke, and also the person that I was with at the time made me believe that it was love.

Q. At some point in time were there discussions about recruiting other girls to engage in commercial sex?
A. Yes.
Q. Who were these discussions with?
A. Those discussions were with Keonte and Johnl.
Q. And again, did you three hang out a lot?
A. Yes.
Q. Every day?
A. I believe so, yes.
Q. Okay. And what -- so what was the discussion that you three had about recruiting other females?
A. Initially at first, the conversations would be through Keonte and Johnl, and during those times I was already -- I already had an understanding of doing exchange for money and sex, that they would hang out on their own time while I would go and do that. And so during those times, they would have those conversations when they would hang out, and then by the time that I would come back from whatever I was doing, I had the understanding of -- that was the conversation -- like they had that conversation and that I was a part of the conversation.
Q. So if I understand correctly, you would go out on a prostitution date of some sort, the defendant and Mr. Scott would stay back and be alone together. When you would return, they would tell you what they talked about while you were gone?

A. Right, yes.
Q. Okay. And on one of those occasions, they told you that they were planning on recruiting other females?
A. Yeah. So, like, during the time when I would go out and I would hang out with the trick, I'd come back and they'd be smoking or drinking or listening to music or whatever, and when I would come back, whoever they were hanging out with during the time, which were people in and out all the time, when I'd come back, like jumping into, like, their conversation of Keonte letting me know that he was going to recruit other girls.
Q. And were you okay with this plan?
A. At that point I felt like my life and what -- and everything that I'd lost -- my job, my family, not having a home, and being so highly addicted to cocaine, which I never tried before, I felt that's all that I had at the time.
Q. Would it benefit you to have other girls go engage in sex acts?
A. Yes.
Q. How so?
A. It would take a lot of -- it would take a lot of pressure off of me, and it also made it to the point where I didn't have to sleep with as many men, and I would benefit, such as doing more drugs.
MS. CADOTTE: Would you please pull up Government's

Exhibit 6.
BY MS. CADOTTE: (continuing)
Q. Do you recognize the individual in this photo?
A. Yes.
MS. CADOTTE: Would you publish to the jury, please.
BY MS. CADOTTE: (continuing)
Q. Who do you know that person to be?
A. Madelynn Taylor.
Q. When did you first meet her?
A. I met her at a trap house.
Q. And do you remember what year?
A. I don't remember right now. I'm sorry. During -- during this time in my life, a lot of -- I consumed a lot of substances, and with all the traumatic stuff that happened, memories come and go.
Q. Okay. Thank you for explaining that.
Do you remember certain events clearly?
A. Yes.
Q. Or is that helpful to refer to?
A. When I first met Madelynn Taylor, I met her at a trap house over in Vancouver, a trap house that Johnl conducted, and during that time I came back from a trick, which is a commercial -- it's exchange sex for money. I just came back from a trick, and when I came back, Madelynn was there with Keonte and Johnl.

Q. Okay. Were there discussions at this point in time about having Madelynn engage in commercial sex?
A. Yes.
Q. Were you a part of those conversations?
A. Yes.
Q. Who did you have those conversations with?
A. Those conversations with Keonte and Johnl.
Q. And what was discussed?
A. Can you repeat that?
Q. What did you guys talk about when you were talking about Madelynn?
A. From my memory at this time, I remember that when we were at the trap house, we were all drinking and getting fucked up, and the impression that we had was she had no money and that she wanted to keep doing more drugs, so we -- the solution was to go make some money. And during that time everybody was, like, it was -- she was cool with that.
MS. CADOTTE: And, again, can you please pull up Exhibit 6 and publish it.
BY MS. CADOTTE: (continuing)
Q. Were you aware of Madelynn Taylor's age at that time?
A. No.
Q. And looking at Exhibit 6, is that what she looked like when you met her?
A. Like social media and that kind of stuff, like pictures,

no.
Q. In person.
A. Yes.
Q. This is what she looked like in person?
A. Yes.
Q. Did she look 18 to you?
A. No.
MS. CADOTTE: You can take the photo down. Thank you.
BY MS. CADOTTE: (continuing)
Q. So what was the plan as to where you were going to get money with her?
A. Is it okay if I take, like, a restroom break?
THE COURT: What was the question?
THE WITNESS: Restroom break.
THE COURT: Yes. We'll take a short break at this time, and come back for further testimony.
(A recess is then taken.)
(Open court; the jury is present.)
THE COURT: Please continue.
BY MS. CADOTTE: (continuing)
Q. Ms. Petrovic, are you nervous to testify today?
A. Yes. I'm terrified.
Q. Is it hard to get your thoughts together?
A. Yes.

Q. Okay. So picking up where we left off, there were discussions about making money with Madelynn. Was money made with Madelynn?
A. Yes.
Q. Can you explain what happened?
A. Yes. So once we left the trap house --
Q. And when you say "we," who are you referring to?
A. "We" as in Keonte and I. We left the trap house that Johnl was conducting, and we went to the first trick's house, which was Lombard. And during that time, the gentleman weren't there, so we went back over to one a couple blocks away, over at the Town Plaza house. And those men were there, and I forget how much money it was, but it was within like a hundred and -- 150 maybe to $200 that I did receive from Madelynn, and then I gave it straight over to Keonte, but after that, we went straight back over to Lombard once they were home.
Q. Okay. So I'm going to try to break this down so I understand.
You and Keonte left the trap house; is that correct?
A. Yes.
Q. Who was with you when you first left the trap house?
A. Madelynn.
Q. And from there did you go to the Lombard house or do you go to a different house?
A. We went straight over to the Lombard house, and they

weren't there, so we went over to the Town Plaza house.
Q. Is the Town Plaza a house or is it an apartment?
A. It's an apartment.
Q. And then at some point did you return to the Lombard house?
A. Yes.
Q. And did something happen at the Lombard house?
A. Yes. Once we got there, Madelynn ended up seeing a gentleman there -- two gentlemen there, Jose and Carlos, and from my memory, which right now is -- I'm having a lot of -- I'm having a lot of nerves right now, so after that we went straight back over to the Lombard house and went on with my day and -- went on with my evening, drink, did coke, whatever, and then I think I went off on my way to -- either it was the Garcia trick or whatever.
Q. I want to talk a little bit more about when you took Madelynn there. Okay? Who took her into the house?
A. I did.
Q. Where was Keonte when this was occurring?
A. He was in the car.
Q. Would Keonte or any man ever go into the house with you?
A. No.
Q. So when you and Madelynn go into the house, do you tell her what to do at some point?
A. Yeah. When we got there, I made it very clear to her, the

rundown they gave me when I first started prostituting.
Q. And what is that rundown?
A. Like the basic things, like use a condom and -- like sometimes, depending on, like, where you would go, which that wasn't a place where that would happen, but, like, sometimes you would have to sleep with them for money, but just make sure that you use precautions, like using a condom, and don't kiss them.
Q. And so at some point in the Lombard house, did Madelynn go into a room with a man?
A. Yes.
Q. When she came out, did she have money?
A. Yes.
Q. Did she try and keep the money?
A. I don't remember that, but, like, I do remember, like, during the time that I knew Madelynn, there would be times where -- when she would try to keep the money. She already had the understanding that we were going to get it from her one way or another.
Q. And was it you that told her you were going to get the money from her one way or the other?
A. No.
Q. Who said that?
A. That was just, like, a general conversation. Like within the three of us, she had that understanding, but then there

were times that at some point that she had the understanding that I would make sure that I would give the money back to Keonte or Johnl.
Q. Okay. So did you take the money from her that night?
A. Yes.
Q. And where did the money go from there?
A. It went to Keonte and Johnl.
Q. Okay. And this was the first time that you met Madelynn?
A. Yes.
Q. And did she end up leaving that night or the next day or at some point in time?
A. I don't remember, but within, like, that 24 hours.
Q. Okay. And sometime after that occurred, was Mr. Scott arrested?
A. Can you repeat that?
Q. Was Keonte Scott ever arrested?
A. Yes.
Q. Okay. And was he arrested after the first time you guys met Madelynn?
A. Yes.
Q. And do you recall that he was arrested in May of 2018?
A. Yes.
Q. Where were you living at that point in time?
A. During the time when he got arrested, I was pregnant, and I planned on proceeding with that, but during that time I

didn't have the right resources and continued to live in that lifestyle. And I became really close to Johnl, and that's when during that time -- during the time that Keonte went to jail, that's when I was giving him all the proceeds.
Q. Okay. So right before Keonte is arrested, are you two couch surfing together?
A. Couch surfing, yes.
Q. And were you pregnant at that time?
A. Yes.
Q. Was that with Keonte Scott's?
A. Yes.
Q. So he's arrested. Where do you start staying?
A. I started staying with Johnl, wherever I was able to stay.
Q. And you said while you were pregnant, you continued with that lifestyle. Does that mean continued using drugs?
A. Continued as in still commercial sex, yeah.
Q. And I'm sorry to have to ask you this, but did you end up having the baby?
A. No.
Q. And did you have an abortion?
A. Yes.
Q. Was that hard on you?
A. Yes. It was very hard on me.
Q. Did you need some time to recover?
A. Yes.

Q. During that time did you take a break from prostituting?
A. Yes. And during that time, after I had the abortion, I did have to go under another surgery for, like, a blood clot. So during that time I was just recovering and I was staying with Johnl.
Q. And was he providing you with support during that time?
A. Yes.
Q. What was your relationship like with him?
A. My relationship with Johnl during that time was parties. Every night we would party, and I'd have a safe place to sleep, and just making money.
Q. Were you grateful to him for his assistance during that time?
A. That's all that I had.
Q. Did you feel like you owed him for that?
A. Yes.
Q. Did Mr. Jackson have a job at that time?
A. No, just selling drugs.
Q. Would he make money any other way than selling drugs?
A. He also continued -- we continued with the sex for money.
Q. Okay. So before Mr. Scott went to jail, were you working more closely with Mr. Scott?
A. Can you repeat that?
Q. Yes. Before Keonte went to jail, were you working more closely with Keonte? Do you understand my question?

A. Yes. I'm trying to answer it.
Q. Do you want me to rephrase it?
A. Yeah.
Q. Did you consider Keonte Scott your pimp?
A. Yes.
Q. And what is a pimp to you?
A. A person who conducts sexual acts for money and, like, grooms you, like, keeps you safe and protects you, feeds you, clothes you, dresses you a certain way, takes pictures of you.
Q. Okay. And what was your role or title to him?
A. My role for Keonte?
Q. Uh-huh.
A. As a bottom bitch.
Q. And can you explain what a bottom bitch is?
A. A bottom bitch is somebody who is -- somebody that's, like, looked at like, I guess, like in the street life, like it's somebody who is -- somebody's, like, girl, and that they make money for them.
Q. Okay. And so once Keonte Scott went to jail, did you become somebody else's bottom bitch?
A. Yes.
Q. Whose?
A. Johnl's.
Q. Did you feel like you had any other options?
A. No.

Q. At some point in August of 2018, were you both running low on money?
A. Yes.
Q. What was your solution to making money at that time?
A. During that time the solution was to find other women to help -- help receive funds, like to help us make money so we were able to -- so I would be able to eat, have a place to live. Like, a few months before then, I think I just had my abortion, so I -- the solution was to go through social media and look through Keonte's Facebook and find some people -- or females who were willing to make money.
Q. Okay. And did you come to an agreement on a female?
A. Yeah.
Q. And who was that?
A. Madelynn Taylor.
Q. And were you two doing this together at the time, like in the same room looking up on your phone?
A. Yes.
Q. And I'm sorry, I assumed it was a phone. Was it a phone you were looking on?
A. Yes.
Q. And why did you two choose to target Madelynn Taylor?
A. We'd met her before when Keonte wasn't in jail.
Q. Did you and the defendant have any discussion about concerns about her age at this time?

A. Yes.
Q. What were those discussions?
A. Can you rephrase the question?
Q. Yes. Did you -- did you or the defendant have any concerns about Madelynn's age?
A. Yes.
Q. Why?
A. She was young.
Q. And it didn't stop you guys from contacting her?
A. No, because from our impression before, she made money before, so it worked out during that time.
Q. So did you ultimately reach out to Madelynn?
A. Yes, on social media.
Q. I'm sorry, go ahead.
A. On social media.
Q. Did she respond?
A. Yes.
Q. And was an arrangement made to meet up?
A. Yeah. She wanted to buy, like, a hundred dollars worth of coke, but she was in Eugene, so --
Q. So was there -- did you tell her you would sell her the coke?
A. Yeah. So we went -- Johnl and I, we were staying at a house over in -- I think in Hazel Dell, and we ended up driving all the way up to -- to Eugene with this woman who just

happened to be staying in the house that we were at, so she came with us.

Q. Okay. So the Hazel Dell house, is that in Washington?

A. Yes.

Q. So did you drive down to Oregon?

A. Eugene.

Q. Okay. And that's a pretty long drive?

A. Yeah.

Q. And so the plan -- what was -- what did you represent to Madelynn as to why you were coming to Eugene?

A. We were coming down there to sell her coke, and she wanted to come down to Portland to go party and hang out for a few days.

Q. And did you agree to give her a ride back up to Portland?

A. Yes.

Q. And so you said you were in the car?

A. Yes.

Q. I believe you said the defendant was in the car?

A. Yes.

Q. And you mentioned another woman was in the car?

A. Yes.

Q. Who was that?

A. Jessica Jones.

Q. Did she live in the area?

A. Yes.

Q. Okay. So what happened when you got to Eugene?
A. When we got to Eugene, we pulled up to a Chevron, and -- like, we pulled up to, like, a library nearby, and when we got there, there was a red car. And Johnl and I and Jessica, we didn't know there was going to be another girl. So there was a girl that came with her, and when we got there, we took, like, a picture by this mural in Eugene, and then her friend at the time wanted to come with her.
Q. And were you okay with that?
A. Yes.
Q. Why were you okay with that?
A. We were okay with that because we already drove all the way down there, and looking back at it, it was an opportunity for Johnl and I to make more money.
Q. Was there any discussion at all at that point with Madelynn or her friend about engaging in sexual activities?
A. Yes.
Q. So they knew when you picked them up that that's what they were coming up there to do?
A. Oh, no. The conversation that I had with Johnl, like that was what we already had in mind.
Q. So you and Johnl had this plan in mind, but did you ever make the girls aware of it before they came up there?
A. No.
Q. Do you feel like that was manipulative?

A. Yes, absolutely.
Q. Do you recall the name of Madelynn's friend?
A. Yes.
Q. What is her name?
A. Stephanie.
MS. CADOTTE: And can we pull up Government's Exhibit 7, please. And you can publish to the jury.
BY MS. CADOTTE: (continuing)
Q. Do you recognize the person in Government's Exhibit 7?
A. (Nods head.)
Q. And who is that?
A. Stephanie Franz.
Q. And were you aware of her age when you picked her up?
A. Yes.
Q. And what was your understanding of her age?
A. That she looked young.
Q. So from Eugene did you head back up to Vancouver?
A. Yes.
Q. And whose car were you using?
A. We were using my car.
Q. Okay. And who was driving?
A. I was driving, and Jessica was in the front seat and Johnl was in the back.
Q. With Madelynn and Stephanie?
A. Yes.

Q. And what occurred during this car ride?
A. The memory is very vivid, but I do remember smoking weed and doing coke and giving the girls coke on the drive over to Washington.
Q. Do you recall if molly was ever being used?
A. Yes.
Q. Where did you go once you got up to Washington?
A. We went straight over to the Buffalo Wild Wings to, I think, try to reup on some Xanax bars.
Q. Okay. And from there where did you go?
A. From there we went over to this, like, bachelor pad over in Hazel Dell with, like, pool tables and dudes lived there. It was super chill. It was the kind of place where you could just kick it.
Q. I guess was the car ride up there kind of like a mini party in and of itself?
A. Yes.
Q. And did the party continue once you got to this bachelor pad location?
A. Yes.
MS. CADOTTE: Could we pull up Government's Exhibit 8.
BY MS. CADOTTE: (continuing)
Q. Do you recognize that location?
A. Yes.

Q. Is this the location you're referring to?
A. Yes.
Q. Did Madelynn and Stephanie appear intoxicated?
A. Yes.
Q. Was that kind of the point?
A. Yes.
Q. And were they paying for these drugs?
A. During that time, yes.
Q. Who was paying for them?
A. Madelynn.
Q. And how much money did she provide?
A. A hundred dollars.
Q. Would that cover all of the drugs that were provided to both of them?
A. No.
Q. Would it even come close to it?
A. No.
Q. Okay. So a lot of the drugs that they were provided were free to them at that point?
A. Yes.
Q. And who was providing these drugs?
A. Johnl.
Q. Did you have access to drugs?
A. Yes.
Q. Where would you get your drugs from?

A. From Johnl.
Q. Do you find it easier to manipulate people when they're under the influence?
A. Yes.
Q. Did you personally have any sexual contact with Madelynn and Stephanie?
A. Yes, although it did happen organically.
Q. Organically. Okay. Did this occur -- what location did this occur at?
A. Over at the bachelor pad.
Q. Okay. And when you say "organically," do you mean it wasn't forced?
A. Right, yes.
Q. Did you have any discussions with the defendant about the age of Stephanie?
A. Yes.
Q. Do you recall what those discussions were?
A. Yes. That she didn't look of age.
Q. Did you all end up staying the night at this Hazel Dell location?
A. Yes.
Q. And is it fair to say that not a lot of sleep happened there? Was it more partying?
A. It was more like partying and drinking and hanging out, listening to music, smoking.

Q. At some point in time did you make Madelynn and Stephanie aware that you wanted them to engage in sex for money?
A. Yes.
Q. How did that come about?
A. That came about -- when we were staying over at that house, I had to go get my car fixed, so we went over to, like, this tire shop over a few miles away from there. And we went to this tire shop and I got my car figured out, and once we went from the tire shop, we went straight to a plug's house to reup.
Q. Let's take this one location at a time. So you went to the tire shop. Who went with you to this tire shop?
A. Johnl, Maddie, and Stephanie.
Q. Who was at this tire shop?
A. The people that worked there, and a gentleman whose name was Ronnie, and he was his uncle, Johnl's uncle, and he's the guy who had the tire shop.
Q. So Mr. Jackson's uncle was at the tire shop. Was that the first time that you met him?
A. Yes.
Q. And you said his name is Ronnie?
A. Yes.
Q. Did Mr. Jackson have conversations with Ronnie at the tire shop?
A. Yes.

Q. Were you involved in those conversations?
A. No.
Q. Okay. So you leave the tire shop, and what was the next location you said you went to?
A. We went to a plug's house to reup, which was just down the street.
Q. Can you explain what a plug is and reupping.
A. A plug and reup -- a plug is somebody who has controlled substances or drugs, and reup is just gathering them again.
Q. Okay. So were you guys running low on drugs at this point?
A. Yes.
Q. And so you went to this plug's house, a drug supplier?
A. Yes.
Q. Whose plug was it?
A. Johnl's.
Q. And what occurred at this location?
A. There was lots of coke, and a gentleman there who lived there.
Q. And what did he look like?
A. He looked like this bald man, Caucasian, bigger dude.
Q. Okay. So what occurred when you went in?
A. When we got there, Johnl and that gentleman went over to the kitchen, and they proceeded to go on with their business with the reup. And during that time Madelynn and Stephanie and

I, we continued to stay in the living room. The place wasn't even that big, so it was just like we were kind of right there, you know. And from my memory, I was so fucked up --
Q. You're using this term. What do you mean by that?
A. Meaning I was so heavily intoxicated and had so many drugs in my system.
Q. Okay. So you, Madelynn, and Stephanie are somewhere in the house. The defendant is with the big bald white man doing their thing, which does that mean exchanging drugs?
A. Yes.
Q. Okay. At some point does either Madelynn or Stephanie leave the living room area, wherever you're standing?
A. Yes.
Q. Where do they go?
A. Madelynn heads over to the bedroom next door in the same apartment over with the bald gentleman dude.
Q. Okay. So you saw them go into a room?
A. Yes.
Q. And at some point did they come out?
A. Yes.
Q. Did Madelynn have any money?
A. Yes.
Q. Do you recall where that money went?
A. It went to me, which went to Johnl.
Q. Did you guys end up leaving the location after that?

A. Yes.
Q. With more drugs?
A. Yes.
Q. Specifically cocaine?
A. Yes.
MS. CADOTTE: And can you pull up Government's Exhibit 9, please.
BY MS. CADOTTE: (continuing)
Q. Do you recognize this location?
A. Yes.
Q. And what is this location?
A. The house where we reupped on the drugs, and there was the bald gentleman.
Q. Thank you.
Okay. What location did you go to after this?
A. After this, I believe that we went back over to the Hazel Dell bachelor pad, and we hung out there for the rest of the day, and that was where we went next.
Q. Okay. Was there another location you guys ended up going to?
A. Yes. We ended up going to -- so Johnl ended up getting a call while we were there from the Uncle Ronnie, which is the guy from the shop. He got a call from him saying that --
MR. OLSON: Objection; hearsay.
THE COURT: Just a moment.

Your response?

BY MS. CADOTTE: (continuing)

Q. Were you a part of this conversation?

A. I'm sorry, can you repeat that?

Q. Were you a part of this conversation with Ronnie and the defendant? Did you overhear the phone call?

A. Yes.

Q. Was it on speaker phone?

A. No.

THE COURT: The objection isn't percipient knowledge, it's hearsay.

MS. CADOTTE: Effect on the listener, and where they ended up going following this phone call.

THE COURT: Go ahead.

BY MS. CADOTTE: (continuing)

Q. So what was your understanding of the phone call, and how did that influence what happened next?

A. I'm sorry, can you repeat that?

Q. Yes, I'm sorry.

What were you told about this phone call?

A. I was told about this phone call that we were going to go to a barbecue and that we were going to hang out with these gentlemen at a barn.

Q. Okay. And did you guys get in the car and take off?

A. Yes. So we went there during, like, daylight, and we got

there, there was a bunch of dudes. It was, like, a paint shop and they were working on cars and there were trailers. It's somewhere in, like -- it's like a farm, a barn, a farm.

And when we got there, there was no food. And I'm not -- I'm not proud of this at all, but when I got there, I remember acting super provocative and having this -- acting as if, like, I wanted to seduce or -- seduce the people around me, and acted as if I normally wouldn't act.

Q. Were you trying to seduce someone into engaging in sexual activity with you?
A. Yes.
Q. And was there a discussion about the purpose of going to this farm with the defendant before you got there?
A. Yes.
Q. Can you tell me about that a little more.
A. Yes. So on our way there, I -- from my memory, we had an understanding that these gentlemen had a lot of money, and that we were going to go to a barbecue and pretty much like feel it out, like see how it goes.
Q. Okay. Did you tell -- well, so you and -- the defendant went with you?
A. Yes.
Q. Who else was in the car with you guys?
A. The lady, I believe her name was Jessica Jones. She came with us, too.

Q. Was Madelynn and Stephanie with you?
A. Yes, yes.
Q. Okay. And was there any discussions with Madelynn and Stephanie about what they should do at this barn or why you guys were going?
A. Yes. When we got there, I let them know that the gentlemen there, they had a lot of money, and that we were going to go to a barbecue and hang out with them, and depending on how -- how the men were feeling about any of us, like, they were going to, like, proceed commercial sex for money.
Q. Did -- how long did you stay there? Did you go there more than once that day?
A. Yeah. So when we got there, we came to, like, a -- we realized that there was no food there at all, so we -- the -- like the -- the energy of, like, the place, I could tell that the girls were super uncomfortable, and Stephanie really wanted to leave.
Q. So did the men seem interested at that time?
A. No.
Q. So did you ultimately leave?
A. We left back to the Hazel Dell house.
THE COURT: I'll pause there for the lunch break. We'll take further testimony at 1:30.
(A lunch recess is then taken.)

(Open court; the jury is present.)
BY MS. CADOTTE: (continuing)
Q. Ms. Petrovic, I believe we left off at the first visit to this farm area. Is that your recollection?
A. Yes.
Q. Okay.
MS. CADOTTE: And if we could pull up Government's Exhibit -- I believe it's 10, please, and publish to the jury.
BY MS. CADOTTE: (continuing)
Q. Do you recognize Government's Exhibit 10?
A. Yes.
Q. And what is that?
A. It's the barn.
Q. The barn that you went to earlier that day?
A. Yes.
Q. Okay. And so at that point you had left. Did anybody make any money the first time around?
A. No. There was also no food.
Q. So where did you go from there?
A. After there we went straight to the bachelor pad, which is the Hazel Dell house.
Q. Okay. And at some point did you end up going back to this shop area?
A. Yeah, later on.
Q. How did that come about?

A. So when we came back to the bachelor pad, we definitely ingested a lot more drugs than Johnl did, and we also -- we drank a lot. And by the end of that night, we went straight back over there when it was dark.
Q. Okay. And when you say ingested a lot of drugs, are we talking about cocaine?
A. Cocaine and molly and alcohol and weed.
Q. And was it clear to you that Madelynn and Stephanie were very under the influence?
A. Yes.
Q. So riding back over to the barn that night, who all went back to the shop area?
A. Johnl and I and Jessica and Madelynn and Stephanie.
Q. Was there any further discussions about how people should behave once they got to the shop?
A. That we were ready to make some money.
Q. Okay. And did you explain to Stephanie or Madelynn what that meant?
A. Yes.
Q. Can you tell me about that conversation.
A. Yes. So we were -- since we came back to the barn -- I'm sorry, a lot of the stress from the trauma from being coerced -- yeah, coerced, a lot of the trauma that I'm working with with my therapist today, my memories, they come and they go, so I'm trying my best.

Q. Okay. Is it hard to go back to this point in your life emotionally?
A. Yeah.
Q. Okay. So were the girls -- and by "girls," I mean Madelynn and Stephanie -- given any directions as to what they were supposed to do at the shop?
A. Yes. So when we came back to the -- to the farm, the shop, that we were going to be getting ready to make some money to be expected of us when we get there.
Q. Were the girls -- were Stephanie and Madelynn told what to say?
A. Yes, they were by me. That they -- that they needed to be prepared to, like, to be able to sleep with these guys or spend time with them for money.
Q. Okay. Did you or the defendant ever tell them what age they should tell these men they are?
A. They were 19.
Q. Who told them that?
A. Johnl.
Q. So what occurred when you got back to the shop area?
A. The second time?
Q. Yes.
A. So when we came back there, this guy walked to there, and I remember when we got there that there was a couple gentlemen there, and at the time, now that I remember, none of the

gentlemen -- they weren't trying to even, like, sleep with me, I guess. They were more concerned about the cars and while -- while we were there, we just kept getting more and more fucked up, from my memory.

Q. When you got back there, did you recognize anybody at the shop?

A. Yeah. When we got there, Uncle Ronnie was there.

Q. Okay. And when you got there, did Madelynn or Stephanie, did you see them talk to any of the men?

A. Yeah. And during the time there, there was so much -- there was, like, paint and cars and -- there was a lot going on, so it was really hard to be in any type of control in that situation. It was just a very, like, open place where there was a lot going on and music playing and a lot of alcohol.

Q. At any point in time did Stephanie indicate to you that she was tired or didn't want to engage with the men?

A. Yes.

Q. Can you tell me about that.

A. Yes. So when we got there, like, our first initial thought is that's not the vibe. If you don't know what that means, like, this isn't a setting where we want to be or where we want to partake in or participate in. It just -- it wasn't the vibe. And so from that point on -- from my memory, I just remember having, like, no control of the situation, and that -- I'm sorry, can you repeat the question?

Q. Yes. At any time did Stephanie tell you that she was tired or did not want to be engaging with these men?
A. Yes. And during that time when I brought this attention up to Johnl, he told me to just slap that bitch, which is Stephanie.
Q. And did you?
A. Yes, I did. And I feel really bad about that.
Q. You feel bad today about it?
A. Yes.
Q. How did you feel at the time?
A. Like I had no control of the situation and that was expected of me.
Q. Okay. Were -- was there frustration about how the girls were interacting with the men or not interacting with them?
A. Yeah, there was. And a lot -- a lot of -- there was, like, a lot of space there. It was really hard to be able to be in every spot, if that makes sense. Like if Madelynn was over here, if Stephanie was over here, if Johnl was over there and he was talking to someone over there, there was so much going on, and with everything that we were consuming at the time, like, it was, like, really hard to, like I said, to be in control of the situation.
Q. Okay. Were you concerned that you guys wouldn't make any money?
A. Yes.

Q. Did the defendant express concern that you guys wouldn't make any money?
A. When we got there, he told us specifically that that's why we came there is to make some money, and that's why we came back again.
Q. Did you feel like that put pressure on you --
A. Yes.
Q. -- to make sure that Madelynn and Stephanie did what they had to do to get money?
A. Yes.
Q. And was the defendant expressing any frustration while at the shop?
A. Yeah. At some point during the time that we were there -- during the events that occurred during that time, Stephanie ended up going into a trailer with this gentleman, and Madelynn got in the car with this -- with this gentleman or this trick, and I remember being so out -- like so out of control of the situation. And I was so scared that I remember knocking on the trailer, and Johnl pulled my hair and he was telling me to leave her alone so she could make money.
Q. So explain to me what you were scared about.
A. I was scared of what the possible outcome of being just three girls in a forum of multiple men.
Q. Were you concerned for Madelynn and Stephanie's safety?
A. Yes.

Q. Did you feel responsible for them?
A. Yes.
Q. At some point did Stephanie come out of that trailer?
A. Yes.
Q. Did she have money with her?
A. She did. And I believe during that time that she tried to keep some of it, now looking back.
Q. Okay. And did that cause any issues?
A. Yeah, because at the end of the night, it didn't really add up.
Q. But did she hand over some money to you?
A. Yes.
Q. And where did that money go?
A. To Johnl.
Q. Do you recall Stephanie meeting with any other men?
A. Honestly, right now I can't.
Q. Okay. What about Madelynn? What was she doing during this time frame?
A. So during that time, she got into this car with this older gentleman, and he was going to take her to his house, and I think that she was going to engage in commercial sex for money at the time. So I just remember being so -- I don't know if the word -- I don't know what word to use, but I had no control over that situation when they left. And when Stephanie got out of that trailer, this was going on, and both of those things

were going on. And I remember being so scared and, like, just terrified that I didn't know if these girls were going to come back ever, what was going to happen to them. I just remember sitting in the back seat of my car crying with Stephanie, letting her know I was truly sorry what was happening, because I didn't know if Madelynn was even going to come back.
Q. Were you at all concerned that somebody would contact the police?
A. Yes.
Q. Did you have any discussions with the defendant while Madelynn was gone in the car with the man?
A. Yes.
Q. About what?
A. When she was gone that -- when Madelynn was gone?
Q. Yes.
A. I don't remember.
Q. Okay. At some point did Madelynn come back?
A. Yes.
Q. And was there a change in her behavior or mood upon her return?
A. Yes. She seemed like she was super -- I don't know how to put a word to it, but she was just very, like -- I don't know if defensive is the word, but just kind of like -- like she was just not being herself, and she was, like, I don't want to get in the car with you. And she, like, refused to get out of the

car.

And then at some point -- like I said, my memory with all this trauma, it goes back and forth. At some point I remember seeing her in the garage with the Uncle Ronnie, and she wasn't -- there was no way she was getting back in the car with us, and there was some conflict between her and Stephanie about her leaving her friend.

Q. Okay. When she first came back from that ride, did you attempt to collect any money from her?

A. Yes.

Q. Do you know -- do you remember if she provided you with any money at that point?

A. No.

Q. Were you trying to convince her to stay with you guys?

A. Yes.

Q. Were you getting upset?

A. Yes.

Q. Were you -- was the defendant aware of what was going on with Madelynn?

A. Yes.

Q. What was the conversation like about that?

A. It was very vivid. I just remember being, like, in the position where there was nothing I could do.

Q. Did he ask you to do anything to try to get her to stay with you guys?

A. Can you repeat that question?
Q. Yeah. Did the defendant tell you to do anything to try and get her to stay with you guys, Madelynn?
A. Yes.
Q. Can you tell me about that.
A. Yeah. So during that time, to let her know that to come back with us -- "us" as in me, Johnl, and Stephanie -- where we could go back to the bachelor pad, which is the Hazel Dell house, and she'd be okay.
Q. Did you tell Stephanie what was going on during this time frame?
A. Yes.
Q. So did you feel like you had totally lost control of this situation?
A. Yes.
Q. Were you panicking?
A. Yes. I was terrified.
Q. Did you ultimately leave the location?
A. Yes.
Q. And who left with you?
A. Johnl, Jessica, Stephanie, and I.
Q. Not Madelynn?
A. No.
Q. Did you ever see any firearms while you were at the shop?
A. Yes.

Q. And can you tell me about that.
A. When -- so, in general, whenever I would be with Johnl, he would always have -- he would always have, like, a gun with him. So he was just constantly, like, readjusting it all the time. But definitely during that time he had it, like, on his waistband where you could see it.
Q. And after that night, have you ever seen Madelynn again?
A. No.
Q. Ever even spoken to her?
A. No.
Q. Were there concerns -- did you have concerns that Madelynn was going to call the police?
A. Yes.
Q. Did you have concerns that the men she was with would call the police?
A. Yes.
Q. Did the defendant share your concerns? Was he also concerned?
Do you want me to repeat the question?
A. Yes.
Q. Was the defendant also concerned that the police might be called after this incident?
A. Yes.
Q. Where did you go from there?
A. After we left the barn, we went straight to the bachelor

pad. Madelynn -- not Madelynn. Stephanie, Jessica, Johnl, and I.
Q. And did you leave that bachelor pad at some point again?
A. Yeah. We stayed the night there, and we wound it down or whatever, and at some point it was just Johnl, Stephanie, and I, and we went to, like, a Marshalls to go get some clothes. He provided money for us to go and get clothes.
Q. And who is "he"?
A. Johnl.
Q. Okay --
A. Go ahead.
Q. So clothes for both you and Stephanie? Did you guys buy clothes for both --
A. Clothes for Stephanie.
Q. Just Stephanie?
A. From my memory.
Q. Okay. Do you have any memory of what types of clothes they were?
A. Like basics, basic needs.
Q. And you said that the defendant paid for that?
A. Yes.
Q. Do you recall approximately how much money it was?
A. Within 200 to $250.
Q. And from there, what did you guys do?
A. After there, I believe we went to go eat somewhere, and

then we went straight over to Lombard with Stephanie.
Q. And what was the plan for the Lombard house?
A. The plan for the Lombard house was for her to go see two of the tricks that were there.
Q. Was she aware that that was the plan at that point in time?
A. Yes.
Q. So tell me what happened when you got to the Lombard house.
A. We got there, it was like daytime, morning. And we pulled up there and we went in and she -- I continued to stay in the living room, and after she got done with one of them, went to the -- I believe I went to the car, and she continued to stay there with one of the other gentlemen who I believe lives upstairs. And by the end of that, she came back to the car and gave us more money than we initially thought she had.
Q. Okay. Can you explain what the inside of the Lombard house looks like.
A. Yes. So there's over five men that live there. There's two bunk beds in each room -- not bunk beds but twin beds in each room. It's like an older house, very wonky. Like if you were to step on the floor, it would, like, squeak and crack.
Q. Can I ask you some questions. So when you walk in the front door, what do you see to your right?
A. Through the front door or the back door?

Q. Front door.
A. The front door, you see, like, a floral couch with a TV, and then you see a bedroom door.
Q. Okay. Is the bedroom behind the couch or in front of it?
A. It's behind the couch.
Q. Okay. And is this a one-story or a two-story house?
A. It's a two-story -- it's a two-story house with a basement.
Q. Okay. And so were there men that stayed upstairs?
A. All the floors.
Q. All the floors. Okay. The basement, first floor, second floor?
A. Yes.
Q. What about the decorations?
A. A lot of them were, like -- like religious, like religious art and, like, floral couch, super outdated.
Q. And was it unusual for you to leave girls in the house alone?
A. No.
Q. You didn't have any concerns about leaving Stephanie alone in there with multiple men?
A. No.
Q. Where did you wait for her?
A. I waited in the car with Johnl around the corner.
Q. And what happened after that?

A. After that, she came back out and she explained to both of us that she had -- she had somewhere -- someone came to pick her up or was going to come pick her up, and she would text me later, something along that.
Q. Okay. When she left, were you under the impression that she would come back at some point?
A. Yes.
Q. And did either you or the defendant encourage her to come back to you guys?
A. Yes.
Q. And do you recall the specifics of that conversation at all?
A. Can you reword this?
Q. Yeah. Do you remember that conversation? Do you want me to back up one more question?
Okay. Did you and the defendant ask her to come -- make sure and come back to you guys?
A. Yes.
Q. How was it worded?
A. Okay. I honestly don't remember at this time.
Q. So at some point you and the defendant leave, just you two, from the Lombard house?
A. Yes.
Q. Where do you guys go from there?
A. From there, I believe we went on with our days. From

Lombard -- from that day we went and I got us a hotel.
Q. Okay. When you say you "got us a hotel," did you --
A. I put it in my name, and he gave me the money to be able to get the hotel.
Q. Okay. And when you say "he," who is that?
A. Johnl.
Q. Had you done that before?
A. Yes.
Q. Why are you putting it in your name and not his name, if he's the one paying for it?
A. That was just what was expected of me during that.
Q. At some point did Stephanie reach back out to you?
A. Yes, she did. And when she reached out to me, she called me and told me to come pick her up. And when I came and picked her up, I picked her up in this -- I believe it was either St. Johns or Johnson Creek. I don't remember. It was a place where I was completely unfamiliar, and when I picked her up, she seemed really distressed, and she didn't have shoes on.
Q. Did you take her back to the hotel with you?
A. Yes.
Q. Was the defendant with you at that time when you picked her up, do you recall?
A. No.
Q. And when you got back to the hotel, who was at the hotel?
A. Johnl was at the hotel and Jessica.

Q. Did any other people come and go from the hotel room while you rented it during that time frame?
A. Honestly, I wouldn't be surprised. I remember coming down during that time.
Q. Were drugs also used at the hotel?
A. Yes. And coming down is like when you're coming off of a substance.
Q. Thank you for that clarification.
Was there any issue with Stephanie's phone while she was with you guys?
A. During the time that we hung out with Stephanie, it was definitely a concern of Johnl's that why was she constantly on her phone and not, like -- like a fear -- not a fear but, like, a second thought of who is she contacting while she's with us. He kept taking her phone and giving it back type of thing, yeah.
Q. At some point in time did Stephanie leave the hotel?
A. Yes. When she left, we were knocked out, we were completely asleep, and I haven't seen her since that day.
Q. Okay. So you went to sleep at some point in time, you wake up, and she's just not there anymore?
A. Not there, and I never saw her in person again.
Q. You never saw her in person again. Did you have any communication with her by phone?
A. Yeah. Through social media -- during that time, we were

friends on, like, what was it? Instagram or social media. And we just, like, connected through social media one other time.

Q. And sorry to go back to another incident we talked about earlier today. I had asked you if you had ever engaged in any sexual activity with Madelynn and Stephanie, and I believe your response was yes?

A. Yes.

Q. Was the defendant ever a part of that sexual activity?

A. Yes.

Q. And was it all four of you at the same time?

A. Yes.

Q. And just to be very clear, you are charged with multiple counts of sex trafficking of minors, correct?

A. Yes.

Q. Okay. You have entered a guilty plea to providing controlled substances to a minor, correct?

A. Yes.

Q. And you're pending sentencing?

A. Yes.

Q. But sitting here today, you still have those other charges hanging out there. Is that your understanding?

A. Yes.

Q. Are you testifying today in hopes that the government will dismiss those charges?

A. That's not up to -- that's not up to the -- it's up to the

judge.

MR. OLSON: Objection. Nonresponsive.

THE COURT: Overruled.

BY MS. CADOTTE: (continuing)

Q. Are you hoping to gain a benefit, whether it is from the government or the judge?

A. I don't know. I hope so.

Q. Have you been promised anything from the government for testifying today?

A. No.

Q. Is there any other reason why you chose to testify today?

A. Coming from somebody who has had this happen to them, I don't want this to happen to anybody. And I really feel sorry for the girls, and I wouldn't want any other girl to have to go through this.

Q. Are you proud of your actions back then?

A. Not at all, no.

MS. CADOTTE: No further questions.

THE COURT: Thank you.

You may inquire.

MR. OLSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. OLSON:

Q. Good afternoon, Ms. -- I'm sorry -- Petrovic. Is that the

right pronunciation?

THE COURT: Over there.

THE WITNESS: Yes.

THE COURT: Can you see him?

BY MR. OLSON: (continuing)

Q. How many languages do you speak?

A. I speak Bosnian, Serbian, Croatian, and English.

Q. So four languages -- four languages?

A. Yes, but the other three are intertwined as one.

Q. Do you speak Spanish?

A. No.

Q. You asked for a Bosnian interpreter to be available during today's trial testimony, correct?

A. Yes.

Q. Because you thought you might need an interpreter, correct?

A. Yes.

Q. And obviously you haven't needed an interpreter, but that was something that you requested, correct?

A. Yes.

Q. And you previously interviewed with Detective Lee over a four-day period, correct?

A. Yes.

Q. Yonsoo Lee, correct?

A. (Nods head.)

Q. Back in 2020?
A. Yes.
Q. Did you request an interpreter at that time?
A. No.
Q. Now, you just told us that you're charged in the same indictment as Mr. Jackson, correct?
A. Yes.
Q. So were it not for this deal that you've struck with the government, you would be sitting here as a codefendant, correct?
A. Can you repeat that?
Q. If you hadn't worked out a deal with the government, you would be here charged in this case, sitting in trial, correct?
A. I don't know.
Q. Okay. And those charges include sex trafficking by force, fraud or coercion?
A. Yes.
Q. And sex trafficking of a minor?
A. Yes.
Q. And transportation in interstate commerce -- transportation of minors in interstate commerce for purposes of prostitution?
A. Correct.
Q. And those crimes carry between a ten-year and a 15-year mandatory minimum sentence, correct?

A. Yes.
Q. And had you been convicted -- had you gone through a trial and been convicted of those, the sentence -- the trial sentence could have been much longer than that, correct?
A. I don't know.
MS. CADOTTE: Your Honor, permission for a sidebar.
THE COURT: All right.
(Discussion held off the record at sidebar between the Court, Ms. Cadotte, Ms. Paaso, and Mr. Olson.)
BY MR. OLSON: (continuing)
Q. So anyway, that was the type of sentence that you could have faced if you had gone through a trial and lost, correct?
A. I'm sorry, can you repeat that?
Q. A 10- or 15-year mandatory sentence could have been the sentence that you would face if you'd gone through a trial and lost, correct?
A. Yes.
Q. And possibly even more than that, correct?
A. Yes.
Q. And instead, what you've done is you've worked out a deal with the government where you've actually pled guilty to a different crime, correct?
A. No.
Q. Well, the crime that you pled guilty to was distributing controlled substances to people under the age of 21, correct?

A. Yes.
Q. And that wasn't in the original charges, correct?
A. Yes.
Q. That's something that the government allowed you to plead guilty to so that by the time you get to sentencing, all these other charges that we've talked about, the more serious charges, will be dismissed, correct?
A. I don't know.
Q. And there's been a discussion here about other charges that are still pending.
You were charged in two separate indictments, correct?
A. Yes.
Q. One indictment is the indictment with Mr. Jackson, this one that we're in trial on right now, correct?
A. Yes.
Q. And then there was another indictment where you were charged with Mr. Scott and Mr. Jackson and another individual, correct?
A. Yes.
Q. And that -- and Mr. Jackson was dismissed from that case. Are you aware of that?
A. I don't know.
Q. Okay. So it's been said that that case is still hanging over your head, but it's your expectation, is it not, that by

providing your testimony today, all the counts in that other indictment will also be dismissed, correct?
A. No, that's not true.
Q. What's your understanding as far as what's going to happen with that other case?
A. That's up to the judge.
Q. It's up to the judge to decide whether that case gets dismissed?
MS. CADOTTE: Asked and answered, Your Honor.
THE COURT: Sustained.
BY MR. OLSON: (continuing)
Q. But that's what you're hoping for, right, that that other case gets dismissed?
A. I don't know.
MS. CADOTTE: That's already answered, Your Honor.
THE COURT: Overruled.
You may answer the question.
BY MR. OLSON: (continuing)
Q. You're hoping that that other case gets dismissed?
A. I don't know. It's up to the judge.
Q. Do you remember when you were proffering -- "proffering," that's a fancy word. Do you remember when you were interviewing with Detective Lee? Do you remember when those dates were?
A. I don't know.

Q. They were in May and June of 2020. Does that sound about right?
A. I don't know. That was a long time ago.
Q. Did you remember that before you started proffering and interviewing with Detective Lee, that there was an alleged supervised release violation that was pending before the Court at that time?
A. Yes.
Q. Okay. What was the nature of that violation or alleged violation?
A. Can you repeat that?
Q. What were you accused of doing? You were on pretrial release, correct, at that time?
A. Yes.
Q. Which means you were out of custody and you were abiding by certain conditions, correct?
A. Yes.
Q. And there was an allegation that you violated one or more of those conditions, correct?
A. Yes.
Q. And what was that condition that you violated?
A. I -- during that time I went into custody and I got my case dismissed.
Q. Okay. But were you accused of violating -- when you say your case got dismissed, you mean the pretrial violation matter

got dismissed?
A. Yes.
Q. And do you know why it got dismissed?
A. Because I wasn't guilty.
Q. It was dismissed after you interviewed with the government, correct?
A. I don't know.
Q. The first time that you met Madelynn Taylor, you discussed the sex trafficking incidents that occurred a few months before in September. You didn't force or coerce her in any way to engage in those acts, did you?
A. Can you repeat the whole question?
Q. The previous time with Madelynn Taylor, you didn't force or coerce her in any way to engage in those acts of prostitution, did you?
A. Yes.
Q. You did?
A. The second -- the previous, the last time?
Q. No, the previous time, when Mr. Scott, Keonte Scott was out of custody.
A. The initial?
Q. Yes.
A. No.
Q. And at that time -- so when September of 2018 rolls around, she was -- Madelynn Taylor was connected to both

yourself and to Keonte Scott on social media, correct?
A. Yes.
Q. And as far as you know, she wasn't connected to Mr. Jackson by social media, correct?
A. Yes.
Q. She had not been in communication with Mr. Jackson as far as you know, correct?
A. Yes.
Q. And as I understand your testimony, she reached out to you at that time and requested to buy $100 worth of cocaine, correct?
A. Yes.
Q. You didn't want to -- you didn't reach out to her at that time, did you?
A. I don't remember.
Q. Okay. So when you went to Eugene, it was strictly about cocaine, selling her some cocaine, correct?
A. No.
Q. All right. Do you recall telling Detective Lee that when you went down to Eugene, it was strictly about selling her cocaine?
A. With -- with what I remember now and back then, a lot of the stuff that happened, it -- the memories, they come and they go. So it's possible. I don't know. But with this, this was so long ago, and I was, like, a teenager.

Q. Okay. Would it be fair to say that you would have been remembering things better in 2020 about what happened in 2018 than where we are today?
A. I don't know because what -- when stuff like that happens when you're -- when you're under the influence and you're dealing with mental health and there's a lot going on, your brain, it instantly blocks those memories out. So I don't know.
Q. Okay. Well, would it refresh your recollection about what the purpose was for this trip by looking at a transcript of your interview with Detective Lee?
A. I don't know. I hope so.
Q. Let me ask this question. Have you reviewed certain documents in preparation for today's testimony?
A. That's confidential and that's between my attorney and I.
Q. Okay. I'm not asking for conversations with your attorney or discussions with your attorney at all. I'm just asking whether you looked at 302 reports, the FBI reports, or if you listened to your prior interviews with Detective Lee in preparation for today's hearing.
A. I don't know.
MR. OLSON: Could you pull up Exhibit 111T.
BY MR. OLSON: (continuing)
Q. So this is -- your conversation with Detective Lee was audio recorded, correct?

A. Yes.
Q. And so what I'm showing you here on page 1, it says, "Diana Petrovic proffer, 5-19-2020."
Does that sound about when you met with Detective Lee?
A. Yes.
Q. If you'd go to page 25. I don't want you to read this out loud, but if you'd just start -- if you want us to pan out so you can read what's above that, just let us know. But if you'd just read that to yourself.
THE COURT: What failure of memory are you working on right now?
MR. OLSON: Your Honor, I did ask her if she remembered saying to Detective Lee. I think I also asked her if she remembers that this was strictly about cocaine.
THE COURT: Her answer to that was no?
MR. OLSON: Your Honor, I think she said she didn't remember.
THE COURT: I understood it to be she didn't remember what she said to Agent Lee. Right? I'm trying to nail down what failure you're working on. That she didn't remember what she said to Agent Lee, or is it more than that?
MR. OLSON: I think at this point I'll just ask her if this refreshes her recollection as to what she said to Detective Lee.

THE COURT: All right. Thank you.

MS. CADOTTE: Your Honor --

THE COURT: Yes?

MS. CADOTTE: I was just going to ask if we could check on the witness.

THE WITNESS: What was that?

THE COURT: Go ahead.

You may follow up, Mr. Olson.

BY MR. OLSON: (continuing)

Q. If you would just read the first few lines there to yourself.

A. (Complies.)

So I'm seeing this today, and that was a few years ago. The impression of us picking up Madelynn, we already -- like, we've made money with her before, so that was already something where we knew -- we knew that making money with her with commercial sex was a thing because of when we met her before. So now, as I remember these things and years go by and I try to unblock those memories, like, that may not be a hundred percent accurate, but now, moving years on today, I'm telling the truth.

Q. But nevertheless, this refreshes your recollection that you did tell Detective Lee that going down there was strictly about $100 of cocaine, correct?

A. Yes.

MR. OLSON: Thank you. You can take that down.
BY MR. OLSON: (continuing)
Q. And then you've said that you planned to meet in Eugene, and you had no idea that she was going to have Stephanie with her, correct?
A. Yes.
Q. And you'd never met Stephanie before, correct?
A. Yes.
Q. Did you notice that Stephanie had a tattoo?
A. Yes.
Q. And then when they -- when you meet together, when you meet, Maddie asks if she and Stephanie can get a ride to Portland -- or Vancouver, correct?
A. Can you repeat that?
Q. When you meet, Maddie asks you if they can get a ride to Portland or Vancouver, correct?
A. Yes.
Q. So it hadn't necessarily been arranged with them that in fact they were going to ride with you back to Portland or Vancouver, correct?
A. Repeat that.
Q. It hadn't previously been arranged with them that you would actually be riding -- driving them back to the Portland metropolitan area, correct?
A. Correct, yes.

Q. So and then the car that they arrived in drove off, correct?
A. Yes.
Q. And when they asked if they could take a ride, you asked Mr. Jackson if that would be okay, and he said that's okay, he doesn't care, correct?
A. Yes.
Q. Do you recall asking the girls why they wanted to go to Portland?
A. Yes.
Q. And what did they say?
A. That they wanted to come down and party.
Q. Didn't they say that they wanted to see their boyfriends?
A. I don't know.
Q. Would it be helpful to refresh your recollection with a transcript of the interview?
A. Yes.
MR. OLSON: Would you pull up 111T, page 25.
BY MR. OLSON: (continuing)
Q. Take a look at that bottom paragraph there.
Does that refresh your recollection as to what you told Detective Lee?
A. Yes.
Q. Did you tell Detective Lee that they said they wanted to see their boyfriends?

A. Yes.
Q. And does that actually -- is that what your memory is today, now that you've read that? Do you recall that?
A. Yes.
Q. Okay. And on the ride up, do you recall that Mr. Jackson was singing and rapping and that sort of thing?
A. Yes.
Q. And did you notice the girls were on their phones and calling people and texting and so forth?
A. Yes.
Q. And somewhere along the way, you strike up a conversation about going to the so-called bachelor pad in Hazel Dell, correct?
A. Yes.
Q. And first you stop at Buffalo Wild Wings?
A. Yes.
Q. You had a meal at Buffalo Wild Wings?
A. No.
Q. And then you go to the Hazel Dell bachelor pad after that, correct?
A. Yes.
Q. And partying ensues, correct? You party?
A. Yes.
Q. So at this point you're at this party house. Now you're in Vancouver, Washington, correct?

A. Yes.
Q. And before you arrived in -- thinking about -- I know it's been a number of years and it's been a couple of years since you spoke with Detective Lee, but thinking about it now, isn't it true that really there was no thought about trafficking these girls until after you had arrived in the state of Washington, in Vancouver? Isn't that correct?
A. Can you repeat that, please?
Q. Isn't it true that you -- you yourself didn't really intend to traffic these girls until you had arrived in Washington?
A. No.
Q. No, you did not?
A. No.
Q. Okay. And it really was after you arrived in Washington, when you were at this bachelor pad, that you guys thought about it, correct?
A. Can you repeat that?
Q. It was not until you arrived in Washington at the bachelor pad that the thought occurred to you to do that, correct?
A. I don't know.
Q. Would it assist in refreshing your recollection to look at --
MR. OLSON: Actually, this time would you pull up Exhibit 130, page 7.

BY MR. OLSON: (continuing)
Q. All right. If you'd look at the bottom paragraph there and read that to yourself. And can you go to the next page.
Having looked at that, does that refresh your recollection as to when you had the thought process or the thought to traffic these girls?
A. Yes.
Q. And so when was that? Was it when you were at the Hazel Dell house?
A. On our way from -- from picking them up.
MR. OLSON: Okay. You can take that down, please.
BY MR. OLSON: (continuing)
Q. Okay. So when you go to the farm property the first time in Battle Ground for this so-called barbecue -- which wasn't really a barbecue, correct?
A. Yes.
Q. At that time there wasn't really a clear plan to traffic these girls, correct?
A. Yes.
Q. That's true that there was not a clear plan?
A. Oh, I don't know.
Q. Well, let me ask it this way. You used the phrase, "Let's get some money." Isn't it true that that phrase, "Let's get some money," doesn't necessarily mean commercial -- having sex with somebody, correct?

A. Correct.
Q. It could mean sweet-talking a guy?
A. Correct.
Q. It could mean just spending time with him, a person?
A. Correct.
Q. Spending time so that they pay you some money for that attention, correct?
A. Yes.
Q. And it was your understanding that there were a bunch of rich guys there?
A. Yes.
Q. And it's true, isn't it, that when you went to this farm property, that's what you were thinking, we're not necessarily going to have sex, we can sweet-talk these old guys and try to get them to give us money?
A. Yes.
Q. Okay. And, in fact, you yourself got a hundred dollars from somebody for just talking with them, correct?
A. Yes.
Q. And so -- and that's what you were conveying to both Madelynn and Stephanie, correct, that that was the plan?
A. Yes.
Q. And by no means were Madelynn or Stephanie themselves tricked or duped into what was going on, correct?
A. Can you repeat that?

Q. By no means were you intending to dupe or trick Madelynn or Stephanie as far as what was happening, correct?
A. I don't know.
Q. You didn't specifically tell them they had to have sex with people, you just told them try to get money out of people by sweet-talking them, that sort of thing, correct?
A. Yes.
Q. So it didn't go so well, you didn't get the right vibes the first time, and you went back to the bachelor pad, correct?
A. Yes.
Q. And then partied some more, and then went back to the farm property, correct?
A. Yes.
Q. And then was there a drum set at this farm, at this barn?
A. Yes.
Q. At times was Mr. Jackson using the drum set?
A. Yes.
Q. Yes? Okay.
So he was also socializing with the guys?
A. Yes.
Q. When Madelynn left for the first time with that guy you talked about, her mood was good at that time, correct?
A. Repeat that, please.
Q. When Madelynn -- were you aware that the first time when she drove off with that man, were you aware of the fact she

drove off with that man the first time?
A. Yes.
Q. And would you say that she was in a good mood at that time?
A. I don't know.
Q. Okay. And then she comes back with the guy, and you kind of described about that. And as I understand it, you were primarily concerned about her safety, correct?
A. Yes.
Q. In other words, that this guy that she rode off with might cause some harm to her, correct?
A. Yes.
Q. And that was part of the reason why you were feeling panicky, in the sense of loss of control; is that fair to say?
A. Yes.
Q. So you were asking her about money, but that's not what you were really freaking out about, correct?
A. Yes.
Q. Were you conscious at the time that you were putting some sort of pressure or coercion on these girls to talk to these guys?
A. Yes.
Q. You did feel that way at the time?
A. Yes.
Q. But again, it wasn't necessarily to have sex?

A. Can you repeat that?
Q. The pressure that you were putting on them, you weren't necessarily telling them that they had to actually have sex with people. The pressure was to get money, correct?
A. Yes.
Q. However that might happen.
And Mr. Jackson didn't direct anyone to actually have sex, correct?
A. I don't know. This happened a long time ago.
Q. You never saw Mr. Jackson intimidate anybody with a firearm, did you?
A. Can you repeat that?
Q. You didn't see Mr. Jackson intimidate anybody with a firearm, did you?
A. Yes.
Q. At the farm property?
A. Yes.
Q. Why don't you tell us about that.
A. During the time we were at the farm, he had a gun on his waist, and he just kept, like, readjusting it the whole time and, like, pointing it places.
During that time I wasn't focused on looking at him. I was focusing on what was going on with these females and these tricks. So a lot of the memory that I have from that, it's -- it's very, like, here and there.

Q. Okay. So -- well, another big difference that you've talked about here today is you've admitted -- you've testified that you did, in fact, slap Stephanie at some point?
A. Yes.
Q. All right. So -- and you realize that when you spoke with Detective Lee early on, you specifically denied that, correct?
A. Yes. I felt really ashamed about that.
Q. Now, but -- well, I assume you felt ashamed about a lot of things when you talked to Detective Lee, correct?
A. Yes.
Q. I mean, there were a lot of things that you were pouring out that you weren't very proud of, correct?
A. Yes.
Q. So saying today that you slapped this girl, you're attempting to bring your testimony in alignment with other testimony in this case, aren't you?
A. I don't know a lot of the stuff from then and now. Like I've mentioned multiple times today, the memories, they resurface.
Q. As far as you know, Stephanie Franz had just one interaction with one person, correct?
A. Yes.
Q. And how much money did she get from that person?
A. I believe around, like, $200 or so.
Q. She didn't tell you anything about that experience,

correct?
A. I don't remember.
Q. She didn't say that she actually had sex with the guy?
MS. CADOTTE: Objection. Hearsay.
THE COURT: Your response?
MR. OLSON: I'll strike the question, Your Honor. Thank you.
BY MR. OLSON: (continuing)
Q. As far as you know, she may have been just talking to that guy, correct?
A. Yes.
Q. And you didn't -- you didn't ask her about it. You didn't ask her what happened with that person?
A. No.
Q. I think, as you've said, perhaps your attention was mainly on what was going on with Madelynn at the time?
A. Yes.
Q. Because you were concerned for Madelynn's welfare?
A. Yes.
Q. Now, you talked about your memory and how it's kind of splotchy, which is kind of understandable. You were using a lot of drugs at the time.
And by the way, Mr. Jackson was using a lot of drugs at the time, too, correct?
A. Yes. Not as much.

Q. Would you say that he also was addicted to cocaine?
A. Yes.
Q. He was using it on a daily basis?
A. No.
Q. He was using cocaine and weed, marijuana?
A. Can you repeat that question or rephrase it?
Q. Was he also smoking marijuana --
A. Yes.
Q. -- at the time?
So both marijuana and weed -- excuse me, both marijuana and coke were part of the drugs that he was using on a regular basis, correct?
A. Regular basis, yes.
Q. So with regard to your memory and how things kind of come and go, if I'm stating that correctly, let me ask you this question. Is it possible that Mr. Jackson did not, in fact, go with you to the Lombard house, to go with you and Ms. Franz to the Lombard house?
A. Yes, he went.
Q. That's your memory, but is it possible that your memory is not correct?
A. No.
Q. Because you yourself had gone to the Lombard house many times, correct?
A. Yes.

Q. With many different people, correct?
A. Yes.
Q. Now, I think you said in your direct examination that after Keonte -- excuse me, after you met Keonte -- and you met Mr. Jackson after you met Keonte, correct?
A. Yes.
Q. Mr. Jackson was not Keonte's friend at the time that you met Keonte, correct?
A. No, he was. He was his big homie.
Q. I think you testified that you all were together pretty much every day?
A. Yes.
Q. But there were blocks of time where you were not around, correct?
A. Yes.
Q. So, like, there were blocks of time where you and Mr. Scott split up, correct?
A. Yes.
Q. So those would be times where you were not all together, correct?
A. Yes.
Q. So the Lombard house, you've testified today that you went into the house with Stephanie, and then you left while she was seeing the first guy. Was that your testimony today?
A. Could you repeat that?

Q. Yes. I think you testified in your direct examination she saw two guys in the Lombard house, according to your testimony, correct, Stephanie Franz?
A. Yes.
Q. And when she saw the first guy, you were in the house, correct?
A. Yes.
Q. Are you saying today you left the house before she saw the second guy?
A. Yes.
Q. Didn't you say before that you stayed in the house for both -- as she was seeing both guys?
A. I don't remember. I don't know.
Q. Do you remember telling Detective Lee that you remained in the house while she saw both people?
A. I don't know. It's a possibility.
Q. Would it be helpful to see the transcript of your interview to refresh your recollection?
A. Yes, yes.
MR. OLSON: Would you pull up 111T, page 34. Just highlight these two paragraphs.
BY MR. OLSON: (continuing)
Q. Just read that to yourself.
A. (Complies.)
Q. It's really the beginning of the second paragraph that I'm

focusing on.

Does that refresh your recollection as to what you told Detective Lee as to whether you were still in the house during the second date?

A. Yes.

Q. Okay. And does it refresh your recollection as to what actually happened?

A. Can you repeat that?

Q. Let's take it this way. Did you tell Detective Lee that you were still in the house during Stephanie's second date in the Lombard house?

A. Yes.

Q. And then having read this, does it refresh your recollection as to whether that's actually true or not?

A. Yes.

Q. And so what's your memory now?

A. So now remembering this, after she saw one gentleman, I remember going back to the car, and Johnl was with me in the car with Stephanie.

Q. So when you told this to Detective Lee, that was not accurate, correct?

A. Yes.

Q. Well, when Stephanie did come out of the house eventually, were her clothes disheveled at all?

A. I don't know.

Q. Did it look like she had her pants or skirt only partly on or something like that?
A. I don't know.
Q. Was there anything about her appearance or her demeanor that was concerning to you?
A. From the Lombard house?
Q. Yes.
A. No.
Q. And then this is where she says that she wants to wait and be picked up by a friend; is that right?
A. Yes.
Q. Did she tell you that she was going to go back into the house to wait for the friend?
A. I don't know.
Q. Because there's not a whole lot there as far as -- you left, you and Mr. Jackson left, and was she just on the sidewalk or where was she?
A. I don't know.
Q. Okay. In any event, she said she wanted a friend to pick her up, and you said that was okay, correct?
A. Yes.
Q. And you said she could do that because she was free to do as she chose, correct?
A. Could you repeat that?
Q. You let her do that because she was free to do whatever

she wanted to do, correct?
A. I don't know.
Q. Now, Carlos, do you know his last name?
A. I don't know.
Q. Okay. The guy that lives at the house upstairs.
A. Yes.
Q. Or that lived.
So how many times had you -- so as of September of 2018, how many times had you gone to that house, either yourself to prostitute or to bring other girls there?
A. Numbers of times.
Q. Like more than 15?
A. Yes.
Q. You were going there possibly as much as once a week, or is that too many?
A. Yes.
Q. Was it once a week or was it more than that?
A. More.
Q. Okay. And this Carlos person, he was a resident of that house the whole time, correct?
A. Yes.
Q. And as far as you know, had Carlos ever raped anyone?
A. No.
Q. Or sexually assaulted any of the people, yourself or anybody that you brought there?

A. No.
Q. So there was nothing -- you say today you remember that you actually left her in the house. Is that because you had no -- you didn't have any concerns for her well-being within that house, correct?
A. Can you repeat that?
Q. You say you left the house after the first date, before she went to see Mr. -- Carlos. You weren't concerned at all for her well-being, correct?
A. Correct, yes.
Q. I want to ask you some questions about this cocaine dealer. This is going back in time before Maddie left you guys, the cocaine plug.
That guy, he was your cocaine plug as well, correct? Did you not buy cocaine directly from him yourself?
A. I don't know. It's a possibility.
Q. So this time when you're talking about when you all went over there with Stephanie and Maddie to reup, your testimony is that you saw Mr. Jackson in the kitchen with a guy getting some cocaine, correct?
A. Yes.
Q. And that somewhere along the way, Maddie just walked into this bedroom with this guy, correct?
A. Yes.
Q. But there was nothing that you said to her that caused her

to do that, correct?
A. I don't know. It's a possibility.
Q. It's a possibility that you did?
A. Can you repeat the question?
Q. Did you tell Maddie to have sex with that guy?
A. I don't know. It's a possibility. This was so long ago.
Q. Is it also possible that Maddie just did that on her own without direction from either yourself or Mr. Jackson?
A. I don't know.
Q. What did you know about Stephanie Franz's age?
A. That she looked young.
Q. Did she ever tell you her age?
A. No.
Q. And you never asked her?
A. I don't know.
Q. What about Madelynn Taylor? Did she tell you her age?
A. No.
Q. Going back in time, when you first started posting websites for yourself or ads for yourself, you learned how to do that from Keonte, correct?
A. Can you repeat that?
Q. When you were first doing -- posting prostitution ads on websites, did you learn how to do that from Keonte Scott, correct?
A. No.

Q. Do you remember telling Detective Lee that you had?
A. Yes. And now, looking back at it, Keonte didn't know how to do it. He had Johnl do it, which that's how I got connected with Johnl, because Johnl knew how to do it.
Q. You say looking back on it now?
A. Years gone by, yeah.
Q. Okay. So isn't it true, ma'am, that when you say looking back at it now, you're saying that because you've read Keonte Scott's interviews. Isn't that right?
A. No.
Q. So just this memory has just now come to you?
A. Yes.
Q. So I want to ask you some questions about how things transitioned after Mr. Keonte Scott was arrested. There was a period of time -- and I didn't mean to ask you about it, but since you talked about it, he was arrested and then how long after that was it that you had this procedure where you lost your baby?
A. From my memory, not very long at all.
Q. And then there was this period of recovery that you went through?
A. Yes.
Q. Recovering from the surgery?
A. Yes.
Q. How long was that?

A. Over a month.
Q. And you say that Mr. Jackson assisted you during that process?
A. Yes.
Q. And I think you said in your direct examination that you felt like you owed him something?
A. Yes.
Q. He didn't say, Diana, now that I've done this for you, I want you to start prostituting for me. He didn't say that, did he?
A. Can you repeat that?
Q. He didn't demand that you now become his pimp once he had assisted you in recovering from the surgery?
A. I'm sorry, can you rephrase that question?
Q. Well, let me just ask it this way. In your direct examination, you said that after he -- after he assisted you in recovering from that surgery, you felt that you -- you felt that you owed him something. What did you mean by that?
A. So during that time in my life when I was homeless, had nowhere to go, was recovering from that, and was still heavily addicted to substances and living in that lifestyle for so long, it was expected of me at that point with how long I've been around them.
Q. Well, expected, but Mr. Jackson didn't say, okay, now I need you to start making some money for me, did he? He didn't

say that?
A. Yes.
Q. He did say that?
A. Can you repeat that?
Q. I'll just move on.
But at some point you recover, and you start engaging in prostitution activities again, correct? And by "recover," I mean recover from your surgery.
A. Yes.
Q. And you were posting ads, correct, for yourself?
A. Yes.
Q. You were soliciting customers?
A. Yes.
Q. And you were also going on Instagram to solicit other girls to be involved with you, correct?
A. Yes.
Q. And again, that was in 2018, correct?
A. Yes.
Q. And so you were making money from that, and you were keeping that money, correct?
A. No.
Q. Are you saying that you were giving all that money to Mr. Jackson?
A. Most of the money went to him, and most of the money would either go to clothes, the car, gas, or food or a place to live.

Q. So when you say a car, you did have a nice car, correct?
A. Yes.
Q. What sort of car did you have in 2018?
A. I believe a 2013 or '14 Dodge Avenger.
Q. 2013 or '14 Dodge Avenger?
A. Yes.
Q. And you were making payments on that car?
A. Yes.
Q. And you were making substantial payments on that car, correct, in order to own it outright?
A. Yes.
Q. Did you pay off that car?
A. No.
Q. Did you come close to paying off that car?
A. Yes.
Q. And when was that?
A. I don't know. I don't remember.
Q. So you were making thousand dollar payments per month or so on that car or what?
A. I don't know.
Can I say something?
THE COURT: Just wait for a question, ma'am.
Go ahead.
MR. OLSON: Thank you, Your Honor.

BY MR. OLSON: (continuing)
Q. Mr. Jackson was a bit of gambler, too, wasn't he, in addition to addiction, drug addiction?
A. Yes.
Q. Would you say he was addicted to gambling?
A. Yes.
Q. Would you say that you guys kind of struck up a friendship during this period where he was taking care of you, and did you develop a friendship?
A. Yes.
Q. And it was kind of a friends with benefits sort of thing?
A. Yes.
Q. You were having relations, sexual relations with him?
A. Yes.
Q. Did you feel at all emotional attachment to him?
A. I felt dependent on him, yes.
Q. Did it seem as though he was feeling dependent on you emotionally?
A. No.
Q. He liked to spend time with you, though, correct?
A. I don't know.
Q. You don't know.
Now, this episode with Maddie Taylor and Stephanie Franz, this was really the first time the two of you had done anything together, correct, where you had gone to pick up some

girls and bring them back. That was the first time you had done anything like that, correct?
A. I don't know.
Q. When Keonte Scott went to jail, where did Mr. Jackson live?
A. He had multiple places to stay.
Q. And --
A. But significantly he stayed with the mother of his children and trap houses.
Q. And the mother of his children, her name would be Bree; is that correct?
A. Yes.
MR. OLSON: Nothing further, Your Honor.
THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. CADOTTE:
Q. Ms. Petrovic, to be clear, was it you or your attorney that requested that a Bosnian attorney be on standby?
A. Me.
Q. You requested that?
A. Yes.
Q. The questions that Mr. Olson was asking you, were they confusing to you?
A. Yes.

Q. Was the timeline confusing to you?
A. Yes.
Q. Are you confident that you understood all of his questions?
A. Yes.
Q. Do you know what confident means?
A. Yes.
Q. Can you tell me?
A. Confidence, it means to feel comfortable about yourself or what you're thinking of.
Q. Okay. So you're comfortable that you understood all of Mr. Olson's questions?
MR. OLSON: Asked and answered, Your Honor.
THE COURT: Overruled.
Go ahead.
BY MS. CADOTTE: (continuing)
Q. You are you very tired right now?
A. I am very anxious and I have a lot of nerves right now.
Q. Is it hard for you to focus --
A. Yes.
Q. -- on questions?
A. Yes, yes, yes.
Q. Mr. Olson asked you if you were trying to match up your testimony to other testimony. Do you remember him asking that question?

A. I don't know.
Q. Okay. Have you been in the courtroom at all for anyone else's testimony?
A. No.
Q. Do you have any idea what anyone else has said in court?
A. No.
Q. And has the government given you reports to review for your testimony?
A. No.
Q. Has the government played any recordings for you to listen to for your testimony?
A. No.
Q. On cross, you asked if you could say something in response to something Mr. Olson was asking you about. Do you remember that?
A. Yes.
Q. Do you remember what you wanted to say?
A. No.
MS. CADOTTE: No further questions.
THE COURT: Thank you. You're excused. You may leave the witness stand.
You can start with your next witness. We'll go until 3:15 for our break.
MS. PAASO: The United States calls Detective Yonsoo Lee.

THE COURTROOM DEPUTY: Please raise your right hand.

YONSOO LEE

called as a witness in behalf of the Government, being first duly sworn, is examined and testifies as follows:

THE COURTROOM DEPUTY: You can remove your mask. Pull your chair all the way forward and state your full name and spell your last name for the record.

THE WITNESS: Good afternoon. My name is Yonsoo Lee. That's L-e-e.

DIRECT EXAMINATION

BY MS. PAASO:

Q. Detective Lee, can you please tell the jury how you're currently employed.

A. Yes, ma'am. So I'm a certified police officer in the state of Oregon. I'm currently employed by the City of Tigard as a major crimes detective. My primary duties involve investigating homicides, officer-involved shootings throughout Washington County.

I'm also a sworn federal law enforcement officer. I've been deputized as a special deputy United States marshal for the last 17 years. I've been assigned to the Federal Bureau of Investigation, FBI violent crimes squad, and my

primary duty has been to investigate human trafficking and sexual exploitation of children.

Q. So is it fair to say that you investigate crimes both as a Tigard police detective, but you also have a caseload for the FBI?

A. Yes, ma'am.

Q. And can you tell the jury about some of the training you've received.

A. Certainly. I have -- I mean, I've been to the basic police academy through the Department of Public Safety Standards and Training. That's the Oregon body that oversees training for all law enforcement officers. That was my basic training. From there, obviously, I've had probably in excess of 3,000 hours of ongoing training in a variety of different disciplines.

Q. Have you had training specific to the investigations of sex trafficking and sex crimes?

A. Yes. I received, oh, I would just say really conservatively in excess of 500 hours in that topic area. Also, yeah, both received and provided training in that area from government sources such as the Department of Justice, the FBI, as well as, like, nonprofits and nongovernmental organizations. So again for NCMEC, the National Center for Missing and Exploited Children.

I've had the opportunity to provide training in that

area both at the Department of Public Safety Standards and Training for the detective academy, as well as a variety of law enforcement partners, community groups, things like OSU and PSU, things of that nature.

Q. And you may have said this when you were discussing your assignment, but just to be clear, how many years have you been working on -- in the area of sex trafficking or sex crimes?

A. So for the last 17 years, that's been my duty with the FBI. I've been in law enforcement about 22 years, I guess, overall.

Q. And do you have experience both applying for and executing state and federal search warrants?

A. Yes, ma'am.

Q. Do you know how many you've applied for?

A. I mean, I can say easily over a hundred. I could say comfortably over 200. Hundreds.

Q. Have you been involved in the investigation of Johnl Jackson?

A. Yes, ma'am.

Q. Do you know when you became a part of that investigation?

A. So this is part of a larger, more far reaching investigation into human trafficking and child sexual exploitation, so the overall investigation started, I believe, in, like, May of 2018.

Q. And what's your role in the investigations?

A. I am the primary case agent, so the lead investigator.
Q. As the lead investigator, what are some of your responsibilities?
A. To put it most basically, it's to coordinate work flow, kind of direct the course of the investigations.
Q. I want to talk a little bit about the timeline of this investigation. Back in 2018, were you investigating Keonte Scott and Diana Petrovic for sex trafficking?
A. Yes, ma'am.
Q. And in the course of that investigation, did you identify a minor victim from Eugene, Oregon?
A. Yes.
Q. Who was that?
A. Madelynn Taylor.
Q. Was she interviewed?
A. Yes.
Q. Do you remember when that occurred?
A. I believe that was in February of 2019, February 8th.
Q. Do you know where that interview took place?
A. Yes, ma'am. That was at the Lane County Juvenile Department.
Q. Did Madelynn go to the police and self-report that she had been trafficked?
A. No, she did not.
Q. Does that surprise you?

A. Not at all.
Q. Why not?
A. Just because of a lot of the pressures and stigmas attached to this particular violation. In any violent crime overall, it's exceedingly rare for minors particularly to be the ones to pick up the phone, you know, and reach out to law enforcement. Even when there's incidental contact, a lot of times -- it's almost never that you're going to have a minor actually self-report as a trafficking victim. Even in the rare instances where they do report, it will come in the form of something else. So they know something bad has happened to them, but sex trafficking really isn't something that's usually typically in their vocabulary, so they'll come up with something else.
Q. And if you remember, was Madelynn 15 years old at the time of her interview?
A. That is my recollection, yes.
Q. And in that interview, that first interview with her, would you expect that you would get all the information that you would need relevant to your case?
A. No, certainly not. Really you're trying to drink water through a fire hose, right? So you're trying to get this victim or whoever you're interviewing to convey to you what represents, you know, days, sometimes weeks, sometimes years of lived experiences to you in the span of, you know, what could

amount to an hour-long interview. And so usually information comes out, you know, is developed over a span of several different interviews, depending on the incident. If you're talking about a theft case, something gets stolen, yes, you can do it in an hour, but you're talking about a very short period of information they're trying to relate.

Q. And I think I asked you that specific to this interview, but would you say that's true also with interviews of other witnesses and crimes and other people that are involved, not just victims?

A. Yes. Yeah, that's true of anybody that you're interviewing. I mean, the very definition of interview is to try to expand your knowledge base over time, right? So the longer you talk to somebody, the more information you're going to get.

Q. And is that particularly true if you're talking to someone about a sexual assault or intimate sexual details?

A. Yes, ma'am.

Q. And how do you -- what's the role of developing rapport? Can you tell me a little bit about that in terms of approaching something like this?

A. In these sensitive investigations, rapport is one of the most critical aspects of that interview process, because if you don't have it, you're not going to get very far. People who have experienced these types of traumatic incidents are only

going to give you the best information when they feel comfortable or secure where they are, and so it could take a long time to develop that rapport. If you lose it or if it's gone, you may never get it back again.

So it's -- I guess a real good example is I've had times where I'll have intermittent contact with a minor multiple times over the span of, you know, a year or month, and I may have had contact with them, you know, on prior occasions where they haven't told me anything, and then a year later they just spontaneously be like -- I've literally had them say, "I'm ready to talk to you now. I trust you now. I'll talk to you now." You're, like, right place, right time, when nothing from my end that seemed to have changed, but they're just at that place where they're ready.

THE COURT: Thank you. We'll take our afternoon break at this time.

THE COURTROOM DEPUTY: Please rise for the jury.

(A recess is then taken.)

(Open court; the jury is present.)

BY MS. PAASO: (continuing)

Q. Detective Lee, I think we left off talking about your interview with Madelynn Taylor. Can you tell me, when you were talking to her, who all was there with you.

A. My recollection was it was myself and a victim specialist, and I believe her juvenile counselor may or may not have been

present for portions.
Q. Okay. And how would you describe her demeanor during this interview?
A. It was similar to how we saw her. She was -- kind of had a flat affect. When she gets nervous, she tends to giggle.
Q. Was she in the course -- well, first, does it surprise you that someone would have a flat affect in describing these kind of events?
A. No, no, not at all.
Q. Why is that?
A. A lot of times there's a certain level of connect disassociation, so when they're talking about, like, really traumatic experiences -- I mean, they run the gamut. Sometimes -- you know, victims are very individualized, so they react very differently, first and foremost. So some you'll have a lot of emotion, like almost, you know, overwhelming, amount of emotion that's expressed, and at other times it's a very flat affect or they're almost speaking of it in terms of very clinically or from a third-party perspective.
Q. Was she able to provide information about other suspects and locations, witnesses?
A. Yes, ma'am.
Q. And did that change your investigation in any way?
A. Yes, it did. Based on that information, obviously, it kind of broadened the scope of -- well, everything. The time

period involved, the number of people involved, the number of locations involved.
Q. And remind me. I know you said this investigation started with Keonte Scott and Diana Petrovic. When -- do you remember when Keonte Scott was arrested?
A. He was arrested May 13th.
Q. Of 2018?
A. Yes, ma'am.
Q. And he's been in custody since then, correct?
A. Yes.
Q. So any trafficking that occurred after that date involving Madelynn, he wasn't directly in person involved in?
A. That's correct.
Q. So I'm going to pull up a timeline of the investigation to help keep track of some of these dates. And have you had an opportunity to review the timeline that I'm referring to?
A. Yes, ma'am.
Q. And does it include information obtained in the course of your investigations?
A. It does.
Q. Do you think it would be helpful to the jury as you describe the course of your investigation?
A. Most definitely.
MS. PAASO: Your Honor, I move to admit and publish Exhibit 1.

THE COURT: Any objection?

MR. OLSON: No objection.

THE COURT: Received.

BY MS. PAASO: (continuing)

Q. So at this point in the investigation, had you developed other suspects related to Keonte Scott?

A. Yes.

Q. And who were some of the other suspects that you developed that are relevant to our case today?

A. So a number of them came up, but for purposes of today, a subject that was using the street moniker of Nelly the Man or Nelly, as well as ongoing activity by Diana Petrovic.

THE COURTROOM DEPUTY: The jury can't see this.

(There is a pause in the proceedings.)

BY MS. PAASO: (continuing)

Q. Detective Lee, in February of 2019, did you know who the suspect who was called Nelly the Man was?

A. No, ma'am.

Q. And --

A. Not, like, a hard ID. No, we just had the street moniker.

Q. And when you say street moniker --

A. Street name, nickname.

Q. Okay. And in that interview with Madelynn, did she identify another victim from Eugene?

A. Yes, ma'am.

Q. Who was that?
A. Stephanie Cheyenne Franz.
Q. And when she identified Stephanie, did you reach out to her immediately?
A. No.
Q. Why not?
A. So in these types of cases, really the interviews are driven by the victims. Again, just like I said, it's when the victims are ready to talk. If you approach one too quickly or in the wrong situation, you run the risk of alienating them or creating a bad rapport that you can never recover from.
So in this particular instance, I'd reviewed some reports in the course of my investigation, and in terms of trying to figure out where she was, who she was, what her current situation was, that led me to believe that she wasn't in a good place where she would be receptive to law enforcement contact. And that's part of the reason.
And then the other is, again as I explained, there's a lot going on with this case during that time period. And so you're prioritizing and -- yeah.
Q. So did you follow up on some of the information that Madelynn gave you during that interview, though?
A. Yes, ma'am.
Q. Did you request and receive a search warrant for Diana Petrovic's cell phone records and phone records?

A. Yes, ma'am.
Q. And do you remember what provider she was using?
A. My recollection is that it was T-Mobile and Metro PCS. Now these two companies are one now.
Q. And in order to obtain those records, did you have to contact T-Mobile in Parsippany, New Jersey?
A. Yes, ma'am.
Q. And is T-Mobile a company that operates throughout the country with transmission towers, stores, business offices outside of Oregon?
A. Yes.
Q. And why would you want to obtain Ms. Petrovic's phone records?
A. So the phone records themselves could provide some insight as to communications with customers, with victims, with co-conspirators. Additionally, in many instances we're able to obtain from the cell service provider call detail records with cell site information or geolocation information, which will allow us some insight as to the whereabouts or the geolocation of the handset during the period that is represented in the records.
Q. We'll return to that geolocation information in a little bit, but let's talk about some of the other people that you talked to after Madelynn.
Did you interview Bob Freund?

A. Yes, ma'am.
Q. Do you remember when that interview took place?
A. It was, I believe, April 2nd of 2019.
Q. And did he provide information that helped identify locations and witnesses?
A. Yes, he did.
Q. And what locations in particular?
A. In particular, he helped me locate the pole barn, what we've been referring to as, like, the barn or the farm property, which is really the auto shop owned by Kenneth Sprowls.
Q. And in the course of -- between your conversations with Madelynn and Mr. Freund, did it help you get a better sense also of the timeline?
A. Yes, ma'am.
Q. And can you please turn to page 2.
So after talking to Bob Freund, I note on the timeline that the pole barn location was identified. Did Mr. Freund give you names of other people that had been at the shop that night that he took the victim back to his house?
A. Yes, he did.
Q. And did you interview some of those people?
A. Yes, ma'am.
Q. Do you remember who among them that you were able to interview?

A. I've been able to, through the course of this investigation, I've interviewed Kenneth Sprowls, his brother Ronnie Sprowls, who we've kind of been referring to as brother Ronnie, in contrast to Ronald Harris, or Ronnie Harris, who I think they called Big Ronnie. Matthew West, Billy Wilcox, David Morgavi.

Q. And were there some people that had either been at the shop or in other aspects of the investigations that you have not yet located or interviewed?

A. Yes, ma'am.

Q. Who are some of those people?

A. So, for example, we have not been able to contact and interview Ron Harris or Big Ronnie. We've talked to some of the others, and supposedly he had left the state to work on an oil rig somewhere or something along those lines. You know, we've developed some additional information that says he might be back in the area, but we haven't been able to locate and interview him.

There's been some mention of Jessica Jones, but unfortunately there's no further information on that, and it's a very common name, unfortunately.

Q. And have you been able to interview Joe Rottman?

A. No.

Q. Okay. So at the end of May 2019, at that point were you able to positively identify the person who was going by Nelly

the Man?
A. Yes, ma'am.
Q. And who is Nelly the Man?
A. Johnl Jackson.
Q. Do you know his date of birth by chance?
A. Mr. Jackson's date of birth is 9-30 of '87.
Q. So in the period that we're talking about, in terms of the offense, in September of 2018, he would be 30, almost 31 years old?
A. Yes, ma'am.
Q. And I know there's been some reference to a time when Mr. Jackson was, I think, at Inverness with Keonte Scott. I just want to ask you generally, when people are booked into any kind of corrections facility, do law enforcement make notes of tattoos?
A. Yes, ma'am.
Q. Okay. And were you able to obtain that information related to Mr. Jackson?
A. Yes, ma'am.
Q. And what tattoos are indicated in those records?
MR. OLSON: Excuse me, Your Honor. I haven't seen these records. I'd like to see them, please.
THE COURT: Do you have them? Are you asking for a pause right now?
MR. OLSON: Yes, please.

MS. PAASO: If I may, they're -- I believe they're in Volume -- either 1 or 2, and I can -- if counsel wants a minute, I can grab it.

THE COURT: Has that been produced already?

MR. OLSON: Yes.

THE COURT: You have your own Volume 1 and 2?

MR. OLSON: I can get it. Can I just see it to see if I should make a hearsay objection here?

THE COURT: Yes.

MR. OLSON: This isn't an exhibit, so I just --

THE COURT: Why don't you two confer off the record briefly.

(There is a pause in the proceedings.)

MR. OLSON: No objection.

THE COURT: Thank you.

BY MS. PAASO: (continuing)

Q. So the records did indicate that there were tattoos?

A. Yes, ma'am.

Q. And did they indicate the location?

A. They did.

Q. And what were those locations?

A. Tattoo abdomen, tattoo back, tattoo chest, tattoo left ear, tattoo left hand --

THE COURT: Could you slow down a little bit. Slow down.

THE WITNESS: Yes, Your Honor. So I'll start over again. Tattoo abdomen, tattoo back, tattoo chest, tattoo left ear, tattoo left hand, tattoo left shoulder, tattoo right hand, tattoo right shoulder.

BY MS. PAASO: (continuing)

Q. And just to be clear, in the course of your investigation, you determined that the defendant Mr. Jackson had used the name Nelly the Man?

A. Yes, ma'am.

Q. Okay. Around the same time period that you were able to identify the defendant, Diana Petrovic was arrested, correct?

A. Yes. I believe June.

MS. PAASO: Go to page 3 of Exhibit 1.

BY MS. PAASO: (continuing)

Q. And so at this point you had the phone records to analyze, as well as additional witnesses to interview?

A. Yes.

Q. And when did you interview Stephanie Franz?

A. Stephanie Franz was interviewed on October 2nd.

Q. Of 2019?

A. Yes, ma'am.

Q. Do you remember the location of that interview?

A. Yes. She had agreed to meet with us at a McDonald's in Eugene, Oregon.

Q. And who all was there for the interview?

A. It was myself, my partner, Detective Angela Hollan with the Portland Police Bureau, and I believe her mom brought her but agreed to wait for us in the restaurant.

Q. What can you tell me about Stephanie's demeanor for that interview?

A. Again, like we were discussing, they have different ways of presenting. And in Stephanie's case, she was much more animated. Her -- like the initial interview, initial portion of the interview, when I say what happened, it kind of comes out in a tumble of words, like, not even in any response to specific questioning, but she kind of gives this free-flowing narrative that dumps out a lot of info, and then you can go back and start framing a structured interview.

Q. So -- and I think you answered this, but was she -- at that point in that interview at McDonald's the first time you saw her, was she able to provide an organized chronology of what happened a year earlier?

A. No.

Q. And did that surprise you at all?

A. No, not at all. So typically what I do in these types of investigations, as far as my interview, it's not so this type of case, it's any investigation I'm conducting, I'll typically -- so people have a difficult time giving dates or specific times as to when things happened, especially if they happen more than just a couple days ago. So what I'll

typically do is do a very brief, like, structured -- where we throw out a baseline of certain marker events that happen so that we can speak in terms of, like, chronology, did it happen before or after that. And people are much better at being able to do that. So sometimes as we do that, you kind of are throwing out, like, the most base, like -- almost the emotional response type of events that happen, because those are the ones that are most memorable, and you kind of peg these out and then from there you can kind of fill in details, in terms of, you know, did this happen before, did this happen after.

Q. And when you first met with Stephanie and were talking with her, at that point in time did you ask for her to hand over whatever phone she had to you?

A. I didn't.

Q. Okay. And why wouldn't you?

A. So typically when it comes to victims, when we're reviewing cell phone records, a lot of times we're gaining those for suspects through a compelled method, whether it be a search warrant or whatever. With victims, they'll tell us the information that they want. So we're not having to compel it out of them, and in terms of -- so that's my basic reason.

Q. Do you ever ask for information like social media passwords and accounts and that kind of thing?

A. Yeah, I certainly do. And I do that for a variety of reasons, but a good example would be I'll ask for that info,

and I have no intention of even seeking it out because I know what the retention periods are, so it may be beyond the retention period or certain types of information aren't available from the service providers because, believe it or not, not every service provider wants to be responsive to our requests, so -- but it's a good means of kind of gauging the veracity of people's statements, are they willing to give it to me. So the fact that a person is willing to give me access to that information is oftentimes as telling as what that may have been in response.
Q. In addition to interviewing Stephanie at that point, were there follow-up interviews conducted with Stephanie's mother and grandfather?
A. Yes.
Q. And did they provide records that helped determine when Stephanie returned from Portland to Eugene?
A. Yes.
Q. And do you know when Stephanie's grandfather picked her up?
A. I believe it was September 8th.
Q. Okay. And also did the information that they provided help you locate the hotel that Stephanie had been at with the defendant and Ms. Petrovic?
A. Yes.
Q. Did you obtain records from the Super 8 Portland Airport

for September 8th, 2018?
A. Yes.
MS. PAASO: Can you pull up just for him Government's Exhibit 18.
BY MS. PAASO: (continuing)
Q. I'm showing you what's been marked Government's Exhibit 18. Do you recognize that document?
A. I do.
Q. And is it something that was obtained in the course of this investigation?
A. Yes, ma'am.
Q. And is it -- was it obtained through either a search warrant or a subpoena?
A. It was. I caused the subpoena to be issued to Super 8, and they responded with this document.
MS. PAASO: And, Your Honor, I move to admit and publish.
THE COURT: Any objection?
MR. OLSON: No objection.
THE COURT: Received.
You may publish.
BY MS. PAASO: (continuing)
Q. So tell me if you need me to enlarge this because I know the print is a little bit small. Can you see who the room was registered to between September 6 and 8, 2018?

A. Yes, ma'am.
Q. Who was it registered to?
A. Diana Petrovic.
Q. Okay. And then did Stephanie also provide you with some information to help you locate what's been referred to as the Lombard house?
A. Yes, ma'am.
Q. And do you remember what information she gave you that assisted you?
A. Yes. So she provided me with some messages that had been sent to her by the man who she described as having sexually assaulted her.
Q. And did that help you figure out both the location of the Lombard house and the identity of the men at the house?
A. Yes.
Q. And did she provide the name to you of the man she reported as having sexually assaulted her?
A. Yes.
Q. And I think it's already been admitted, 13. I want to make sure we get the right text message.
MS. PAASO: Could you publish that, please. And if you scroll down to the second page.
BY MS. PAASO: (continuing)
Q. Is this the text message that Stephanie sent to you?
A. Yes.

Q. And do you -- is that the name of the individual that she said was at the house?
A. Yes.
Q. And then did you find the address for that location as well in the course of your investigation?
A. Yes.
Q. Did you eventually go to and -- you can take that down -- the Lombard house and interview some of the occupants?
A. I did. And just for a point of clarification, the Lombard house, what everybody has been calling the Lombard house is actually not located on Lombard but just off of Lombard, and I believe the actual address is 5808 Northeast 42nd, I believe.
Q. But it's in the Lombard neighborhood?
A. Yes, it's off of Lombard, and it is just as it's been described. It is -- well, the residence, I took that photo but it's located on a corner, it's located across the street from some brown apartments as been described and across the street from a park.
Q. Okay. And did you eventually go out to that house and you interviewed some of the occupants?
A. Yes.
Q. Did you learn that a Jose Gonzalez and a Carlos Canul lived at that house?
A. Yes.
Q. And had Madelynn and Stephanie both provided descriptions

of the interior of that house?
A. Yes, they had.
Q. So when you went out there, did you take a video of the house?
A. I did.
Q. And if you remember, do you remember when you took that video of the house?
A. I don't off the top of my head, but it would be embedded in the video file.
Q. But it was well over a year after these events, correct?
A. Oh, yes.
Q. So you recorded the video when you were there?
A. Yes.
Q. And you've had a chance to review it?
A. I have.
Q. And does it accurately depict the interior of the house as you viewed it?
A. Yes.

MS. PAASO: I move to admit and publish Exhibit 12.

MR. OLSON: No objection.

THE COURT: Received.

You may publish.

(Government's Exhibit No. 12, a video, is played for the jury.)

BY MS. PAASO: (continuing)
Q. And while we're watching this, I'm just going to ask you a couple questions going through.
Looks like a creche or some sort of decoration on the mantle. Looks like a crucifix on the door?
A. Yes.
Q. And is that a bedroom off the living room?
A. Yes. Behind the couch there there is a bedroom right off the living room, adjacent to the front door. That's the front door we're looking at right there.
Q. I'll let you narrate the rest of it.
A. So now we're standing with our back kind of to the front door, looking at the bedroom that's immediately to the right as you enter. So that front door just opens right into the living room, and then if you go straight back, you're going through the kitchen now. There's a small bathroom. Then you go up some very narrow steps.
And now we're on the second floor of the residence, and there's not much of a landing up there, just open to the right is a bedroom, and then straight across there is a second bedroom with a very curious dog in it, and then I believe this was a bathroom. Yes.
Again, not much to the upstairs in terms of like open space. It just immediately opens into a couple bedrooms.
Going downstairs. Now we're back in the kitchen.

And as you make your way around, there's some stairs leading down into a basement area. My recollection was it was an unfinished basement, but there were clearly people residing down there. Yeah, the lighting is not great, but there's hammocks and beds set up down there. So it was clearly for living down there.

There's one of the hammocks right there. And my recollection was there was a bed kind of behind that hot water heater. And you can kind of barely make it out there.

Q. And is the investigation into the activities that occurred at that house still ongoing?

A. Yes.

Q. So in the course of this investigation, you also interviewed Keonte Scott, correct?

A. Yes.

Q. And do you remember how many times he was interviewed?

A. Twice by me.

Q. And you had testified earlier when we were talking about your interview with Madelynn about sometimes witnesses give additional information in subsequent interviews. Is that the same with someone who is a target of an investigation or considered a codefendant?

A. No, typically not. In terms of, you know, defendants or people who have criminal liability or criminal exposure, their motives are a little bit different, and so depending on what

the motive is, typically -- I mean, what doesn't change is hopefully over time you're going to gain more information, but they may intentionally try to mislead you, you know, withhold information. It just depends on the particular motives of that person at that time.

MR. OLSON: Your Honor, I'm going to move to strike that. It seems like he's -- as a comment on the credibility of a witness.

THE COURT: Your response?

MS. PAASO: I can move along.

THE COURT: I grant the motion to strike, in the sense that one witness isn't here or allowed to provide you their opinion on the credibility of another witness. That's totally for you to decide.

Go ahead.

BY MS. PAASO: (continuing)

Q. So following these interviews with both Keonte Scott and Diana Petrovic, were you able to identify additional information and locations related to the case?

A. Yes, ma'am.

Q. And also I want to talk briefly about information you received from the Multnomah County Sheriff's Office. Did they provide a roster related to inmate housing?

A. They did.

Q. I'm going to show you what's been marked as Government's

Exhibit 22. And I know defense referenced it, but has it been admitted?

Do you recognize it?

A. I do.

Q. And was it obtained in the course of this investigation?

A. It was, yes.

MS. PAASO: I move to admit and publish this.

MR. OLSON: No objection.

THE COURT: Any objection?

MR. OLSON: No.

THE COURT: Received.

BY MS. PAASO: (continuing)

Q. Okay. So again, can you tell the jury what this is?

A. Yes, ma'am.

So what you're looking at is a dorm occupant report. So that tells you who is in a particular pod or dorm of the jail. In this case it's Dorm 4. So each dorm is kind of like a wing or a pod of the jail where inmates will be housed together. The facility MCIJ refers to Multnomah County Inverness Jail, and then the snapshot date, time kind of shows you what time frame we're looking at.

And it shows that for that particular report, it shows that Keonte Desmond Scott moved into that dorm facility on July 26, 2019, and was moved out in August 6th, 2019. And then around that same time period, Johnl Jackson was brought

into that pod on July 27, so a day later, or after Mr. Scott, and then left August 31st.
Q. And in the course of your investigation, did you also obtain some jail calls from -- or at least a jail call from the Columbia County Jail?
A. Yes, ma'am. I caused a subpoena to be issued to that agency as well, and we received jail calls.
Q. And did you receive a call from Keonte Scott to Stephanie Franz from September 30th, 2019.
A. Yes, ma'am.
Q. And so that call would have been placed after this time that both the defendant and Mr. Scott were in the same dorm at the jail?
A. Yes.
Q. In the course of this investigation, were you also able to identify the house where Mr. Jackson was alleged to have received cocaine?
A. Yes.
Q. I'm going to show you now back to Exhibit 5, page 1. And that's the East 18th location. And so that's the East 18th location, correct?
A. Yes. So it's the photo that's the adjacent to the caption box that has 61120 East 18th location identified.
Q. So by June of 2020, you'd identified the pole barn, the Lombard house, and the East 18th location, correct?

A. Yes.
Q. And were Madelynn and Stephanie shown a photo of that East 18th location in separate interviews?
A. Yes.
Q. And did they recognize that location?
A. Yes.
Q. And did they provide additional information related to their time with the defendant and Ms. Petrovic?
A. Yes.
Q. And when I say, "did they provide additional information," because now we're talking about a period in time of, you know -- in 2020, so it's well after your initial interviews with both of the victims. Did it surprise you that you hadn't heard this information previously?
A. No, not at all.
Q. Why didn't it surprise you?
A. So, as I explained --
MR. OLSON: Your Honor, I'd object again. I think this is improper rehabilitation of a witness.
THE COURT: Your response?
MS. PAASO: I'm asking about the effect on the listener in terms of the information that he received.
THE COURT: You're asking about the effect on him?
MS. PAASO: Yes. Whether he was surprised by the information, the statements that he heard.

THE COURT: I sustain the objection. The idea is that by being surprised or not surprised, it comments on whether the information was credible.

BY MS. PAASO: (continuing)

Q. So finally let's talk about -- Let's go back to the geolocation from Ms. Petrovic's phone.

When you obtained the records from T-Mobile, did it include cell tower location information?

A. Yes, it did.

MS. PAASO: And briefly -- I'm briefly going to show -- well, if you can pull up just for the witness Exhibit 23 first. I'm only nervous about pulling it up because -- okay.

BY MS. PAASO: (continuing)

Q. I know this is small, but do you recognize this?

A. I do.

Q. And is this a copy of the records you received pursuant to that warrant?

A. Yes.

MS. PAASO: Move to admit and publish.

THE COURT: Any objection?

MR. OLSON: No.

THE COURT: Received.

You may publish.

BY MS. PAASO: (continuing)

Q. And I know, again, it's really small, but Detective, can you give a broad overview of some of the information? We don't even have to go off the first page of what the jury has seen.

A. It is very small.

So I'm just going to go from memory, folks. So typically when we get these reports, like in the column to the far left, you'll get, like, the date and time. You'll get -- the mobile switch kind of gives you the area or region that we're looking at. Then it will give you some information as to what type of transaction that it is, is it a text message out, text message in. And depending on the coding, you can discern some additional information off of that, whether it was, like, mobile to mobile, you know, landline to mobile, that kind of thing.

Yeah, again, so it will tell you the mobile dialing number, so the number that's calling, the number that's receiving the call. There's typically some duration information as to how long that call was. It will tell you -- give you information about, like, the connection type, was it successfully connected, was there an error, was there something wrong with that transaction.

Q. And one of the things you mentioned before was the cell tower location information.

A. Yes.

Q. Can you explain just briefly how cell towers work.
A. Certainly. So when you pick up your phone and you dial a number, the way that the -- that transaction is completed is that your phone at any given time is in communication with multiple cell towers, and it can reach out and see where various towers are. When you make or place a call or a data transaction, something of that sort, it's going to connect the network using the strongest, cleanest signal. And by doing that, it then goes a mobile relay station and through the network and then completes the call, and the reverse on the other end.
Q. And do cell towers show a precise or exact location where the phone is?
A. No.
Q. Does it give sort of a range of information or kind of a range of location?
A. It does. So let me rewind there. There's multiple different types of information you can obtain from a cell service provider. So when we're talking about the very most basic call detail record with cell site information, really what you're getting from them is which cell tower and which antenna serviced that call. Based on that, yes, we can make some determinations as to the expected coverage area of that tower. Conversely, there are times where we are able to get additional engineering data that the phone companies keep, and

that will allow us to refine that to a much, much narrower geolocation.

Q. And in this case would you -- or did you determine that the cell records or the phone records indicated that cell towers in both Oregon and Washington were touched or contacted in the course of the dates that we're focused on?

A. Yes.

Q. And why or how are cell records helpful in the course of your investigation?

A. I think we touched on that a little bit earlier in terms of how the phone records themselves can be -- the geolocation is important because it helps us or aids us in corroborating witness statements, you know, finding locations, identifying locations that have been talked about, things of that sort.

Q. And how did you use cell records in this investigation?

A. So in this particular investigation, once I received the records, I analyzed them or processed them using a software program called ZetX. It's a commercially available program that I use to visualize geolocation or cell site information that I receive from the cell providers.

And doing that, it allows me the ability to take a look at, you know, what could be hundreds and oftentimes thousands of phone transactions and put it into a user interface that I'm able to move forward and back in time and see the power usage over the -- over a period of time.

Q. And does that program you use actually create a video that you can display to the jury?
A. It doesn't create a video, but I did do the analysis. The video is my work product, yes.
Q. So did you put together a presentation using that cell tower information that you had?
A. Yes, I did.
Q. And do you think that would assist the jury in understanding where Ms. Petrovic's phone was during the period in question?
A. Most definitely.
MS. PAASO: Move to admit and publish Government's Exhibit 24.
THE COURT: Any objection?
MR. OLSON: None.
THE COURT: Received.
BY MS. PAASO: (continuing)
Q. Detective Lee, I'm going to let you -- I think the video is about 13 minutes, so I'm going to let you narrate it as we go.
A. Is there any way that I can control the video, forward, pause it, stop it? Otherwise trying to time my narration to it will be pretty difficult.
MS. PAASO: Your Honor, permission for him to approach.

THE COURT: Yes.

(There is a pause in the proceedings.)

(Government's Exhibit No. 24, a video, is played for the jury.)

THE WITNESS: So obviously as we start out, what the program does is it allows me to output a KMZ file that can be read in Google Earth, so that's what we're looking at. Currently you're looking at an overview of the Portland metropolitan area there. You can see where Gresham is here, Lake Oswego, just the general overview of the center of Portland.

What you can also see on the map is some of these addresses that we've been referring to throughout the course of this trial. This here is the Super 8 hotel. This 5808 Northeast 42nd, this is the Lombard house that we've been talking about. 3517 East 18th Street is the one that we were just talking about, the 18th Street trap house, where they went and obtained the cocaine.

717 Northeast 77th Street I think is what we've been referring to as the Hazel Dell bachelor pad, I think it's been referred to. This Fairhaven Avenue is a residence belonging to Doneena Caster.

And then up here on the top of the map -- we haven't seen it yet, you'll see in it a second when it comes into view -- is the farm property or the shop belonging to Kenneth

Sprowls.

So the further -- I'm bringing up this bubble not because it's particularly relevant time -- relevant transaction, but just to show the time, kind of where we are in time, and it's on September 3rd, 2018, at about 9:00 in the morning. So I'm starting this timeline at about -- on that date, September 3rd.

So what this -- I'll go back here. So what this is showing here is that at -- on September 3rd, 2018, at about 4:10 p.m., Diana Petrovic's handset is being utilized, and the tower that's being used is the one located here in that Hazel Dell area, where you see -- denoted by the red pushpin there. You can see the overlay. What you're seeing on that big red blob, what that is is what we call a horizontal plane. Basically it's a representation of how energy kind of propagates away from an antenna. It's a directional antenna, so you can see that it goes in one direction with what we call side lobes, and there is some lower lobes.

And what this blob kind of represents is our expected handoff coverage. So as I explained earlier, at any given time your handset or your cell phone is in communications with multiple different cell towers, and when we -- when it makes that connection, it's using the strongest, cleanest signal, and based on real world kind of experiments, we know -- this is the coverage area we would expect that handset to come or hand over

or hand off to a cleaner, stronger signal from a nearby tower.

And again, so by 4:10 p.m., that device is -- what we're seeing in the records is consistent with Diana Petrovic's phone being at this Hazel Dell trap house.

And what you see from there is a progression as we enter the evening hours. You'll see that handset consistent with traveling south along I-5, so that by 6:11 it's down near Corvallis, Junction City. And what you're seeing is this is Petrovic's phone records, and this particular transaction is it's traveling -- the record is consistent with it traveling south on I-5. It has a call transaction with this phone number here, (541)953-0216, which records show is registered to Brian Taylor, who I know to be the father of Madelynn Taylor.

And it's just showing the progression of calls. You can kind of see how like the lobes change size depending on a variety of factors, but tower density is the greatest factor there. So, like, in rural areas you can have fewer towers and you'll see bigger coverage areas compared to when you're in urban setting typically.

So by about 6:32 p.m. on the 3rd, the records are consistent with Petrovic's phone being in the downtown Eugene area. So, again, that coverage area is -- would also include -- the estimated coverage area would include this Chevron station.

And then I'll scroll over here to show a business

structure with a mural painted on the side, which was described to me.

So as of 9:31 -- I'm sorry, I believe that was 7:31, still within the Eugene area. Soon thereafter you'll see it beginning to show transactions moving back up I-5.

So about 9:15, it's kind of in the Wilsonville area, and by 9:50, it is in the area that -- back in the area of the Hazel Dell.

You see some progression of time here. That would indicate that it remained there overnight. We're now into September 4th, in the early morning hours.

And now we're into September 4th, about 3:09 p.m. And you can see the expected coverage area is kind of in the vicinity of that 15th Street, quote, trap house or drug house where they purchased the cocaine.

And by 6:00 p.m. on the 4th, it would be consistent with the first time you see the coverage area extending over the shop or the farm property.

And then subsequent to that, you see it move back into the area of the Hazel Dell location, 7:38 p.m.

Still seems to be in that general location about 8:24, and then by about 10:53, so just shortly before 11:00 p.m., you see it back kind of in the area of the farm property or Kenneth Sprowls' property.

So now we've progressed, so to kind of situate us in

time by now, this is the morning of the 5th, and subsequent to the second trip to Mr. Sprowls' location. So this would be past the period of time where Maddie Taylor would say she has left with Rob Freund. So this is the morning following that time period, and we're looking at about 10:06 a.m. on the 5th, and we're back in the area of the Hazel Dell house. So you saw some movement there. That would be consistent with it traveling out -- I think it's Highway 500 on the Vancouver side, and then by 4:23 on the 5th, we're back at the Hazel Dell location.

So now we're looking at around noon on the 7th, and you see this expected coverage area being consistent with them being at the Lombard house, which isn't really on Lombard.

Now, again, this is the residence we've been referring to as the Lombard house, and you can scroll around and see that there is like a park or sports field on the other side of the street. And you can kind of see that that device is in that general area for quite some period of time. That was at 1:42.

So then you see the device move off and do some traveling and end up over at the Super 8 motel, or records are consistent with it being in that vicinity.

And you see it travel over to this Fairhaven location, which is that residence of Doneena Caster, where Stephanie Franz ended up. And that's as of 10:54 p.m. on the

7th.

Then you see it next move back over to the vicinity of the Super 8. And that's at about 1:30 in the morning, 1:32.

And then this is at 12:48 p.m., so in the afternoon, which is right about the same time or shortly before the cab was dispatched to pick Stephanie up.

And this is a record I obtained, again, using a subpoena to the cab company that shows the time and date of the cab that was ordered by David Snyder.

I think that is the end of that presentation.

BY MS. PAASO: (continuing)

Q. Detective Lee -- Detective Lee, in looking at this cell phone information, did Ms. Petrovic's phone connect with cell towers in both Oregon and Washington?

A. Yes.

Q. And do the records indicate that the phone crossed state lines first from Washington state, down in Oregon to Eugene, Oregon?

A. Yes.

Q. And then traveling back up north, crossing the state line into Washington, into Vancouver?

A. Yes.

Q. And then at some point later going back across the river into Oregon, where we show that it's in the area of the Lombard house?

A. Yes.

MS. PAASO: No further questions.

THE COURT: Thank you.

You may inquire.

MR. OLSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. OLSON:

Q. Agent Lee, you talked to Madelynn Taylor in February of 2019, correct?

A. Yes, sir.

Q. And you talked about not talking to -- not wanting to talk to young people when they're not ready to talk. Correct?

A. That is the best practice. So those are best practices. It's what we strive for. Of course, we live in the real world where that's not always possible, so there are times where the situation dictates when those incidents -- or these interviews take place.

Q. Well, what was it about Madelynn Taylor in February of 2019 that suggested that she was ready to talk to you?

A. We had no information to indicate she didn't. We contacted the juvenile probation officer down there, and we found out -- I think my recollection was I had called down there kind of seeking out information about her once we learned of her name, and we were told, oh, in fact, she's going to be

in the office, I think like the following day or very soon from that time period, and then talking to the unit officer or counselor, we didn't get any indication that she would not be cooperative. And so, yeah, we had the opportunity to speak with her and we took that opportunity.

Q. In fact, wasn't it a condition of her juvenile probation that she, in fact, talk to you, talk to law enforcement?

A. So I wasn't aware of that condition at the time that I interviewed her. I mean, I'm certainly aware of that now, but yeah, that wasn't part of my thought process or calculation in terms of when we interviewed her or anything like that. In fact, at the time I didn't know those conditions existed.

Q. So in this interview she identified her friend Stephanie Franz, correct?

A. Yes.

Q. And she told you about this trip that she and Stephanie took to Portland and Vancouver, correct?

A. Yes.

Q. And she also told you that Stephanie Franz told her --

MS. PAASO: Objection. Hearsay.

MR. OLSON: It's getting to the issue, Your Honor, the timing of when he spoke to Stephanie Franz. It's not being offered for the truth of the matter asserted.

THE COURT: So folks, you remember the drill. It's not for the truth of the matter asserted.

Go ahead.

BY MR. OLSON: (continuing)

Q. So Ms. Taylor told you that Stephanie Franz told her that she had been raped by ten men, correct?

A. I think so.

Q. You think so. That's in your report, correct?

A. Certainly, yeah. If it is, then that's what I documented.

Q. Okay. All right. And she said it was at some Mexican house, correct?

A. Yes.

Q. Maddie had said that Stephanie said that?

A. Yes.

Q. So at this point in time, in February 2019, you know who Stephanie Franz is, correct?

A. Yes. So we had the name Stephanie Franz, obviously, when we spoke with Maddie. Within a couple of days we figured out who she was beyond the name.

Q. Who she was and where she was, correct?

A. No. I mean, as I think was testified to earlier, during that time the girls were definitely moving around, running away. So in terms of where she was, I didn't know at that time. The Eugene area.

Q. I don't mean literally where she was situated, but you could locate an address associated with the minor named Stephanie Franz?

A. Yes. Her parents, anyway.
Q. And you did that. You located where they lived?
A. That is my recollection.
Q. But you didn't go and talk to her, correct?
A. That is correct.
Q. You didn't go and talk to her until October of 2019, correct?
A. Yes, sir.
Q. So that was, what, eight months later?
A. Yes.
Q. And why is that?
A. So as I explained earlier, I mean, obviously this is part of a much bigger investigation, so there is a lot of investigative activity going on. And I think I explained earlier, just in reviewing some of the records, I was aware that she had had some interactions with law enforcement that would indicate she was not ready or wouldn't be a good interview time.
Q. And what were the nature of those encounters with law enforcement?
MS. PAASO: Objection. Hearsay.
MR. OLSON: Your Honor, it goes -- he testified on direct that she was not ready, so I think I can inquire about that.
THE COURT: I agree. I overrule the objection.

You may answer.

THE WITNESS: So it was my understanding she had had contact with some street officers, and when -- I think it was my partner at the time, Angela Hollan, was dispatched to call and come speak with her, that she ran off before she was able to get there. And additionally there was some -- I think incident regarding, like, her phone, and her mom had asked to see her phone or something like that, and she had smashed the phone to keep her mom from getting it.

BY MR. OLSON: (continuing)

Q. Okay.

A. So that portion didn't have anything to do with law enforcement specifically, this was mom, but in any case, yeah, she wasn't receptive.

Q. But in any event, so here we are in February 2019, and you receive this report that this young girl who you knew to be 14 years old, correct --

A. Yes.

Q. -- had been raped by ten men. I mean, wouldn't you want to go investigate that?

A. Yes.

Q. And did you?

A. We did, which is why we're here today.

Q. But it took you eight months to go and talk to her about this?

A. It did.
Q. And when you finally talked to her about this in October of 2019, and in a follow-up discussion with her very shortly after that, you were able to identify who the alleged perpetrator was, correct?
A. Yes.
Q. It wasn't ten men, but she did say that one guy named Carlos Canul had raped her, correct?
A. Yes.
Q. And he's the guy who is one of the main residents of that Lombard house, correct?
A. That is my understanding, yes, sir.
Q. And Mr. Carlos Canul to this day has not been arrested or prosecuted or charged with anything relating to rape, correct?
A. As of this date, that is correct.
Q. And as of this day, you learned of all sorts of other allegations of people who have -- young girls who have been brought to that house and subjected to sex trafficking, correct?
A. Yes, sir.
Q. And when you were asked questions about -- you were asked -- eventually you went to that house to take that video of the interior of the house that we saw. When did you take that video?
A. I answered earlier, I'm not sure.

Q. It was just this last fall, wasn't it?
A. Yes.
Q. Okay. So you learn his identity in the fall of 2019, and two years passed before you even go to the residence to inquire of the residents there, correct?
A. Yes.
Q. And you didn't arrest them, obviously?
A. No.
Q. You sought permission to come into the house, correct?
A. Yes.
Q. So that you could take this video?
A. Yes.
Q. That is an exhibit in this case, correct?
A. Yes.
Q. So your priority then was taking -- getting an exhibit to charge Mr. Jackson rather than arresting this guy who is alleged to have raped a 14 year old?
A. That is not true.
Q. Okay. Do you have any evidence that Mr. Jackson has gang tattoos?
A. I don't. So in terms of beyond what I have explained, I'm aware that he does have tattoos. As far as what they are, I don't know what they are.
Q. So when you talked to Stephanie Franz, you said you didn't -- when you first talked to her, you said you didn't

compel her to turn over her cell phone, correct?
A. That's correct.
Q. Or execute a search warrant or anything of that nature, correct?
A. Yeah. I mean, so she -- this was, again, sometime later, so in terms of what phone she had on her at that time, if any, I don't recall. We didn't seize it. And in terms of search warrants, as I explained earlier, we don't typically compel or use legal process records from victims or minors.
Q. But apart from your ability to compel, did you ask her? Did you ask permission for her to turn over --
A. We did talk about her records. I don't know that we -- I'm trying to remember when we actually came into knowledge of what her phone number even was. But no, we don't have her records.
Q. And you talked about your interviews of the various witnesses that we've heard from today and yesterday. Some of those interviews you recorded, correct?
A. Yes, sir.
Q. And then some of those interviews you did not record, correct?
A. That's correct.
Q. For example, the first interview of Stephanie Franz, you recorded that, correct?
A. Yes.

Q. And then the second one you did not record, correct, in May of 2021?
A. I don't recall, but it's possible.
Q. Okay. And then there was another one in December of 2021. You did not audio record that one either, did you?
A. That's possible. I don't recall exactly. I mean, I could refer to the records and find out which ones I recorded and which ones I didn't.
Q. Well, Keonte Scott, the proffer, the first proffer that occurred with his attorneys, you recorded that one, correct?
A. Yes.
Q. That was in the U.S. Attorney's Office?
A. Yes.
Q. And then there was another one a few months after that, correct, that you recorded?
A. Yes.
Q. And then again the most recent one, December of 2021, you did not record, correct?
A. That's correct.
Q. And so you're the one making the decision about what to record and not record?
A. Ultimately, yes. I mean, it's dictated, like, by situation. So, for example, in those -- what we were just describing, like with Keonte Scott, the first two were structured interviews, proffer interviews that I conducted, and

then in terms of the third one, more than a structured interview, it was like a trial prep meeting. And so it just depends on the circumstances. There are times where if it's a structured interview, I'll try to record it. Sometimes the circumstances dictate that that's difficult or not feasible at the time.

Q. So the first interview of Stephanie Franz in the car while you're waiting outside the McDonald's, would you consider that a structured interview?

A. I would, yeah.

Q. And then the next one, was that not structured?

A. Again, I'm having -- I have to refresh my memory. I don't even recall exactly which one was the second one or the third one. Obviously, I've done a lot of interviews in this case.

Q. Well, the second interview was the one where she disclosed that she had been away from the defendants for a period of time, looking for Mr. Charlie Hernandez. Do you recall that?

A. Can you --

MS. PAASO: Objection. Hearsay.

THE COURT: Overruled.

You can go ahead.

BY MR. OLSON: (continuing)

Q. It was in May of 2021.

A. I'd have to review my records as to exactly which one that was and where it was.

MR. OLSON: I don't have any further questions, Your Honor.

THE COURT: Any redirect?

MS. PAASO: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PAASO:

Q. Was this investigation the only case that you were working on in 2019, 2020, 2021?

A. I wish. No, most certainly not.

Q. And is the investigation that you testified about to today part of a larger investigation -- I think this is what you said -- regarding additional suspects and victims?

A. Yes, ma'am.

Q. And I know that you were just asked some questions about the location we've referred to as the Lombard house. Is there an ongoing investigation?

A. Yes, ma'am.

Q. And is the FBI the only law enforcement agency with jurisdiction over that location?

A. No.

MS. PAASO: Nothing further.

THE COURT: Thank you, sir. You're excused.

That concludes our evidence presentation for today. I'll ask you to be ready for further matters in this case at

9:00 tomorrow morning.

Two of you have homework tonight, right? So I'll be interested to hear from you tomorrow morning.

Thank you.

THE COURTROOM DEPUTY: Please rise for the jury.

(The jury leaves the courtroom.)

THE COURT: Please be seated.

Is the government resting?

MS. PAASO: Yes, Your Honor.

THE COURT: The government rests. Do you wish to make any motions?

MR. OLSON: Your Honor, yes, we do, Your Honor. I need to confer with Ms. McVicar for a moment.

THE COURT: You can make it tomorrow morning, then, at 8:45. Will that be fine?

MR. OLSON: That would be best. Thank you.

THE COURT: I'll entertain the motion tomorrow morning at 8:45, and then at 9:00 we'll start with the defense case.

And some preview about how long, now that you've heard the entire government case? Do you know how long it will be?

MR. OLSON: I think it will be very short, possibly very, very short. I need to confer with Mr. Jackson about that, and --

THE COURT: I need to inquire of your client about his decision to testify or not to testify, so will that work before 9:00 tomorrow morning?

MR. OLSON: Yes.

THE COURT: So after the motion, I'll inquire of your client about his decision to testify or not testify.

MR. OLSON: That's fine. And if there is -- I've decided not to call Dr. Cara Laney because I've decided the testimony just doesn't fit with what she would be testifying about. So that shortens it. And there's just one or two witnesses I'm undecided about.

THE COURT: All right.

MR. OLSON: But it will be relatively short.

THE COURT: So then we'll expect closing instructions and closings tomorrow, and I'll ask you tomorrow for a rough estimate of closing, and that's just so I can plan breaks and lunches so they don't interrupt, if possible, your closings, so I can just think about how that will play out. So let me know that tomorrow also.

Anything further tonight from the United States?

MS. PAASO: No, Your Honor.

THE COURT: From the defense?

MR. OLSON: No, Your Honor.

THE COURT: See you all at 8:45 tomorrow morning.

THE COURTROOM DEPUTY: Court is adjourned.

(Proceedings adjourned at 4:57 p.m. and reconvened on March 10, 2022.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause. A transcript without an original signature or conformed signature is not certified.

*/s/Bonita J. Shumway* *April 4, 2022*

BONITA J. SHUMWAY, CSR, RMR, CRR DATE
Official Court Reporter