IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 3:19-cr-00458-MO-1 |
| v. | ) | |
| JOHNL JACKSON, | ) | March 10, 2022 |
| Defendant. | ) | Portland, Oregon |

**Jury Trial - Day 4**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT SENIOR JUDGE

APPEARANCES

FOR THE PLAINTIFF: Ms. Pamela Paaso
Ms. Ashley Cadotte
Ms. Suzanne A. Miles
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

FOR THE DEFENDANT: Mr. Per C. Olson
Ms. Megan McVicar
Hoevet Olson, PC
1000 S.W. Broadway, Suite 1740
Portland, OR 97205

COURT REPORTER: Bonita J. Shumway, CSR, RMR, CRR
United States District Courthouse
1000 S.W. Third Ave., Room 301
Portland, OR 97204
(503) 326-8188
bonita_shumway@ord.uscourts.gov

# I N D E X

(Jury Trial Day 4 - March 10, 2022)


| | |
|---|---|
| Motion for Judgment of Acquittal | 595 |
| DEFENDANT'S WITNESSES | |
| RORI DICKER | |
| Direct Examination by Mr. Olson | 610 |
| WAYNE ALDERMAN | |
| Direct Examination by Mr. Olson | 616 |
| Defense rests | 618 |
| Jury Instructions | 621, 651, 714 |
| Closing Argument - Government | 656 |
| Closing Argument - Defendant | 669 |
| Rebuttal Closing Argument - Government | 705 |
| Jury Note B Telephone Conference | 719 |

(P R O C E E D I N G S)

(March 10, 2022; 8:47 a.m.)

* * * * *

(Open court, the jury is not present.)

THE COURT: For starters, we're here for the defense motion. Go ahead, Mr. Olson.

MR. OLSON: Your Honor, Ms. McVicar will handle that.

MS. MCVICAR: Good morning, Your Honor.

THE COURT: Good morning. Go ahead.

MS. MCVICAR: Defendant moves for a judgment of acquittal on the ground that the prosecution has failed to present sufficient proof on each and every element on every count from which a rational juror could conclude beyond a reasonable doubt that the defendant is guilty.

But I'd like to draw some specific attention to Counts 5 and 6, which charge the transportation of a minor with intent that the minor engage in prostitution. These are the counts relating to the crossing of the state line from Oregon to Washington, so the trip from Eugene to Vancouver.

The intent that the minors engage in prostitution needs to coincide with the act of crossing state lines. So the evidence presented by the government was that they were picked up in Eugene, Ms. Petrovic was driving, and they went down there because I believe M.T. wanted to buy cocaine, and -- but Ms. Petrovic testified that there was no prearranged plan to

bring M.T. and S.F. back up to the Vancouver-Portland area. But when they arrived at the gas station, I think she said she saw a red car drive away, and M.T. asked for a ride. Ms. Petrovic asked Mr. Jackson, "Is that okay? Can we give them a ride?" And he said, "Okay, fine." That was my notes as to what she said. And the girls got into the car.

And asked when Ms. Petrovic came up with the idea of trafficking the girls, she responded, "On the way from picking them up." But there's no evidence that this idea that she had was expressed to Mr. Jackson. Ms. Petrovic was driving. There was another woman in the passenger's seat, and Mr. Jackson was sitting in the back with the minors, was the testimony.

So we also had testimony from M.T., who asked -- was asked whether or not there was any discussion of sex trafficking during this trip up to Vancouver, and she responded "definitely not."

And again, the question is whether there is sufficient evidence to say that the defendant had the intent to have these minors engage in prostitution when -- at the moment that they crossed the state lines, and that intent isn't -- the statute is not violated when you cross the state line with an immoral purpose in your mind or even an amorphous intent about -- you know, just a general idea. It has to be a dominant, significant or motivating purpose of transporting this person across state lines. And there is insufficient

evidence to draw that inference with regard to Mr. Jackson having such an intent when Ms. Petrovic drove all of them across the state lines into Washington, which relatedly raises the question of venue for Counts 2, 3, and 4, in particular, which are the sex trafficking counts alleged to have occurred between August 1st and September 6th, which is while they were in Washington. And venue is decided -- you identify the conduct constituting the offense and then figure out where it was committed.

And in terms of the sex trafficking counts that occurred in Washington, absent any intent that this was even going to occur or plan that this was going to occur in this car ride up to -- from Eugene to Vancouver, you couldn't find that any of these acts of recruiting or enticing, providing or transporting occurred prior to the intent forming that this was going to happen, and so -- and then the acts themselves, the commercial sex acts that are at issue occurred in Washington, at which time the crime was complete. So none of the offense conduct occurred in Oregon, and venue in Oregon has not been established, which is -- there's a preponderance of the evidence standard for that in terms of the government's burden of proof. But again, they've failed to establish that.

And each of those counts have both the enticing language as well as the alternative conduct element of benefiting financially. The -- you know, the benefiting

financially, if you're looking at what the conduct constituting the offense is, it's not -- it's going to be, like, where he received the benefit, and that would have been again in Washington, and the acts would have occurred in Washington.

And so for that reason, I think that we've kind of been going back and forth with the government this morning on a venue instruction, but I would argue as well that there is insufficient evidence to establish venue on those Washington counts.

THE COURT: I understand your argument on Counts 5 and 6. I want to make sure I understand your argument on 2, 3, 4. And the idea is that -- Well, first, are you referring to both times that a trip was made to Eugene and back up or one or the other?

MS. MCVICAR: So there's the one trip from Eugene to Vancouver, where they picked the girls up in Eugene and they take them up to Vancouver. And so it's crossing the state line with minors with the intent -- they don't have to know that they're minors, but you're transporting someone across the state line to engage in prostitution.

THE COURT: That's 5 and 6.

MS. MCVICAR: Yes, that's 5 and 6.

THE COURT: 2, 3, 4, you're contending it's the same trip at issue that has to -- Well, let me ask it this way. Your argument on venue on 2, 3, 4, is that your same argument

on 5 and 6 applies here as to what -- when intent was formed to do anything illegal as you cross state lines, and without knowing that that occurred in Oregon, all the other elements that have to do with where the crime occurred, either benefiting or enticing or anything else, all occur in Washington?

MS. MCVICAR: The only evidence that was presented was of the conduct in those counts occurred in Washington, yes.

THE COURT: I want to go back to Counts 5 and 6. I actually expected this motion on 5 and 6, and I thought on cross Ms. Petrovic was even better for your argument than what you've just described. I thought she actually on cross at least said that the intent to do this hadn't formed until they arrived in Washington. Am I misremembering at least cross-examination?

MS. MCVICAR: I have that in my notes as well, but it was somewhat -- she said no. I think the question was was this intent formed when you were in Washington, and at one point she said no, at one point she said I don't know, I think.

THE COURT: So you had multiple answers?

MS. MCVICAR: But my recollection was that there was no evidence that it was formed in Oregon.

THE COURT: All right. And she did or didn't, in terms of the light most favorable to the nonmoving party, did or didn't deny that it had been formed at least with regard to

any knowledge by Mr. Jackson prior to the trip even starting?

MS. MCVICAR: She did or did not? Is that --

THE COURT: Well, what is your view on what the state of the evidence is about Mr. Jackson's and her forming this intent before they even went down to Eugene?

MS. MCVICAR: I don't believe that there is sufficient evidence to establish that they formed this intent on their way down. The evidence established that -- and I think, you know, what's particularly helpful in establishing that there wasn't evidence is she said, "Hey, is it okay if they get a ride with us?" And he said, "Yeah, that's fine," which establishes that there wasn't any intent that they were even going to come up with them, so there wouldn't have been an intent -- a prior agreement to prostitute them.

THE COURT: Thank you.

Who is arguing this?

MS. PAASO: Your Honor, I'll take the first part, and then any discussion of venue, I'll defer to Ms. Miles.

On direct, Ms. Petrovic was explicit: they targeted Maddie from Keonte Scott's social media because she had been trafficked previously. They reached out to her and they communicated with her. They went down there and got her because they said they needed money. The $100 cocaine deal doesn't even make any sense, given that on the way up they were providing them additional drugs free of charge. She testified

explicitly on direct that they targeted Maddie because she'd been trafficked before, and so they drove down there to pick her up.

And I believe Ms. Petrovic also said on direct that when they saw Stephanie, the thought was another girl meant more money, and so they treated Stephanie in the same way that they were treating Madelynn on the way back up.

I think in the light most favorable to the prosecution, it can definitely be inferred that they intended to traffic both of them. They went down there intending to traffic Madelynn. They ended up having another girl available, and they made that decision and treated them in a similar way on the way back up.

On cross-examination, there may have been some confusion from Ms. Petrovic, but I thought she cleaned it up, and I --

THE COURT: It doesn't really matter, though, right? If you have it on direct and it's diminished in some way on cross, then for purposes of this motion, unless she actually repudiates it on cross, then you can argue that she was believable on direct and confused on cross, at least in terms of my review of this motion, right?

MS. PAASO: Yes, Your Honor.

THE COURT: I mean, it would be one thing -- I'd have to take this differently if you get what you need on direct and

then you just lose it on cross so that no rational jury could any longer believe what was heard on direct, but I'm sure your contention is that that's not what cross did in this case.

MS. PAASO: It's not only our contention that that's not what happened on cross, we think she cleaned it up and she -- and I think --

THE COURT: On redirect, you mean?

MS. PAASO: Actually, no. I think still on cross. I think the questions were a little bit confusing in terms of whether they're asked as a double negative or the manner in which they were, which I know is appropriate for leading questions, but I thought her final -- and I believe my colleague agrees that her final answer on cross, too, did indicate that they went down there with that intent.

THE COURT: Thank you.

On Counts 2, 3, and 4, Ms. Miles?

MS. MILES: Your Honor, the issues are honestly the same. I think that what Ms. Paaso said hangs true for these, too. There's a transportation component to 1591 which creates that continuing effect, and so so long as any of that portion was done within the District of Oregon, the venue is certainly proven by a preponderance.

THE COURT: So your contention is that if the intent is there on 2, 3, and 4, that even if all the other activities -- financial benefit, enticing, et cetera -- are

occurring in Washington, so long as Mr. Jackson had that intent when he went down to Eugene and headed up to Washington, that's enough of a venue hook for purposes of 1591?

MS. MILES: As long as he committed some act with the intent, and the enticing, the transporting, done with intent from the state of Oregon, getting them to Washington is enough.

THE COURT: Thank you.

That's my view on it. I thought it was an interesting -- as it played out in trial, I thought that it would be interesting on transportation and venue to see where it all went, but it's the -- the decision here is really a burden of proof sort of decision, and that is that I think a jury here, a rational jury has sufficient evidence to find the intent for transportation, and find venue, based on the evidence from Ms. Petrovic, as well as corroborating evidence from the testimony of the minor victims to get past this motion. We'll see what happens with the jury at trial.

MS. MILES: Your Honor, if I may speak to the venue point as well. The defense did ask for an instruction, so I think the Court is obligated to give one. As defense counsel has indicated, we've talked over what an appropriate instruction would be. We've come up with a proposal, a joint proposal for the Court. I've made 20 copies just to try to make it easier to get it to the jury. So if you would like me to present that to you now, I can.

THE COURT: An agreed-upon instruction?

MR. OLSON: Yes.

THE COURT: Yes, please hand that up. It answers, I think, another question I had. The jury has a copy of the final instructions, and they're not a hundred percent final. I have to finalize the decision to testify, and then I have questions for the defense about what should go into the other crimes, wrongs or acts instruction.

So I had the question whether we -- whether if I gave them a master copy we needed to completely redo -- take from them the copies they have and completely redo them and give them something that's identical to the master, or if what they have is so close that we didn't. But I think with this additional instruction here, I'll probably just redo the whole thing, pull the ones that they have from them, give them new copies so they can have them in the jury deliberation room.

MS. MILES: In that case, I'll send an electronic copy so you can add a number to it.

THE COURT: Thank you very much.

MS. MCVICAR: Your Honor, our office will be filing or has just filed an updated copy of the jury instructions with some corrections that we had already cleared with the government on a few of the counts.

THE COURT: Did you undertake to clarify or fill in the brackets on other crimes, wrongs or acts?

MR. OLSON: We didn't, Your Honor.

THE COURT: You did or did not?

MR. OLSON: Did not. When I looked at them last night, I was going to suggest that the first sentence and the last sentence of that instruction be in there. I think that's correct.

THE COURT: Tell me how you'd like that instruction to read. The obvious ones are drug possession, drug distribution. I don't know if you want to name them or not.

MR. OLSON: I was going to suggest it just be -- this is Instruction 13. "You have heard evidence that defendant committed other acts not charged here," and then skip that middle sentence and then just go with the last sentence.

THE COURT: So not list or name anything specific, just first and last sentence?

MR. OLSON: Correct.

THE COURT: Any objection to that from the United States?

MS. MILES: Can we have a moment?

THE COURT: Yes.

Could the defense send me a red line version of the changes you made, in addition, so I'll know what changes were made? Is that all right?

MS. MCVICAR: Yes, Your Honor.

THE COURT: Thank you.

We're talking about No. 13. Any objection to the defense proposal?

MS. MILES: No, we don't have an objection to it. I think all the other act evidence that we brought in was directed towards the conspiracy, as we intended, so I don't think we need to treat it as 404(b).

THE COURT: All right. Whether that's right or wrong, that means the text of 13 at least is as the defense has suggested. So I don't need to resolve any dispute on that point. So I will make that change to 13.

The United States has filed a motion to exclude discussion of penalty during closing. Here are my tentative views, and then I'll hear from you, Mr. Olson, or your colleague.

It's clear -- I think the United States agrees -- that the defense should be allowed in closing to argue that Ms. Petrovic received a substantial benefit and is therefore motivated to please the government in what she says. And that can -- it's allowable for that to include how big a drop her plea agreement possibly brings her, including a drop from minimum mandatory sentences.

It's not necessary to make that point for the closing argument to include any reference to whether the defendant is facing the same high exposure. And so I intend to exclude that without excluding reference to Ms. Petrovic's change, her swing

from high to low.

Any objection to that?

MR. OLSON: No, Your Honor.

THE COURT: Have I got your motion correctly?

MS. MILES: Yes. Thank you.

THE COURT: That will be my ruling.

Lastly then is your client's decision whether or not to testify.

MR. OLSON: Yes, Your Honor. He's prepared to talk about that. He has decided not to testify.

THE COURT: Mr. Jackson, I need to address you personally for a moment here. So you have the absolute right to go either direction. You have the constitutional right not to testify, and if you chose not to testify, no one can draw any inference of guilt against you. You also, of course, have the absolute right to testify in this trial. And the decision is yours. I'm glad that you have two attorneys to help you make that decision, but ultimately it has to be yours.

So I just need to know, is this your decision, your personal decision not to testify?

THE DEFENDANT: Yeah.

THE COURT: Have you had enough time to talk with your lawyers about it that you feel comfortable making this decision?

THE DEFENDANT: Yeah.

THE COURT: Thank you.

Anything further from the United States before we begin?

MS. PAASO: No, Your Honor.

THE COURT: From the defense?

MR. OLSON: Your Honor, I have two witnesses that are going to be very short. And I've previewed for the government what they're going to be testifying about. I can preview for the Court if you'd like.

THE COURT: I'll just watch with interest.

MR. OLSON: Okay.

THE COURT: Let's bring in the jury.

MR. OLSON: Should I have my witness come to the witness stand?

THE COURT: Yes, please.

Ms. Paaso, the red line I'm going to give with changes from last night from the defense, are those all agreed to?

MS. MILES: Yes.

(There is a pause in the proceedings.)

(The jury enters the courtroom.)

THE COURT: Please be seated.

Thank you, folks, for being on time this morning. I'm sorry to have kept you waiting for a little bit this morning. But as I think I said at the outset, sometimes

there's legal rulings that have to be made to keep this trial moving along.

I'll let you know that the defense -- excuse me, the prosecution's case has rested. That's a legal word meaning they've concluded their presentation in their case of the evidence. So now we're turning to the defense, and they have a witness to call.

Could you tell us who it is?

MR. OLSON: I'm sorry. Her name is Rori Dicker.

THE COURT: Go ahead and swear in the witness.

THE COURTROOM DEPUTY: Please stand and raise your right hand.

RORI DICKER

called as a witness in behalf of the Defendant, being first duly sworn, is examined and testifies as follows:

THE COURTROOM DEPUTY: Thank you. Go ahead and have a seat. You can remove your mask.

And please state your name for the record and spell it.

THE WITNESS: Rori Dicker. R-o-r-i, last name D-i-c-k-e-r.

THE COURT: Go ahead.

MR. OLSON: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. OLSON:

Q. Ms. Dicker, I'm Per Olson. We've spoken on the phone but we haven't met in person, correct?

A. Correct.

THE COURTROOM DEPUTY: Can you scoot a little closer to the microphone.

BY MR. OLSON: (continuing)

Q. Ms. Dicker, do you know Johnl Jackson?

A. Yes, I do.

Q. How do you know him?

A. He's my friend.

Q. How long have you known him?

A. Like three years -- about four years.

Q. Okay.

A. Five years.

Q. Five years.

And where do you live?

A. In Vancouver.

Q. And what do you do for a living?

A. I'm a housing outreach coordinator.

Q. Okay. Where did you live in 2017-2018?

A. Vancouver.

Q. Okay. And what was the nature of your relationship with

Mr. Jackson at that time?
A. We were good friends.
Q. And would he come over to your house on occasion?
A. Yes.
Q. Were there other people that would come over to your house at that time?
A. Yes.
Q. Was your house sort of a gathering place for people to meet?
A. Yes.
Q. There's been reference in this trial to a trap house owned by Rori Dicker. Does that term mean anything to you? Does that sound like an accurate term?
A. Not in my opinion. Absolutely not.
Q. Okay. Were there -- were there activities going on there that were illegal, such as drug use?
A. Yes.
Q. And drug distribution, things like that?
A. I mean, I don't know if that was going on, but it was definitely drug use.
Q. Was there a lot of parties going on?
A. Yes.
Q. Was there a woman that lived with you by the name of Ashley Williams for a while?
A. Yes.

Q. And what was her relationship with Mr. Jackson?
A. They were together, like boyfriend-girlfriend.
Q. So would he come over to see her?
A. Yes.
Q. Was there, like, some sort of musical equipment or studio equipment in the garage there?
A. Yeah. We had a studio in the garage.
Q. And would Johnl -- Mr. Jackson and other people use that?
A. Yes.
Q. At the time you were struggling with some substance abuse, correct?
A. Yes.
Q. And how are you doing now with that?
A. I'm doing very well. I'm in recovery. I have almost three years.
Q. Okay. Great.
And so when people would come over in this time frame, talking 2017-2018, would you socialize with the people that would come over?
A. Yes.
Q. And that would include Mr. Jackson?
A. Yes.
Q. At some point did you meet a person by the name of Keonte Scott?
A. Yes.

Q. And would you socialize with him as well?
A. Yes.
Q. And then did you get to meet his girlfriend, a woman by the name of Diana Petrovic?
A. Yes.
Q. And did you at times talk with her as well, or interact with her?
A. Yes.
Q. And did Keonte actually live in that house for a while?
A. Yes.
Q. And just to kind of set an end time for this time period that we're talking about, at some point you lost the house, correct?
A. Yes.
Q. You were evicted?
A. Yes.
Q. Do you remember when that was?
A. August -- I mean April 5th, 2018.
Q. With respect to your interactions with Diana and your observations of Diana, did you make any observations as to whether she was involved in sex trafficking of young women?
MS. CADOTTE: Objection, Your Honor. Calls for speculation.
THE COURT: I'll allow the answer to the question since it will tell me whether it's speculation or not. You've

asked about her own personal observations?

MR. OLSON: Yes.

THE COURT: You may answer as to your own personal observations.

THE WITNESS: Can you repeat the question?

BY MR. OLSON: (continuing)

Q. Yes. Did you make -- did you have any personal observations regarding whether Ms. Petrovic was engaged in sex trafficking of young girls?

A. I seen her a couple times with young females, and so it was, like, an unspoken thing.

Q. Okay. Did she ever brag or boast about pimping girls?

MS. CADOTTE: Objection, Your Honor. Hearsay.

THE COURT: Your response?

MR. OLSON: Your Honor, it's not offered for the truth but rather Ms. Petrovic's attitude towards prostitution and pimping.

THE COURT: I sustain the objection.

You may continue.

BY MR. OLSON: (continuing)

Q. Did you make any observations as to whether Mr. Johnl Jackson was involved in sex trafficking of minors?

A. Absolutely not.

Q. No, you didn't have any observations one way or the other?

A. I didn't see him at all, any of that.

Q. We talked over each other, so let me ask the question.

Did you see anything that caused you to suspect that he was involved in sex trafficking of minors?

A. No, I didn't.

MR. OLSON: No further questions, Your Honor.

THE COURT: Thank you.

You may inquire.

MS. CADOTTE: No questions.

THE COURT: Thank you. You're finished. You're excused.

You may call your next witness.

MR. OLSON: The defense would call Wayne Alderman.

THE COURTROOM DEPUTY: There's stairs right around this wall over here.

WAYNE ALDERMAN

called as a witness in behalf of the Defendant, being first duly sworn, is examined and testifies as follows:

THE COURTROOM DEPUTY: Go ahead and have a seat. Please remove your mask.

And please state your name for the record and spell it.

THE WITNESS: My name is Wayne Alderman. A-l-d-e-r-m-a-n.

DIRECT EXAMINATION

BY MR. OLSON:

Q. Good morning, Mr. Alderman.

Where do you live?

A. I live in Ridgefield, Washington.

Q. And what is your employment? Are you currently employed?

A. I'm retired.

Q. Are you a retired Portland police officer?

A. I am.

Q. When did you retire?

A. I retired last January.

Q. How long had you been a Portland police officer?

A. Twenty-seven years.

Q. You're here today for me to ask you some questions about an incident that happened on August 3rd, 2018, regarding a welfare check. Do you recall that?

A. I do.

Q. And this was a welfare check regarding Charlie Hernandez and a woman by the name of Stephanie Franz, correct?

A. Correct.

Q. We don't need to get into details of the welfare check. My question for you is just with regard to your interaction with Ms. Franz.

Did Ms. Franz identify herself to you?

A. She did, and she gave me a date of birth of being born in the year 2000.

Q. Okay. And this was August 3rd, 2018, when you had this interaction with her?

A. Correct.

Q. Did you subsequently learn that that wasn't her true birthdate?

A. True, yeah, I did. I believed her initially and thought that the original call that I had received was maybe like a typo or bad information, but I confirmed that she was 14 with her mother on the phone.

Q. So when she said she was born in 2000, did her appearance appear consistent with a 17-year-old or an 18-year-old?

A. Yeah. I definitely thought that she could easily be 17 or 18 years old.

Q. And why did you think that?

A. Just her general appearance, her manner, her interaction with me. She definitely spoke with me as if she was an older teenager. She -- I think she had some body art of some sort that I wouldn't expect like on a 14-year-old, like maybe body piercing or tattoos, something to that effect.

Q. Are you aware of any regulations surrounding tattooing of minors?

A. In Oregon you can't tattoo minors until they're 18.

MR. OLSON: I have no further questions, Your Honor.

THE COURT: Thank you.

Go ahead.

MS. CADOTTE: No questions, Your Honor.

THE COURT: Thank you, sir. You're excused.

Any further witnesses for the defense?

MR. OLSON: No, Your Honor.

THE COURT: The defense rests?

MR. OLSON: Yes, Your Honor.

THE COURT: Any rebuttal witnesses for the United States?

MS. CADOTTE: No, Your Honor. Thank you.

THE COURT: Folks, that concludes the presentation of evidence in this case.

There's a couple things I need to take up, but what will happen next is in a few minutes -- you'll have a break now, even though you just got started, but it's just necessary for a few things to happen. But when you come back into the box in a few minutes, I'll read the final instructions to you.

How many of you have your own personal copies with you right now of the final instructions? Okay. Raise your hand. Just one. How many of you have them in the building, like in the room back there?

Okay. So what we're going to do is collect all those. What you have is going to match what you're about to get, but what you're about to get is going to have a couple

additional instructions in it, so I don't want you to get confused. I'll collect your old ones, you'll get new ones, and you won't be expected to read those right away because the next that will happen is you'll come back and I'll read them to you. That's just a requirement that I actually read them out loud into the record. You'll follow along with your copy, I'll read them into the record.

When we're done with that, you'll hear the closing arguments of the lawyers in the case. When the closing arguments are finished, you'll be sent back to begin your deliberations, and I'll talk to you a little more about how you'll do that in a minute. We'll have a break and take those next two steps, reading instructions and hearing closing arguments.

Thank you. We'll be in recess.

THE COURTROOM DEPUTY: All rise.

(The jury leaves the courtroom.)

THE COURT: So it will take us maybe 20 or 25 minutes to make all the changes and print new paper copies and get them ready. We'll take a break for that long.

Is there anything further before we go to my closing instructions and closing arguments from the United States?

MS. CADOTTE: No, Your Honor.

THE COURT: From the defense?

MR. OLSON: No, Your Honor.

THE COURT: Thank you. We'll be in recess.

(A recess is then taken.)

THE COURT: Before I brought the jury out, I wanted to just get a brief estimate -- and it's only an estimate -- of length of argument for the United States' initial argument.

MS. PAASO: Twenty minutes, Your Honor.

THE COURT: Mr. Olson?

MR. OLSON: About 45 minutes, Your Honor.

THE COURT: Are you seeking time for rebuttal?

MS. CADOTTE: Yes, Your Honor. Maybe 15 or 20.

THE COURT: All right. Thank you very much.

Let's bring out the jury.

MS. CADOTTE: Your Honor, I have the statements by defendant instruction. Do we still have that in there?

MR. OLSON: You mean defendant not testifying or --

THE COURT: What's the issue?

MS. CADOTTE: Disregard. Thank you.

(The jury enters the courtroom.)

THE COURT: Please be seated.

So just so it's clear on the record, I have retrieved from you the copies that I gave you earlier of the final jury instructions, and you now have just received on your chairs copies of what I'm about to read to you, identical to the last instruction.

You also will be given a couple of copies of the

verdict form. One will be the master copy. Don't write on it, don't make any notes on it, and it will be the copy that you actually hand back to me. And then, one, another copy is for you to make notes on or whatever.

The same with your jury instructions. I will give you a set of the jury instructions that will have my signature on top, and it will be the master copy of the jury instructions. The ones you have in your hands right now you can write on and make notes on and use as sort of a worksheet.

I did want to find out if the two of you who were going to go home and read them, were you able to read them?

THE JUROR: Yes.

THE COURT: And you, sir?

THE JUROR: Yes.

THE COURT: I'm going to read to you these final instructions. Please read along.

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not. You must decide the case solely on the

evidence and the law. Do not allow personal likes or dislikes, sympathy, prejudice, fear or public opinion to influence you. You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances. Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious awareness, control or intention. You will recall that you took on oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important. Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return. That is a matter entirely up to you.

The superseding indictment is not evidence. The defendant has pleaded not guilty to the charge. The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence to prove innocence. The government has the burden of proving every element of the charge beyond a reasonable doubt.

A defendant in a criminal case has a constitutional

right not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits which have been received into evidence, and any facts to which all the parties have agreed.

In reaching your verdict you may consider only the testimony and exhibits received in evidence. The following things are not evidence and you may not consider them in

deciding what the facts are: one, questions, statements, objections, and arguments by the lawyer are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answer of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Any testimony that I have excluded, stricken or instructed you to disregard is not evidence. In addition, some evidence was received for a limited purpose. When I have instructed you to consider certain evidence in a limited way, you must do so.

And three, anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes

no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account the witness's opportunity and ability to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important,

you may choose not to believe anything that witness said. On the other hand, if you think a witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in the indictment.

A separate crime is charged against defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

The indictment alleges that certain crimes were committed on or about certain dates. Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in each count of the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

You have heard testimony that defendant made statements. It is for you to decide whether the defendant made the statements, and if so, how much weight to give to the

statements. In making those decisions, you should consider all the evidence about each statement, including the circumstances under which defendant may have made it.

You have heard evidence that defendant committed other acts not charged here. You may not consider this evidence as evidence of guilt of the crime for which the defendant is now on trial.

You have heard impeachment evidence throughout the trial. You may consider impeachment evidence in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness.

You have heard testimony from Diana Petrovic, a witness who -- who received favored treatment from the government in connection with this case. Ms. Petrovic pleaded to a crime arising out of the same events for which the defendant is on trial. This guilty plea is not evidence against the defendant, and you may consider it only in determining this witness's believability. For these reasons, in evaluating the testimony of Diana Petrovic, you should consider the extent to which or whether her testimony may have been influenced by any of these factors.

You have also heard testimony from Keonte Scott, a witness who received favored treatment from the government in connection with another case. In evaluating the testimony of Keonte Scott, you should consider the extent to which or

whether his testimony may have been influenced by this factor.

In addition, you should examine the testimony of both Diana Petrovic and Keonte Scott with greater caution than that of other witnesses.

You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may consider the various the factors mentioned in these instructions concerning the credibility of witnesses. In addition to those factors, in evaluating eyewitness identification testimony, you may also consider: one, the capacity and opportunity of the eyewitness to observe the suspect based upon the length of time for observation and the conditions at the time of observation, including lighting and distance; two, whether the identification was the product of the eye witness's own recollection or was the result of subsequent influence or suggestiveness; three, any inconsistent identifications made by the eyewitness; four, the witness's familiarity with the subject identified; five, the strength of earlier and later identifications; six, lapses of time between the event and the identifications; and seven, the totality of circumstances surrounding the eyewitness's identification.

You have heard testimony from persons who testified to opinions and the reasons for their opinions. This opinion testimony is allowed because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

During the trial, certain charts and summaries were shown to you in order to help explain the evidence in the case. These charts and summaries were not admitted into evidence and will not go into the jury room with you. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

To act with intent means to have the conscious objective to engage in the alleged conduct or the conscious objective to cause a particular result.

A person acts with reckless disregard when the person is aware of and consciously disregards a substantial and unjustifiable risk that a circumstance exists or that a particular harm will result from the person's conduct. The risk must be of such a nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

The indictment alleges that some act in furtherance of each of the offenses charged occurred in the District of Oregon, which encompasses the entire state of Oregon. There is no requirement that all aspects of the charged offenses take place in the District of Oregon, but for you to return a guilty verdict, the government must convince you that the offense began, continued or was completed within Oregon, or that the offense involved transporting a person from, through or into Oregon.

Unlike all the elements that I have described, this fact has to be proved by a preponderance of the evidence. This means that the government only has to convince you that it is more likely than not that some act in furtherance of each of the crimes charged took place here -- "here" meaning in the District of Oregon.

Remember that the government must prove all other elements beyond a reasonable doubt.

I'll now go through instructions involving each of the counts, and as you've noticed from your reading, there's some duplication of language, and that has to do typically with either a different date alleged or a different victim alleged or something like that. But please forgive me as I repeat the terms several times.

In order for the defendant to be found guilty of Count 1, the government must prove the following elements beyond a reasonable doubt: first, beginning on or about August 1, 2018, and continuing through about September 30, 2018, there was an agreement between two or more persons to engage in the sex trafficking of at least one person; and second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Sex trafficking of a person is defined as either, one, recruiting, enticing, harboring, transporting, providing, obtaining or maintaining by any means a person; or two, benefiting, financially or by receiving anything of value, from participating in a venture that did so knowing or in reckless disregard of the fact that force, threats of force, fraud or coercion will be used to cause the person to engage in a commercial sex act; or knowing or in reckless disregard to the

fact that the person is under 18 years old and will be caused to engage in a commercial sex act.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed. For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the sex trafficking crimes alleged in the indictment as an object of a conspiracy, with all of you agreeing as to the particular sex trafficking crime the conspirators agreed to commit, as explained in the verdict form, which I'll come to in a moment.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all of the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some

object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

Count 2, sex trafficking of a child.

The defendant is charged in Count 2 of the indictment with engaging in sex trafficking of M.T. in violation of Section 59 -- 1591(a)(2) and (b)(2) of Title 18 of the United States Code. For the defendant to be found guilty of Count 2, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about August 1, 2018, and continuing through on or about September 6, 2018, the defendant either knowingly, one, recruited, enticed, harbored, transported, provided, obtained or maintained by any means M.T. to engage in a commercial sex act; or two, benefited, financially or by receiving anything of value from participating in a venture that did so.

Second, the defendant knew or was in reckless disregard of the fact that M.T. had not attained the age of 18 years and would be caused to engage in a commercial sex act.

And third, the defendant's acts were in or affecting interstate or foreign commerce.

Finally, at the time M.T. had attained the age of 14 but had not yet attained the age of 18.

With respect to the first element, you must all agree on whether defendant recruited, enticed, harbored, transported, provided, obtained or maintained by any means M.T. to engage in a commercial sex act; and you must all agree on whether the defendant benefited, financially or by receiving anything of value, from participating in a venture that did so.

Count 3, sex trafficking of a child.

The defendant is charged in Count 3 of the superseding indictment with sex trafficking of S.F. in violation of 1591(a)(2) and (b)(2) of Title 18 of the U.S. Code.

For the defendant to be found guilty of Count 3, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about August 1, 2018, and continuing through on or about September 6, 2018, the defendant either knowingly, one, recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act; or two, benefited, financially or by receiving anything of value, from participating in a venture that did so.

Second, the defendant knew or was in reckless disregard of the fact that S.F. had not attained the age of 18 years and would be caused to engage in a commercial sex act; and third, the defendant's acts were in or affecting interstate

or foreign commerce.

Finally, at the time, S.F. had attained the age of 14 but had not yet attained the age of 18.

With respect to the first element, you must all agree on whether defendant recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act, and you must all agree on whether the defendant benefited, financially or by receiving anything of value, from participating in a venture that did so.

Count 4, sex trafficking by force, fraud, or coercion.

The defendant is charged in Count 4 with sex trafficking of S.F. in violation of 1591(a)(1) and (b)(1) of Title 18 of the U.S. Code.

For the defendant to be found guilty of Count 4, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about August 1, 2018, and continuing through on or about September 6, 2018, the defendant either knowingly, one, recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act; or two, benefited, financially or by receiving anything of value, from participating in a venture that did so.

Second, the defendant knew or was in reckless

disregard of the fact that means of force, threats of force, fraud, coercion or any combination of such means would be used to cause S.F. to engage in a commercial sex act; and third, the defendant's acts were in or affecting interstate or foreign commerce.

Finally, the offense was effected by means of force, threats of force or coercion.

With respect to the first element, you must all agree on whether the defendant recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act; and you must all agree on whether the defendant benefited financially or otherwise by receiving anything of value from participating in a venture that did so.

Count 5, transportation of a minor with intent to engage in sexual activity.

The defendant is charged in Count 5 of the superseding indictment with transporting M.T. with intent that she engage in prostitution, in violation of 2423(a) and (e) of Title 18 of the U.S. Code.

For the defendant to be found guilty of Count 5, the government must prove each of the following elements beyond a reasonable doubt:

First, on or about September 3, 2018, the defendant knowingly transported M.T. from the state of Oregon to the

state of Washington; second, the defendant did so with the intent that M.T. engage in prostitution; and third, M.T. was under the age of 18 years at the time.

Prostitution is knowingly engaging in or offering to engage in a sexual act in exchange for money or other valuable consideration.

It is not a defense to the crime of transporting a minor for the purposes of prostitution that the defendant was ignorant of the child's age. If someone knowingly transports a person for the purposes of prostitution, the transporter assumes the risk that the victim is a minor, regardless of what the victim says or how the victim appears.

Defendant may also be found guilty of Count 5 if he attempted or conspired to transport a minor with intent to engage them in prostitution.

To find defendant guilty of attempting this crime, the government must prove: First, beginning on or about September 3, 2018, and continuing through on or about September 6, 2018, the defendant intended to transport M.T., who was under 18 years old, from Oregon to Washington in order that M.T. engage in prostitution; and second, the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime.

Mere preparation is not a substantial step toward

committing the crime. To constitute a substantial step, a defendant's acts or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

You do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of the crime.

To find defendant guilty of conspiring to commit Count 5, the government must prove: first, beginning on or about September 3, 2018, and continuing through on or about September 6, 2018, there was an agreement between two or more persons to transport a minor with the intent that they engage in prostitution; and second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

The instructions that I gave you regarding conspiracies in regard to Count 1 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether defendant committed the attempted crime. And you must all agree on whether defendant committed the conspiracy to commit the crime.

The defendant is charged in Count 6 of the superseding indictment with transporting S.F. with intent that she engage in prostitution, in violation of law.

For the defendant to be found guilty of Count 6, the

government must prove each of the following elements beyond a reasonable doubt: first, on or about September 3, 2018, the defendant knowingly transported S.F. from the state of Oregon to the state of Washington; second, the defendant did so with the intent that S.F. engage in prostitution; and third, S.F. was under the age of 18 years at the time.

As I instructed you with regard to Count 5, ignorance of the victim's age is not a defense to this count.

Defendant may also be found guilty of Count 6 if he attempted or conspired to transport S.F. with the intent to engage her in prostitution. The definitions of "attempt" and "conspiracy" that I provided for Count 5 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether defendant committed the attempted crime. And you must all agree on whether defendant committed the conspiracy to commit the crime.

The defendant is charged in Count 7 of the superseding indictment with sex trafficking of S.F. in violation of law.

For the defendant to be found guilty of Count 7, the government must prove each of the following elements beyond a reasonable doubt: first, beginning on or about September 6, 2018, and continuing through on or about September 10, 2018, the defendant either knowingly, one, recruited, enticed, harbored, transported, provided, obtained or maintained by any

means S.F. to engage in a commercial sex act; or two, benefited, financially or by receiving anything of value, from participating in a venture that did so; second, the defendant knew or was in reckless disregard of the fact that S.F. had not attained the age of 18 years and would be caused to engage in a commercial sex act; and third, the defendant's acts were in or affecting interstate or foreign commerce.

Finally, the government must prove beyond a reasonable doubt that at the time S.F. had attained the age of 14 but had not yet attained the age of 18.

With respect to the first element, you must all agree on whether defendant recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act, and you must all agree on whether the defendant benefited, financially or by receiving anything of value, from participating in a venture that did so.

Count 8, sex trafficking by force, fraud, or coercion.

The defendant is charged in Count 8 of the superseding indictment with sex trafficking of S.F. by force, fraud, and coercion in violation of 1591(a)(1) and (b)(1) of the U.S. Code.

For the defendant to be found guilty of Count 8, the government must prove each of the following elements beyond a reasonable doubt:  first, beginning on or about September 6,

2018, and continuing through on or about September 10, 2018, the defendant either knowingly, one, recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act; or two, benefited financially or by receiving anything of value from participating in a venture that did so.

Second, the defendant knew or was in reckless disregard of the fact that means of force, threats of force, fraud, coercion or any combination of such means would be used to cause S.F. to engage in a commercial sex act; and third, the defendant's acts were in or affecting interstate or foreign commerce. Finally, the offense was effected by means of force, threats of force, or coercion.

With respect to the first element, you must all agree on whether defendant recruited, enticed, harbored, transported, provided, obtained or maintained by any means S.F. to engage in a commercial sex act; and you must all agree on whether the defendant benefited financially or by receiving anything of value from participating in a venture that did so.

Give me just a moment.

(There is a pause in the proceedings.)

THE COURT: Count 9. The defendant is charged in Count 9 of the superseding indictment with transporting S.F. with intent that she engage in prostitution, in violation of 2423(a) and (e) of the U.S. Code.

For the defendant to be found guilty of Count 9, the -- for the defendant to be found guilty of Count 9, the government must prove each of the following elements beyond a reasonable doubt: first, on or between September 6, 2018, and September 10, 2018, the defendant knowingly transported S.F. from the state of Washington to the state of Oregon; second, the defendant did so with the intent that S.F. engage in prostitution; and third, S.F. was under the age of 18 years at the time.

As with Counts 5 and 6, ignorance of the victim's age is not a defense to this count.

Defendant may also be found guilty of Count 9 if he attempted or conspired to transport S.F. with the intent to engage her in prostitution. The definitions of "attempt" and "conspiracy" that I provided for Count 5 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether defendant committed the attempted crime. And you must all agree on whether defendant committed the conspiracy to commit the crime.

The term "coerce" means, A, threats of serious harm to or physical restraint against any person; B, any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or C, the abuse or threatened abuse of law or the legal process.

The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial or reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

The term "commercial sex act" means any sex act on account of which anything of value is given to or received by any person. It is not necessary that the United States prove that the defendant or even the victim gave or received the thing of value, but the government must prove beyond a reasonable doubt that something of value was given or received to or by somebody on account of the sex act. I instruct you that the word "value" is not limited to pecuniary gain. Money need not be involved in order for you to find that value was given or received on account of the sex act. However, you must find beyond a reasonable doubt that something of value was involved.

The term "interstate commerce" means trade, transactions, transportation or communication between any point in a state and any place outside that state or between two points within a state through a place outside the state. I instruct you that an act or transaction that crosses state lines is in interstate commerce. Additionally, any act or

transaction that is economic in nature and affects the flow of money in the stream of commerce to any degree, however minimal, affects interstate commerce. In determining whether the activity was in or affecting interstate commerce, it is not necessary for the United States to show that the defendant knew that his conduct would affect interstate commerce or to show that the defendant intended to affect interstate commerce, only that the activities engaged in were in or did affect interstate commerce.

The term "participating in a venture" means knowingly assisting, supporting or facilitating the described sex trafficking offense.

The defendant may be found guilty of any of the crimes stated in Count 2 through 9 even if the defendant personally did not commit the acts or act -- the act or acts constituting the crime but aided and abetted in its commission. The term "aid and abet" means intentionally to help someone else commit a crime. To prove a defendant guilty of any of the offenses charged in Counts 2 through 9 by aiding and abetting, the government must prove each of the following beyond a reasonable doubt: First, someone else committed the offense; second, the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of the offense; third, the defendant acted with the intent to facilitate the offense; and fourth, the defendant acted before

the crime was completed.

It is not enough that the defendant merely associated with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the charged offense.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime, and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

All right. The remaining instructions have to do with your deliberations, and I will go over this with you following closing argument.

We're going to take a brief maybe five- to ten-minute break between now and the first closing argument, and then after that as well. We'll be in recess.

THE COURTROOM DEPUTY: All rise.

(A recess is then taken.)

(Open court; the jury is not present.)

THE COURT: Can I just say this is a first for me: a jury note before closing arguments.

So here's where I think the problem lies. If you agree, I think I know the solution.

Take a look at the instruction for Count 2. And that's what is being described in the note, not a problem with knowing that all the elements must be proven, but when there's a subpart to the element, what is the jury supposed to do. And it's the only time I get an "or" followed later by an "and."

So with the subparts 1 and 2 there, they are divided by the disjunctive, by "or," find 1 or 2. And then later we say with respect to the first element, you have to all agree, and it's really just you have to all agree on one, and it says and you must all agree on whether 2 happened. So the "and" sort of makes sense because there's a "whether" in there.

But here's what we're really telling them, and what I want to tell the jury. I want to tell them that each time they see this language explaining 1 and 2, what it means is that they must all agree if they find that either 1 or 2 occurred. And now I want to be clear. I'm not going to reread that language because I think that's confusing. I'm going to say: If you agree that subpart 1 or subpart 2 occurred, then you must all agree on whether it was 1 or whether it was 2, and it's not required that you agree that both of them occurred, just on what if any of them occurred, whether it was 1 or 2,

you must all agree.

MS. MILES: Your Honor, can we add one clarification?

THE COURT: Yes.

MS. MILES: They are allowed to find both. So if you can just clarify they can find one or the other or both, but they have to agree.

THE COURT: But you agree they're not required to find both?

MS. MILES: No, that's right.

THE COURT: And you agree also?

MR. OLSON: Yes.

MS. MILES: They're just not prohibited from finding both.

THE COURT: So I intend to bring the jury back in, answer their question, reread the three instructions that are wrong, go into closing.

Your initial was maybe 45 minutes, you said?

MS. PAASO: Your Honor, mine is probably 20, 25.

THE COURT: So we'll do your initial opening and then stop for lunch. Okay?

So my explanation means we make no changes to those counts, I just explain what I think they actually say. Right from both sides? The United States?

MS. PAASO: Correct.

MR. OLSON: Yes.

THE COURT: Thank you.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Thank you for your patience with this process. I'd like to do two things before we begin with closing arguments. The first is to answer a jury note I've received, and so I'll read the note into the record.

It says: "As to Counts 2 and 3 and 4 and others. First parts 1 and 2, 'or' or 'and.'"

That's just the -- I think the description of what you're about to hear.

And as I read this, why don't you start by -- as I read this, I'm going to try to explain it with reference to Count 2.

"Please explain why in several counts there are two parts of an element that must be proved as either/or but the instruction to the jury instructs that we might find both are true. Example: Count 2. First element, parts 1 and 2. Is this part 1 or part 2 or part 1 and part 2 that the defendant knowingly participated, et cetera."

So you'll recall that I read Count 2 as an example, and it has several elements. And I want to be clear that for every count, each and every element of that count must be proven by the United States beyond a reasonable doubt. The only exception isn't really an exception because it's not an

element, and that's what I told you about with venue, which had a different burden of proof. So setting aside venue, the government must prove each and every element of each count beyond a reasonable doubt. But there were times -- and Count 2 was the main one, and it's repeated in these other counts -- where the first element reads as follows: Beginning on or about August 1, 2018, and continuing through on or about September 6, 2018, the defendant either knowingly -- and then there was a part 1 and a part 2.

Are you all with me so far? And it says either knowingly did part 1 or part 2.

Then later in the instruction -- you'll recall I read this several times. It said with respect to the first element, which has these two subparts, you have to all agree, and it says you must all agree on whether he recruited, et cetera, and you must all agree on whether he benefited, et cetera.

The "and" is a little confusing there, and it prompted this note because it's followed by "whether."

So here's what it's really telling you. You have to all agree for element 1 on any count that has these two subparts, you must all agree on whether either of the two subparts occurred. If you think that one of the subparts was proven beyond a reasonable doubt, you must all agree on which one. So you must all agree that it's either one or two. You can also all agree that it's both of them. That's also fine.

You don't have to, but if you find that any or both of them occurred, you must all agree on one of them.

Of course, I'm reminding you that I'm not suggesting that you must find beyond a reasonable doubt that any of them occurred. You're free to say that neither of them were proven beyond a reasonable doubt. But that's simply telling you that you must all agree on which one. In other words, we can't have a jury that thinks -- six of you think one of them happened and six thinks the other happened, but nobody agreed that either of them happened by a vote of all 12 of you.

Fair enough so far? All right.

Any objection to my explanation?

MR. OLSON: No, Your Honor.

MS. PAASO: No, Your Honor.

THE COURT: The reason you don't have a copy of the jury instructions with you right now is I made a mistake in reading them, and now I'm going to try to correct that mistake, and while closing arguments are happening, I'm going to reprint a brand-new copy for you all.

Don't worry about not having copies of the instructions with you, because I want you to pay attention to what the lawyers are saying anyway, and if they want to focus in on an instruction, they'll do that either by displaying it or reading it to you or whatever they think is best.

So I'm going to reread to you instructions for Count

5, Count 6, and Count 9. I'm just going to reread them into the record. And when I get to the part that I omitted earlier, I'm going to tell you that you're about to hear what I omitted, and then you'll have the whole instruction with you. I'm sorry, but that's happened. My fault, but we'll fix it with this.

So defendant is charged in Count 5 of the superseding indictment with transporting M.T. with intent that she engage in prostitution in violation of 2423(a) and (e) of Title 18 of the United States Code.

For the defendant to be found guilty of Count 5, the government must prove each of the following elements beyond a reasonable doubt: first, on or about September 3, 2018, the defendant knowingly transported M.T. from the state of Oregon to the state of Washington; second, the defendant did so with the intent that M.T. engage in prostitution.

And now I'm going to read you the new language.

For purposes of this element, the government must prove beyond a reasonable doubt that a dominant, significant or motivating purpose of defendant's travel across a state line was for M.T. to engage in prostitution. The government need not prove that M.T. engaging in prostitution was the sole and exclusive purpose of the travel, as a person may have more than one significant, dominant or motivating purpose for transporting others across a state line, but the government

must prove that the prostitution was not merely incidental to the trip.

That's the end of the new language.

And third, M.T. was under the age of 18 years at the time.

Prostitution is knowingly engaging in or offering to engage in a sexual act in exchange for money or other valuable consideration. It is not a defense to the crime of transporting a minor for purposes of prostitution that the defendant was ignorant of the child's age. If someone knowingly transports a person for the purposes of prostitution, the transporter assumes the risk that the victim is a minor, regardless of what the victim says or how the victim appears.

Defendant may also be found guilty of Count 5 if he attempted or conspired to transport a minor with intent to engage them in prostitution. To find the defendant guilty of attempting this crime, the government must prove: First, beginning on or about September 3, 2018, and continuing through on or about September 6, 2018, the defendant intended to transport M.T., who was under 18 years old, from Oregon to Washington in order that M.T. engage in prostitution; and second, the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime.

Mere preparation is not a substantial step toward

committing the crime. To constitute a substantial step, a defendant's act or actions will unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

You do need not agree unanimously as to which particular act or actions constituted a substantial step towards the commission of a crime.

To find defendant guilty of conspiring to commit Count 5, the government must prove: First, beginning on or about September 3, 2018, and continuing through on or about September 6, 2018, there was an agreement between two or more persons to transport a minor with the intent that they engage in prostitution; and second, the defendant became a member of the conspiracy, knowing of at least one of its objects and intending to help accomplish it.

The instructions that I gave you regarding conspiracies in regard to Count 1 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether the defendant committed the attempted crime, and you must all agree on whether the defendant committed the conspiracy to commit the crime.

Now I'm going to reread Count 6.

The defendant is charged in Count 6 of the superseding indictment with transporting S.F. with intent that

she engage in prostitution, in violation of federal law.

For the defendant to be found guilty of Count 6, the government must prove each of the following elements beyond a reasonable doubt: First, on or about September 3, 2018, the defendant knowingly transported S.F. from the state of Oregon to the state of Washington; second, the defendant did so with the intent that S.F. engage in prostitution.

And here's the new language again.

For purposes of this element, the government must prove beyond a reasonable doubt that a dominant, significant or motivating purpose of defendant's travel across a state line was for S.F. to engage in prostitution. The government need not prove that S.F. engaging in prostitution was the sole and exclusive purpose of the travel, as a person may have more than one significant, dominant or motivating purpose for transporting others across a state line, but the government must prove that prostitution was not merely incidental to the trip; and third, S.F. was under the age of 18 years at the time.

As I instructed you with regard to Count 5, ignorance of the victim's age is not a defense to this count.

Defendant may also be found guilty of Count 6 if he attempted or conspired to transport S.F. with the intent to engage her in prostitution. The definitions of "attempt" and "conspiracy" that are provided for Count 5 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether the defendant committed the attempted crime. And you must all agree on whether the defendant committed the conspiracy to commit the crime.

I will now reread Count 9 with its changes.

The defendant is charged in Count 9 of the superseding indictment with transporting S.F. with intent that she engage in prostitution, in violation of 2423(a) and (e) of Title 18 of the U.S. Code.

For the defendant to be found guilty of Count 9, the government must prove each of the following elements beyond a reasonable doubt: First, on or between September 6, 2018 and September 10, 2018, the defendant knowingly transported S.F. from the state of Washington to the state of Oregon; second, the defendant did so with the intent that S.F. engage in prostitution.

Again, with the new language.

For purposes of this element, the government must prove beyond a reasonable doubt that a dominant, significant or motivating purpose of defendant's travel across a state line was for S.F. to engage in prostitution. The government need not prove that S.F. engaging in prostitution was the sole and exclusive purpose of the travel, as a person may have more than one significant, dominant or motivating purpose for

transporting others across a state line, but the government must prove that the prostitution was not merely incidental to the trip. And third, S.F. was under the age of 18 years at the time.

As with Counts 5 and 6, ignorance of the victim's age is not a defense to this count.

Defendant may also be found guilty of Count 9 if he attempted or conspired to transport S.F. with the intent to engage her in prostitution. The definitions of "attempt" and "conspiracy" that I provided for Count 5 also apply here.

You must all agree on whether defendant committed the completed crime. You must all agree on whether defendant committed the attempted crime. And you must all agree on whether defendant committed the conspiracy to commit the crime.

Thank you. I think that gets us up to speed on the instructions. As I said, before you begin your deliberations, you'll all have your personal copy and a master copy.

I'll now receive on behalf of the jury closing arguments from the United States.

Ms. Paaso.

MS. PAASO: May it please the Court, Counsel, and members of the jury. You've spent the last three days listening to evidence, looking at exhibits, and reading more than 40 pages of jury instructions, and by now the verdict form may look more like a complicated multiple choice test than

anything else. But it's not complicated, and I'm going to spend a few minutes walking through the charges and the verdict form, and you'll realize you have everything you need to start deliberating.

The defendant has been charged with nine counts related to trafficking of 15-year-old Madelynn Taylor and 14-year-old Stephanie Franz. There are six counts specific to sex trafficking, and three counts related to transportation.

The Court has provided you with the definitions, but it might be helpful to think about sex trafficking in two separate steps.

First, determine whether the defendant was involved in the recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining by any means a person, or did he benefit financially by receiving anything of value from participating in a venture that did so.

It's helpful to think of the first step in two categories. The first category involves facilitation. What was done to make that commercial sex act possible? And then the second category is benefiting from the commercial sex act itself, whether through money or something else of value, including drugs. And if you find the defendant falls into one of these two categories or both of these categories, you move on to the next step, specifically, was that involvement -- was that facilitation or was that benefit either done knowing or in

reckless disregard of the fact that force, threats of force, fraud or coercion will be used to cause a person to engage in a commercial sex act, or knowing or in reckless disregard of the fact that a person is under 18 years old and will be caused to engage in a commercial sex act.

The second part is straightforward: Did the defendant actually know or recklessly disregard that his victim was under 18.

For the first part, you've been provided with the definition of coercion. It's threats of serious harm to or physical restraint against any person, any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person.

And what's serious harm? It's any harm, whether physical or nonphysical, including psychological, financial or reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a person of the same background and in the same circumstances to perform or continue performing commercial sexual activity in order to avoid that harm.

And I want you to focus on some words there: "A person of the same background and in the same circumstances." So when you're evaluating the evidence in this case, ask yourself -- and asking yourself whether this victim was

coerced, you need to evaluate the circumstances from a 14- or 15-year-old girl a hundred miles from home. Again, it sounds like it's a lot, but it's not. Step one, was there facilitation or a benefit; and if so, step two, did the defendant know or disregard the victim was being forced or did he know or recklessly disregard that the victim was under 18.

For the transportation counts, the elements are straightforward. You'll be asked to consider whether the defendants knowingly transported Madelynn or Stephanie across state line with the intent that they engage in prostitution.

There's a couple other definitions I want to draw your attention to. First is conspiracy. And that's a criminal partnership of two or more people to commit one or more crimes, and it doesn't matter if the crime was actually committed or whether there was a formal agreement. And you have to agree as to the particular crime that the conspirators agreed to commit.

There's also aiding and abetting, and those will only apply to Counts 2 through 9, and the defendant may be found guilty of all of the crimes in Count 2 through 9 even if the defendant personally did not commit the act or the acts constituting the crime but aided and abetted in its commission. And to aid and abet means to intentionally help someone else commit a crime.

There's also interstate commerce, and there are numerous ways to prove interstate commerce. If its crosses

state lines, it's interstate commerce. Cell phones affect interstates commerce, so does social media. Even drugs are interpreted as interstate commerce because of the economic impact.

Reckless disregard. A person acts with reckless disregard when the person is aware of and consciously disregards a substantial and unjustifiable risk that a circumstance exists or that a particular harm will result from the person's conduct.

So you have the law and the definitions. So let's talk about the evidence that supports each and every charge in this case beyond a reasonable doubt.

I'm actually going to jump to Count 2. If you want to look on your verdict form, you can. You don't have to. Just keep these things in mind.

Count 2 involves the drug house on East 18th Street in Vancouver. Madelynn, Stephanie, and Diana testified that the defendant took them to that location, that he engaged with a big bald guy, and that after that, the guy had sex with Madelynn. And Madelynn and Diana both testified that Madelynn got paid. Whether she received some, all or none of that money, it's still a commercial sex act. It doesn't matter if the defendant ended up with the money or if Madelynn had the money. A commercial sex act occurred.

You'll be asked if the defendant facilitated the

commercial sex act. Diana and Keonte told you it was the defendant's drug house or his drug plug. The defendant took Madelynn to the house. A commercial sex act occurred. The defendant facilitated that act. And you'll be asked if he benefited from the commercial sex act. Madelynn, Stephanie, and Diana all testified that the defendant was the one who received the baggie of cocaine, yet no one saw the money exchanged for it because it was Madelynn that was exchanged for it, and the defendant benefited from it.

And were his actions in reckless disregard of her age? Absolutely. You've seen her in person. You've seen photos of her at the time. You've heard testimony that Madelynn did not look anywhere near 18, and also that the defendant was even told that she was underage.

Moving on to Counts 3 and 4, these involve the shop in Battle Ground, Washington. And you'll be asked whether defendant was involved in facilitating the commercial sex act in which a man three times her age had sex with Stephanie in the trailer. You heard testimony from the man at the shop linking the defendant to the location through his uncle. Diana had never been there before and wouldn't have been there but for the defendant. Stephanie told you that she felt she had no choice but to make money, and Diana and Stephanie both testified that the money Stephanie received went to the defendant.

You heard plenty of evidence to find that the defendant both facilitated and benefited from the commercial sex acts involving Stephanie in Count 3, and Stephanie was 14 years old at that time. She testified she told the defendant her age. And Diana testified that she and the defendant talked about how young she was. Keonte Scott even testified that he and the defendant talked about how Stephanie was a minor after the fact. The defendant knew or recklessly disregarded that Stephanie was under 18.

Count 4 involves that same commercial sex act in the trailer at the shop, but Count 4 alleges that the defendant knew or recklessly disregarded that force, threats of force or coercion were used to cause Stephanie to engage in that act.

You heard Stephanie talk about wanting to rest, about being tired. And she tried to sit down. And both Diana and Stephanie testified that Diana slapped her. And Diana told you that she did so at the instruction of the defendant, telling her to slap that bitch.

You also heard talk of the defendant carrying a gun. You heard about it from Diana, you heard about it from Stephanie, and you heard it about it from David Morgavi. And any of the charge involving coercion must be evaluated from the victim's point of view. So when you think about the defendant's actions that night, think about them from the perspective of an exhausted, drugged 14-year-old out in the

middle of nowhere being told that she's supposed to make money.

Think about the circumstances that would lead Madelynn Taylor to tell a complete stranger "They're going to kill me." You heard about the threats, the actual force, and the coercion. The defendant knew and actively participated in that coercion.

Counts 5 and 6 are about the trip from Eugene to Vancouver. You heard direct testimony from Diana Petrovic. Diana told you that she and the defendant specifically targeted Madelynn because she had been trafficked before. They picked her out of social media belonging to Keonte Scott. They made a plan. They conspired to get her to Vancouver. And when they discovered Stephanie was with her after they drove down there, remember what Diana said? It was an opportunity to make more money. More girls, more money.

They fed both girls cocaine and molly on the way up, continued to give them drugs through the night, and then took them to the shop in Battle Ground to make money. Diana made clear what the intent was. Madelynn knew exactly what was expected, and told Bob Freund as much. And Stephanie fulfilled the plan. When defendant and Diana took both girls into Washington, it was with the intent that they engage in sex for money.

The defendant would have you believe that they drove down there for a $100 cocaine deal. That doesn't make sense.

That doesn't make sense. They could make so much more money prostituting the girls, and remember what Keonte Scott said when he testified: the real money is in prostitution.

Count 7 and 8 involve taking Stephanie to the Lombard house. And you'll be asked whether defendant was involved in facilitating the commercial sex act in which two men had sex with 14-year-old Stephanie in that house. You heard testimony from Keonte and Diana that the defendant introduced them both to that house. Defendant and Diana drove Stephanie there. Defendant paid for the clothes that she wore there, and Stephanie testified that by then she understood what was expected from her. And you heard Stephanie recount being sexually assaulted in that house. Diana and Stephanie both testified that the defendant got the money she was given. You've heard more than enough evidence to find the defendant both facilitated and benefited from the commercial sex act at the Lombard house described in Count 7.

As for the coercion in Count 8, the coercion started in Eugene when they were first given the drugs for the drive up. The coercion continued when the defendant slept with both girls, and when he ordered or directed the girls to sleep with each other.

The coercion continued when he flashed his gun. And remember what Sergeant Sydow told you about the minor victims of trafficking, about how they don't have the same ability to

find food, shelter or safety as adults. Remember he said drugs can be used coercively to control trafficking victims, and remember how Stephanie told you about being afraid to contact the police.

If you look at the evidence from the perspective of a 14-year-old girl, far from home, with a history of running away, who had been doing drugs and thought her friend abandoned her, you will find that the defendant facilitated and benefited from the commercial sex at the Lombard house described in Count 8, knowing or with reckless disregard that force, threats -- of force of coercion were used.

Count 9 involves the defendant transporting, attempted to transport or conspiring to transport Stephanie to the Lombard house to engage in prostitution. The defendant took the girls to that house for one reason: to make money off their bodies. Keonte knew that, Diana knew that, Madelynn knew that, what that house was for, because she'd been there before. And the defendant crossed the river into Portland in order to make money off of Stephanie's body, and he did.

So now I want to go back to Count 1. And Count 1 is related to the conspiracy to commit sex trafficking. Madelynn was targeted because she had been trafficked before. Stephanie was literally an opportunity to make more money. Defendant conspired to commit sex trafficking by driving Madelynn and Stephanie to Vancouver, keeping them drugged, brandishing his

gun, and making them available for commercial sex, knowing or in reckless disregard that force, threat of force or coercion would be used, and knowing full well that they were under 18.

On Monday when we laid out this case for you, we asked you to listen to the evidence carefully, and told you that each piece of evidence was a part of a puzzle. Each witness had a story to tell. And there were going to be some inconsistencies, and that should be expected. We're talking about 14- and 15-year-old girls who are testifying about something that happened three years ago, when they were being given a lot of -- a lot of drugs.

And I anticipate the defense is going to highlight those inconsistencies. But don't forget about the consistent arguments as well. There's consistent accounts about what happened. And the location of Diana's phone, remember that video? It's Exhibit 24 if you want to watch it again. The victims told Detective Lee what happened to them. They told him about being picked up at gas station. They told him about the trap house in Vancouver, they told him about the shop with the men. They told him about how the defendant, Diana, Madelynn, and Stephanie were all there, and then you heard from those men who reported they were there as well. You heard from multiple witnesses that the defendant's uncle was the only connection those girls had to that location, and you heard multiple people testify about Stephanie going into one of those

trailers with one of those men.

Diana's phone was at all those locations, at the gas station in Eugene. You saw it travel up I-5. You saw it in the trap house in Vancouver, and you saw it at the shop in Battle Ground. You saw how Diana's phone traveled to the Lombard house. Dine and Keonte both testified that it was the defendant that took them there. Madelynn recognized that location because that's where she was trafficked before.

And the video of the interior of that house matches the victims' discrimination. Stephanie and Madelynn told you the names of two individuals that lived there, and that was confirmed by Detective Lee. And you saw how Diana's phone tracked back to the location where Stephanie was picked up when she called for help. And you heard Sergeant Sydow and Detective Lee tell you why victims feel they can't call the police. Stephanie herself told you that she was afraid of getting in trouble. And I think that Keonte Scott, when he testified, said it best. And you heard him on the phone. You heard him telling Stephanie: remember, remember the code of the streets.

I anticipate that the defense will argue that Diana Petrovic was the one running the show. But that's what it was supposed to look like. Remember that's what the role of a bottom is, to manage the day-to-day operations and to insulate the defendant or the trafficker from criminal liability. And

Diana Petrovic did that job well. She told you that being a bottom meant that you didn't have to have as much sex and you were taken care of. She was absolutely clear about her motivation at that time. It was survival: food, drugs, a safe place to sleep.

Diana wasn't the one calling the shots. The defendant was doing that. The defendant had the connections, he had the drugs, he had the client base, and he had the power. The defendant was the big homie. He was the one in charge.

We told you on Monday that the case begins and ends with the defendant. And given what you've seen and heard over these past three days, I think you can see that that's true. When you go back to deliberate, you're going to reflect on everything you've seen and heard this week. And when you do, that verdict form isn't going to seem complicated at all. You'll be able to work your way through each and every count and find the defendant guilty.

THE COURT: Thank you.

Because of the time, we'll take our lunch break now before we hear closing arguments from the defense. We'll receive those closing arguments at 1:15, 1:15 this afternoon.

(A lunch recess is then taken.)

(Open court; the jury is not present.)

THE COURT: We are here for one brief question. With what's happened already today, I want to have on the record

whether anyone has any objections to the most recent version of the jury instructions that was emailed to each of you over the lunch hour, starting with the United States.

MS. PAASO: No, Your Honor.

THE COURT: Mr. Olson?

MR. OLSON: No, Your Honor.

THE COURT: That's it. Thank you very much.

THE COURTROOM DEPUTY: Court is in recess.

(A recess is then taken.)

(Open court; the jury is present.)

THE COURT: Thank you, folks.

Mr. Olson, we'll now hear your closing argument.

MR. OLSON: Thank you, Your Honor, counsel, Mr. Jackson, Your Honor, members of the jury.

First off, I really want to thank you for your service, and I can tell that several of you were paying very close attention to witness testimony and taking notes throughout the process and taking this whole experience very seriously, and I really appreciate it. I'm sure that the government really appreciates that as well. It's a big sacrifice, and thank you for that.

I want to start off by talking about something troubling and a little unexpected, and that is the definition and meaning of "commercial sex act," which is defined in your instructions. It's actually not all that complicated. The

part about commercial is perhaps a little bit complicated, but that's not really what I'm talking about. The part I'm talking about is sex act. A sex act is what you might think it is. It's a sex act.

And the reason I'm starting with this is because one of the things -- probably the only thing Ms. Petrovic was very clear about in her testimony was that when they went to the Battle Ground property, there was no plan to have sex with these guys. The plan was to sweet-talk these guys out of their money, to seduce them, to talk nice to them, to perhaps make them feel young again, but she was quite clear that this was not about -- the girls were not required to engage in sex acts. And Stephanie Franz confirms this. She said it in her grand jury and she said it in her testimony here in court that she was not told that she had to sleep with any of the men.

So I'm starting off with that because that's obviously a very critical piece of this. If you believe everything else, there's still a problem there with several of the government's first few counts, at least of the indictment. Perhaps that affects the conspiracy count, but it most certainly affects both Counts 3, 4, and 5 of -- 3, 4, 5, and 6, which have to do with that first trip, the sex trafficking counts that pertain to the Battle Ground property.

Excuse me. It affects Counts 3 and 6 -- 2, 3, 4, and 6. So -- excuse me, not 6. I'm sorry. They affect all the

counts that pertain to the going to the Battle Ground property, because that's where this conversation occurred, and that was what Ms. Petrovic was referring to.

So when you think about it, Ms. Petrovic herself got $100 out of some guy, not for having sex with him but for just talking to him for a little while. Mr. Wilcox testified that he paid somebody -- probably Stephanie -- a hundred bucks because she asked for it, so he gave her a hundred bucks. So there was no sex acts there.

So this goes to the defendant's intent. It goes to the conspiracy. It goes to whether the -- these gals were recruited, transported to engage in commercial sex acts. They weren't. That wasn't the plan. Okay.

So I'm going to move on to my next point, and what we heard from the prosecutor this morning was a relatively short presentation. We'll probably hear some more here in a moment in their rebuttal argument. At this point I'll just say the government is picking out, obviously, the best parts of the testimony to illustrate to you how they have proven all of the elements of all these offenses, and obviously they're leaving out -- they're ignoring a lot of testimony that was -- that came from the witness box there from the witnesses, all sort of inconsistencies. I'm actually not going to go through every inconsistency. I'm going to talk about a few of them that are particularly pertinent to us, but the government so far has

sort of cherry picked, frankly, the best of little pieces of testimony that most favor the prosecution.

Now, when it comes right down to it, though, your job is going to be to really think about the credibility of these witnesses and whether you can legitimately just cherry pick the best parts. And I want you to -- I'm going to ask you to take a close look at Instruction 8, which is the credibility of witness instruction -- witnesses instruction, because it really provides an excellent road map for how to go about assessing witness credibility. And a lot of it is common sense, the sorts of things you might normally think about in judging whether a person is being credible or reliable or not, but it's sort of helpful to have it there all in writing.

And the way it starts off is, "In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it."

And so thus far what the government has proposed to you is really there's parts of each person's testimony that you should believe. But what I want to say is you should go further than that and say can you really trust any part of it once you've decided that some part of it, some other part of it is seriously flawed.

And then the instructions go on to say all the sorts of things that you may take into account when you're evaluating

witness testimony. "The witness's opportunity and ability to see or hear or know the things testified to." Okay.

Number two is a big one: the witness's memory. Now, memory came up quite a bit during the course of this trial, and how often did you hear witnesses, especially Ms. Petrovic and Ms. Franz, basically admit that their memory had been severely compromised, that they were really remembering just sort of bits and pieces of things, and their brain has been fried by drug use and passage of time. And, again, Stephanie and Ms. Petrovic were unique in that, in stressing that.

Now, maybe they were saying that at times when I was cross-examining them or asking them a difficult question and it was sort of a way for them to dodge the question and say they just couldn't remember. So that's one possibility. Or maybe they just don't remember things, or maybe they've confused things when I've shown them prior statements. Maybe they've confused this event with some other event and got it kind of muddled in their head, or maybe they've talked to some other -- read some other report in the case and got things confused. Somehow that's affected their memory.

But the bottom line is these witnesses, their memory is terrible. It's terrible. And they admit it, basically. And so that's a problem for the government. Whether it's purposeful lies or unintentional lies or maybe things that started off as lies and they've morphed into truths in their

heads, that's a big problem in the telling of the story because there's so much of it that is so forgotten, so muddled up and so confused, and that's a big problem for the government in presenting its narrative, its very clean-cut narrative of this happening and this happening and this happening. Okay. So that's one thing.

One of the other -- the other ways that you consider witness testimony is the manner while testifying -- we'll come to that later -- the witness's interest in the outcome, if any, the witness's bias or prejudice. And this is where I'd just like to talk about motive to lie. Stephanie Franz, we heard early in the case -- it seems like forever, but early in this case, she testified about and she acknowledged that when she first told the story to Detective Lee, she told this sort of kind of overblown story, frankly, about how Mr. Jackson and Ms. Petrovic held her captive, took her phone away from the beginning, you know, wouldn't let her look out the window when they were driving to places so she couldn't tell where they were. And most importantly, that she was with them the whole time, held captive.

Well, that was completely false. Okay? She admits that now. And she was leaving out this significant piece where she went off with this Charlie Hernandez person and ended up getting into a fight with a girl and getting shot at at a park and running barefoot and bruised to the Casters' house.

Now, we don't know why she lied about that, why she kept that out of her first account, but she did. And you may think -- and the government will argue that that has nothing to do with this, but it does because it's so intertwined with her original telling of the story. And it's also intertwined because when she was at the hotel and she was -- during the relevant time of our indictment, when she's at the hotel and she's texting her mom and she's saying that she's in this predicament, one of the things she just gratuitously throws out there is that the police are at Charlie's house, but I didn't see him, I'm not with him. So she's basically telling her mom, hey, look, whatever is going on here, I didn't see Charlie, because she knows, she testified, that she's assuming that the police are going to call Charlie Hernandez and her mom is going to be mad at her for, you know, connecting with Charlie Hernandez again.

And so, again, we don't know why, we don't know what the big deal is with him, but there's something going on there. So when she's telling this first story to the detective for the first time about defendant and how terrible the experience was, and she's certainly exaggerating certain aspects of it, there's a likelihood that it's somehow tied in with this Charlie Hernandez person, and those memories -- so she admits certain things are false, but now the parts she's testifying to are kind of baked into it. So the question is, you know, can you

trust the whole story, given how the first story was so false and so convoluted with all these other lies and omissions.

And, again, we don't know why, but perhaps she was trying to deflect blame from Charlie Hernandez, and in doing so, by putting more blames, the police will focus their attention on Mr. Jackson and Ms. Petrovic at the time. We don't know. All we know is she lied.

And then when she was confronted about this the next time in May of 2021, she admitted that she left the defendant for a period of time and claimed that he trusted her, and she admitted she tried to connect with Charlie Hernandez and couldn't and didn't. So she really lied again. And it wasn't until the final time that she talked to the detective where she finally admits that she was with him, and she tells more of the story about what happened.

So, again, you know, we don't know why she lied like that, that story, how it took so long to kind of drag that out of her, but it shows that she's just not willing to -- her story changes over time. Okay? It evolves.

So then the question is, if that story evolves so much, how can we trust the other part. Okay? The other part of her testimony that favors the government. And you can't.

And then as we talk about interest and bias, we also have to talk about Diana Petrovic, obviously. She had -- she has a huge motive to lie, to curry favor with the government,

to get the best possible deal for herself. And she got a fantastic deal. She pled guilty to something and is probably looking at no more than a year or so, whereas she could have been looking at a 10- to 15-year mandatory prison sentence. So that's a fantastic deal for her, and it gave her tremendous incentive to come in here and testify against Mr. Jackson in a way that incriminated him, in a way that curried favor with the government.

Now, I asked her, "What do you hope to get out of this?" And, frankly, her initial response was a little scripted, probably. She said, "It's up to the judge. The judge decides." And eventually she admitted that she does hope that the other case that she has will get dismissed. So the very fact that she was a little reluctant to admit that is something that you can consider in considering her credibility.

Now, it's been said that she's got this other case hanging over her head, but the very fact that she's got this other case hanging over her head means that she's got more to do and that's why she came in here to testify, in order to really complete the transaction that she has arranged with the government to provide testimony, to provide cooperation against the defendant. And so it's part of her deal to come in here and do that, and she's done that.

And there's another instruction here that I'll turn to briefly, and that is Instruction 15, which involves

testimony of a witness involving special circumstances. It basically tells you that both Diana Petrovic and Keonte Scott have pled guilty pursuant to cooperation deals with the government. You can look at that. Basically the bottom line of that instruction tells you that you should examine the testimony of both Petrovic and Scott with greater caution than that of other witnesses. And it says you should. It doesn't say you have to. All of these are sort of you may consider that sort of thing. It's totally up to you how much weight you give this evidence. But you should. You should consider her testimony with some degree of -- a tremendous degree of caution, especially given the significant reduction that the government has offered her in return for this testimony. And she seems to know how valuable that is.

Keonte Scott, you know, he denied that he's trying to get a good sentence, and for Keonte Scott, who is also cooperating with the government, he's not guaranteed anything. Okay? But he's cooperating with the government, and for him it's not about a lower sentence. For him it's all about the truth, he says.

Well, that's just complete nonsense. You don't take the witness stand and put yourself out there like that if you're just all about the truth. Okay? So you can -- I ask that you view that with great skepticism. This is not about Keonte wanting to tell the truth. This is about Keonte

protecting Keonte. Of course he wants a good deal out of this. Who wouldn't? That's the whole point to enter into an agreement with the government, so you can get a lesser sentence. People do that all the time. Why can't he admit that? So, again, the very fact he's denying that shows that he's a liar. He cannot be trusted. So Keonte, for Keonte it's not all about the truth.

Now, his first statements which, you know -- his first statement, he tells -- he says that Mr. Jackson is just a dope dealer, he's a bystander, not involved in pimping. By the time he talks to Agent Lee again, Ms. Petrovic has cut a deal with the government. So now Mr. Scott portrays Johnl Jackson as a pimp, as his mentor, the guy that gave him tips on how to prostitute girls. And so he's changed his story, obviously, quite dramatically.

Also in that second statement to Agent Lee, he changes his story quite dramatically about this Lombard house, because before this he had been saying that Petrovic was a prostitute when he met her and Petrovic introduced him to the idea of prostitution by taking him to this Lombard house, and that's how he got into it.

In the very middle of that interview, he changes his story and says, no, it was actually Mr. Jackson that introduced me and Petrovic to the Lombard house. So he just cannot be trusted when his story evolves so much.

Now, the main part of his testimony had to do with this threatening phone call -- alleged -- that he placed to Stephanie Franz, allegedly at the -- on behalf of Mr. Jackson. Okay? So this is Government's Exhibit 15. It was played for you. I really urge that you go back and listen to that and decide if the tenor and the content of that phone call really sounds like a threatening phone call intended to protect Mr. Jackson.

Because here's the situation: That phone call was placed on September 30th, 2019. And what Mr. Scott is saying to us from the witness stand is that before that, two months before that, he was in custody with Mr. Jackson in late 2019 at the Multnomah County Inverness Jail, and they both had been indicted for sex trafficking, and they were looking at the charging documents. He said the charging pleading or whatever. They said they were trying to figure out who MV5 was. And they figured out who MV5 was -- that's Stephanie Franz -- and Keonte Scott said he would make sure that Franz is warned or whatever -- whatever he said.

But as we established in cross-examination, Stephanie Franz was not even a victim yet. She was not identified in the indictment that existed. So it could not be that you're looking at the indictment and trying to figure out who she is, because she's not in there.

And so -- and then Mr. Scott says, "I'll take care of

it." He tells Jackson, "I'll take care of this." Well, why does he let two months pass, then? Why does he let two months pass before he calls Ms. Franz and says, you know the rules of the street sort of thing.

And when you listen to the phone call, again, he's just calling her up to say hello, and she says, "I'm going to go talk to a detective."

"About what?" So on and so forth.

But I think he's just a little full of himself when he says to Mr. Jackson, and he tells us that he told Mr. Jackson that he's going to take care of his problem and call Stephanie Franz, because the phone call, the timing, the content of the phone call, it doesn't add up.

So why is he telling this story? Well, he's telling this story to help the government. Okay? To help the government in its prosecution of Mr. Jackson, because they want to be able to show that Mr. Jackson had this guilty knowledge and he was all worried about Stephanie Franz, so he had this conversation with Mr. Scott, and this phone call somehow proves it. But it doesn't. It just doesn't add up.

And there's a few exhibits that I'd like to point your attention to with regard to Mr. Scott. They were not discussed but they are in evidence. Defense Exhibit 157-T, 163-T, and 165-T. Those are transcripts of phone calls between Mr. Scott and Stephanie Franz from the jail.

So the jury instruction on cooperating witnesses tells you -- or cooperating defendants, defendants who have reached a deal with the government, tells you to look at that. You should look at that testimony with caution, and you should.

The next point I'd like to discuss is the fact that Mr. Jackson is really at a disadvantage here, quite frankly, because of the stereotypical image and picture that we probably all have for this trial of a pimp. And it's been sort of reinforced a little bit during the course of this trial with expert testimony. What I mean by that is a pimp who has a bottom bitch, so called, who then has these prostitutes working under her.

Now, there was some expert testimony about that general structure, and the expert was careful to say that, you know, there's no -- nothing totally uniform about this, obviously. These are just sort of patterns and this isn't how it always works, but Ms. Petrovic said that she was a bottom bitch for Keonte and then for Mr. Jackson.

The danger here is that if you accept that idea of the stereotypical pimp and that sort of structure, then it makes the government's case so much easier because what the expert said is that what the pimp does is he puts the bottom out there and she does all the work and she is the one that has the exposure if they get caught or something happens. And so the government can say in this case that the very fact that

it's Diana Petrovic that's doing all the work, it's Diana Petrovic that's hitting the face of these girls when they're not moving it fast enough, the very fact that the government can -- the very fact that she's doing that and the defendant is not, or that there's not so much evidence of the defendant doing really anything, the very fact of that, the government is saying, is proof of a sex trafficking operation.

So -- and this is dangerous because it's almost sort of Orwellian that the lack of evidence that Mr. Jackson did anything is, in fact, evidence of his guilt, because that's how pimps operate.

So I want to ask you to be really careful about that, because it almost -- it was their first witness, and so you get this idea in your head, okay, he's a pimp and so she does all the work, and that's why she's interacting with these gals. But instead I want you to consider the possibility that Diana was the one in control, and she was the one directing traffic because -- because she was in control. She was the one running the show, and that Mr. Jackson was just sort of there with her.

Now, again, that doesn't fit the mold of the stereotypical pimp, but that's -- if you look at it from just a slightly different angle, you can get there. And the reason you need to look at it from that slightly different angle is because of the presumption of innocence. It's because -- I'm halfway through, and it's the first time I've gotten to this

point. The government's burden here is proof beyond a reasonable doubt. So proof beyond a reasonable doubt, you can't start with the assumption that he is a pimp and this is a typical pimp-prostitute structure. Okay? You have to consider the evidence not in view of that structure or that preconceived notion of how pimps operate. You have to consider the evidence in light of the government's burden of proof, which is proof beyond a reasonable doubt, and it's the presumption of innocence.

So you start with a blank slate to consider this evidence, no assumptions about what role each person is playing, no assumptions about what Diana's role is. Consider the evidence and start with the assumption that the government has to prove everything, has to prove everything, has to prove its case beyond a reasonable doubt. And when you look at it through that lens, you can see the evidence in a different way.

Let me give you an example. There was testimony from Madelynn Taylor about she went off with Mr. Freund, she came back, there was a lot of drama there. At some point she gets out of the car and sits at the table with Diana, and Diana is trying to persuade her to stay. And Madelynn Taylor says that Diana would get up and go talk to Mr. Jackson and then come back, get up and talk to Mr. Jackson and then come back. So the picture from that, right, is that Diana is getting direction from Mr. Jackson and coming back and talking to

Madelynn.

So -- but we don't know what was said in those conversations. The most that Ms. Petrovic herself said was that Mr. Jackson -- Mr. Jackson's position is that she should stay with them because he was concerned -- because it was safe. And both he and Ms. Petrovic were concerned that if she went off with this guy, they didn't know who this guy is. Ms. Petrovic said she was concerned for Madelynn's safety, and that's part of the reason she was freaking out.

So you have this image in your head from Madelynn's testimony about Mr. Jackson directing Diana, but that's not the right -- that's not the right image, because you don't know what that conversation is.

And by the way, Mr. Freund was watching Madelynn very carefully, by his own testimony, because he was concerned for her well-being, and he didn't testify to any of this interaction. So -- and the other thing about that is that again, when Mr. Freund has this interaction with the defendant in the doorway, he talks about getting out of the car and they all walk in, I think, towards the barn or into the barn or something, and the defendant is walking out, and Mr. Freund somehow determines that Mr. Jackson is in charge, A, because he's the stereotypical pimp, right? So Mr. Freund says to Mr. Jackson, "Hey, this gal is not going with you. She's not going to go with you."

And what does Mr. Jackson do? Does he pull out his gun that he's got? Does he brandish his gun and show a show of force there? Does he assert control over the situation?

No. What does he say? He says, "That's cool."

So where is the coercion and how does that fit in with the paradigm, the stereotypical pimp? He says, "No, that's cool."

Maybe it's Diana is the only one that's really freaking out here, and maybe she's freaking out because she's the one that's in control, supposed to be in control, and things are kind of going sideways, and she actually said from the witness stand something very telling. She said, "I had no control."

Well, control was hers to lose. She was in charge of this operation. So when she said, "I had no control," that means she had been in control of what was going on, and she was losing control of what was happening.

So beyond reasonable doubt, that's the only lens that you should be viewing this evidence, not that it was stereotypical of a pimp.

The next point I want to talk about is Diana Petrovic more specifically, and Maddie said that Diana was manipulative. Maddie said that in her experience, her impression was that Mr. Jackson was subservient, and that Diana was the dominant manipulative one. So Maddie spoke to this.

And I submit that what we saw yesterday with her testimony was a little bit of a drama show. Okay? That may sound mean and cruel, but I'm just going to say it. She lined up a Bosnian interpreter to be available in the event she claimed that she needed a Bosnian interpreter. And as we established, she had spent six hours with Agent Lee, talking to him. She didn't need a Bosnian interpreter, but she wanted something there so that if she needed to take a break, if she needed to, you know, talk to somebody and try to figure out what's going on here, she would be able to do that. And she doesn't have any language problems, I mean, not even remotely. Now, she may have some memory problems, but not language problems. So I suggest that was a bit of a manipulation for her. And you'll recall that she's the only one, she's the only witness who asked to take a break during this trial. No other witnesses did that.

Now, I get that witnesses get nervous and anxious. That's perfectly normal and perfectly acceptable. But when you consider the manner in which she answered some of the questions, it wasn't just nerves. What I mean by that was there were a number of very simple questions that were posed to her by the government that were simple and understandable but the answers were going to be incriminating. They were going to be incriminating to Mr. Jackson. And there were times when she paused for quite some time before answering them. And I submit

to you that that was not let me think about my answer and make sure I answer it carefully. That was more of a let's just have a little dramatic pause here before I answer it.

Now, you folks are closer to the witness box than I am -- I'm way over there -- and you have a much better view of things like demeanor. So you can take that and consider demeanor. That's actually one of the things that you can consider, manner of testifying. And so you had a closeup view of the manner in which she testified.

I'm not asking you to question what she's overcome in life. It sounds like she has overcome a lot in life, in terms of substance abuse and anxiety, but I do ask that you look at her testimony with a skeptical eye, particularly seemingly the way that she kind of portrays herself as a victim, as appearing sort of meek and mild and submissive. That's not how other witnesses have described her. And so consider her testimony with skepticism.

Now, the next point I'd like to talk about -- I'm going to go briefly through some points in my opening. I made some predictions -- I tried to make some predictions. One of my predictions was that I couldn't make any predictions because stories had evolved so much. And I think that prediction was correct. But I also tried to predict some things about what Diana was going to say. And I was right about the one thing, the first thing about these not being commercial sex acts. I

was wrong about another thing having to do with the slap. She denied that initially. I'll come to that in a second.

But the other thing I don't know if I was right or wrong about, and that had to do with what I was anticipating from her regarding her testimony regarding what the plan was when they drove down from Vancouver to Eugene, what the intent was, did they form an intent to traffic these girls, and if so, when.

Again, this is also important to a number of the counts, particularly, I believe, Counts 2 through 6, which I'll explain here, because all of these counts, Counts 2 through 6 arguably all occur in Washington.

Let me break this down a little bit. Counts 5 and 6 are transportation -- Count 5 is transportation of a minor with intent to engage in sexual activity, referring to Madelynn. Count 6 is transportation of a minor with intent to engage in sexual activity, referring to Stephanie. And what Counts 5 and 6 refer to is the transportation of those two girls from Eugene to Vancouver on September 3rd, the date that they picked them up and brought them to Vancouver.

The issue here and the issue in some other counts has to do with at what point did they form the intent to traffic these girls or to have them perform acts of prostitution. And I thought Diana was going to say there was no intent, no plan until they got back to Washington, but she said otherwise in

her direct examination. She testified about how they looked them up -- looked up Maddie, rather, on Facebook, and on Keonte's Facebook, got in touch with her and so forth, and that they were targeting her. That was her testimony in direct examination.

And I would submit that what happened, though, in cross-examination, it became a lot less clear that that's really what they intended when they drove down there. She expressed a great deal of doubt about that, especially when I reminded her about what she had said to Detective Lee before was that the reason that they went down there was strictly to provide cocaine to Madelynn Taylor.

Okay. I don't know why they would go a hundred miles, maybe just for fun, just for an outing, but she was very clear about that with Detective Lee. And when I pointed that out to her, she seemed to actually express some doubt about her initial testimony, and, you know, there was some back and forth. Her testimony was actually kind of confusing.

I also pointed out to her that she told Detective Lee that her thought process about trafficking these girls didn't really occur until they got back to the Hazel Dell bachelor pad. And at the end, she just kind of said, well, maybe it was on the drive up somewhere, as she thought about it.

But here's the deal. It's Mr. Jackson who is on trial, obviously. So what we don't have a clear picture of is

when he formed the intent to cross a state line with the intent to prostitute these two girls. And that's the critical point on Counts 5 and 6. And that's the critical point, among others, that I would ask you to return a not guilty on those two counts because there's no evidence, no solid evidence of when the defendant formed the intent, according to Ms. Petrovic's testimony about that.

So -- and the other thing that's kind of weird about her testimony is although she said that we planned it all along, she also said pretty clearly that there was no intent to drive these girls back. When they get down to Eugene, there's this other friend, Stephanie Franz. They both get in the car, and Ms. Petrovic remembers that they said something about going to see their boyfriend. And she turns to Mr. Jackson and she says, "Hey, do you mind if they come along?"

And he says, "Yeah, sure. That's fine."

So if their plan all along was to go down there and recruit these girls and transport them back to Washington, what's all this stuff about being surprised that these gals want a ride up to Portland or Vancouver to see their boyfriend or whatever?

So that clearly is very muddled. It's probably very muddled in her head. I think she probably acknowledges that there's some confusion there about whether maybe she's confusing some other event or who knows what. But at the end

of the day, the government didn't prove -- hasn't proven -- again by Ms. Petrovic's testimony they haven't proven what the defendant intended, let alone Ms. Petrovic's intent.

So that affects 5 and 6, but it also affects Counts 2, 3, and 4 in kind of a different way. And I'll just tell you that the reason it affects 2, 3, and 4 is because 2, 3, and 4 have to do with -- apparently Count 2 now has to do with Madelynn at the cocaine house, Count 3 and 4 has to do with Stephanie Franz at the Battle Ground property. So the first couple of alleged incidents of sex trafficking, they all occur in Washington. So for purposes of venue -- and that's why you have an instruction on venue. So for purposes of venue, you have to find that some part of those offenses occurred in Oregon. So if there's no intent until they get into Washington, then there's no venue here and you have to return a verdict of not guilty to those counts. It's a lower burden of proof. It's preponderance of the evidence. It's not beyond a reasonable doubt. But there is that issue with respect to those counts.

The other thing I would point out with regard to those transportation counts is that when you cross the river with the intent, prostitution has to be a dominant and significant motivating purpose of the transportation. So the thing there is that Mr. Jackson obviously lives in Vancouver, and so he's crossing the river because he lives on the other

side of the river. So you can certainly consider whether prostitution was a dominating motivating purpose when he's just returning -- returning home.

So the issue with the slap -- and I guess this pertains to Count 4, which is sex trafficking by force, fraud or coercion. This is Stephanie Franz saying that Diana slapped her at the prompting or urging of the defendant.

What we established in cross-examination is that she had denied this before, you know. She flat out denied that she slapped anybody anywhere at any time. And she says, well, she feels ashamed now. Well, is she ashamed or just attempting to bring her story in alignment with another story to better position herself with the government in order to get these counts dropped?

So when she denied it, she hadn't yet reached a deal with the government. So maybe she was worried that if I admit this, it's not going to go so well for me. And then she pleads guilty, she's got a deal in hand, she's pled guilty to a charge that is extremely minor compared to what she was faced with. So maybe now she feels like, well, I'll say this now so the government dismisses this other case. Her value improves by bringing her story in alignment with Ms. Franz's. That's what I ask you to consider. And as near as I can tell, that's really only the only force issue with respect to Count 4.

Now, the other thing that -- again, one thing I was

right about with respect to Ms. Petrovic's testimony is the bit about this not being about commercial sex. And I've already talked about that.

Now, Count 2 apparently pertains to -- and it's not clear from your instructions or from the indictment exactly what incident, but as we understand it now, Count 2 pertains to Maddie having sexual relations with this cocaine dealer. This is one of those late disclosures. So Maddie didn't talk about this when she first met with Detective Lee in February of 2015, and it came out a couple years later, where she admitted this or said it.

I guess the key thing I want to talk about this is this act, this sex act was not at anyone's direction. So unlike the Battlefield -- the Battle Ground, where they're driving out there, there's some evidence of a discussion that this is what's going to happen, you're talking to these guys. Going to the coke plug, so called, there was no previous conversation with Maddie about what was expected of her, and the way she testifies and really the way everyone testifies was that was just sort of something that happened. No one said, okay, Maddie, we got our cocaine now so you need to go have sex with this guy. The way she described it was this guy just sort of gave her some body language of some kind, and they go into a room and she says that they had sex. And there's some lack of consistency as to what exactly the compensation was, whether

that was cocaine or whatever, but the main point is this was not done at anyone's direction. No one prompted this. No one directed her to do it. So conversation about it, it's like it just happened. So is that something -- it's not something that Mr. Jackson or Ms. Petrovic did to groom, entice, harbor, et cetera, or again, and because of that benefit financially. Well, to benefit financially, you have to participate yourself in the venture. And so I submit that's not proven. In fact, I think Ms. Taylor is speculating about whether defendant actually got cocaine in return for that, as opposed to some other transaction.

Now, along these same lines, I think Ms. Taylor testified that she felt like -- I think she said she felt like she had to do it. So, again, no one told her to do it, no one directed her to do it, she just said that she felt like she had to.

Well, we're talking about force, fraud or coercion in any of these counts. It's not the -- it's not the girl's subjective feelings. Okay? There's got to be some conduct by the defendant or one of the defendants. There has to be something that the defendant is aware of or consciously disregards that puts pressure on her to engage in a sex act.

Here there really isn't that. There's no evidence of any kind of conversation or circumstances surrounding that to suggest that -- and again she's not -- this isn't actually a

force, fraud or coercion allegation, but it's all kind of blended up in the conspiracy count. The point is, you know, Stephanie Franz herself testifies she felt like she didn't have a choice.

And while I'm on that topic, so the government's -- the government's not necessarily tying itself to, you know, a slap or rape, I think, when it comes to force, fraud or coercion. The government is more talking about the circumstances of a 14- or 15-year-old girl a hundred miles from home. If we're talking about a hundred miles from home, both of these girls, when they wanted to leave, they left, and no one stopped them.

The Maddie Taylor thing, which actually isn't a count, Maddie Taylor is not a count in the indictment when she leaves from the Battle Ground property, but my point is that when she leaves, there's obviously a lot of drama, there's a lot of consternation, Diana is worried about who she is going off with, is this the same guy, she's freaking out, losing control. But at the end of the day, she leaves, and she leaves after Mr. Freund tells Mr. Jackson that she's going -- coming with him, and he says, "That's cool." So when you talk about a hundred miles from home, you know, these gals don't seem to have any problem with that.

And then when Stephanie Franz leaves, same thing. She says, I'm going to call up some friends and they're going

to come pick me up. No problem.

So where is the coercion there? They both seemed to have the means and the ability to leave, and certainly there's nothing that this defendant is doing by their own account to stop that. So a hundred miles from home, they seem to be pretty savvy on how to get around.

The other thing is they're 14 or 15 years old. Their age is dealt with in the counts that deal with sex trafficking of a minor. So I submit just because they're young -- and clearly they're young -- that's not a circumstance that's going to result in them feeling coerced or result in the defendant thinking that he can coerce them.

So I want to talk a little bit about some of the counts that are -- I'll call them the age-related. There's a defense -- not a defense really, but one of the things the government has to prove is that the defendant knew or was reckless with regard to whether these girls were minors. And so this pertains to Counts 2, 3, and 7.

On those counts the government has to prove that the defendant knew or was reckless with regard to the age, and "recklessness" is a term that's defined in the instructions, and that's kind of the lower standard. Obviously if he knew, that's one thing, and then there's the standard of reckless disregard. Instruction No. 22, "The person acts with reckless disregard when the person is aware of and consciously

disregards the substantial and unjustifiable risk that a circumstance exists or that a particular harm will result from the person's conduct." And then it goes on, "The risk must be of such a nature or degree that the disregard of such a risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

So it's a reckless standard rather than a negligence standard. If it were a negligence standard, you might be thinking Mr. Jackson should have known, but that's not the standard. Okay? It's a higher standard of his mental state.

So take a look at that instruction.

And now I believe both Stephanie and Maddie claimed that they told their ages to the defendant. We dispute that, and Diana denied that. She denied that they were told the ages. Diana also said that -- she said that they, both of them -- herself and the defendant -- had some concerns about Maddie, I believe, or perhaps both, is what her testimony was. But remember that Maddie had actually told Diana the previous time that she came down there and was trafficked by Diana, she told her then that she was 17 years old. Okay? So -- and as far as Stephanie Franz goes, she said that she testified that she told them their age, but that's not really her pattern. Her pattern is to tell the police officers that she's 17 years old, and to tell other people that she's 18 years old, like peers or slightly older men that she's 18 years old.

If you look at Exhibit 116-T, where she's talking to Keonte Scott for the first time, she tells him, "I'm 18 years old." She admits she told Charlie Hernandez she's 18 years old. This guy Austin Hermann, there was a quick reference to the fact that she told him that she was born in 2000. So she's got this pattern of telling guys that she's older than she is, and you did hear from the police officer this morning who testified that she certainly looked older to him than 14 when he encountered her in March of 2018.

So there's some question there, there's reason to doubt whether they were told the ages, that Mr. Jackson was told what their ages were, and whether he was reckless in not knowing what their ages were.

And really the bottom line here -- and there's some photographs of these gals, but without really any good photographic evidence, being able to know what they looked like at the time, I think it's really difficult for you to be able to assess this. And were no photographs taken. There was some mention of some photographs taken, but we don't have that.

So the other point -- just a few points regarding Stephanie. You know she's prone to rather great exaggeration, I'll put it that way. When she says that when they show up at the Battle Ground property the second time, her testimony was that there was a line of 30 guys there and that it was sort of this bidding process and defendant was standing there bidding.

Well, who corroborates that? No one testifies anything remotely like that. So I submit that she's just -- I mean, that's just completely fantastical, completely made up. If there was any truth of that, we would have heard about that from one of the guys at the property or Diana or something, something like that. But, again, that kind of goes to Stephanie's credibility about how she's able to sort of blow things out of proportion.

And then the other classic one you heard was where she said at grand jury, and I guess she still thinks today that this whole time period that she was with defendant and Ms. Petrovic was one month, which clearly it was not. And somehow she's got her mom believing something like that as well, because her mom testified, yeah, it was like three weeks or so.

Well, it's undisputed that it was five days. So where are they coming up with this time period that they were -- that they were spending with the defendant? I mean, it's just outrageous and truly puzzling how they have come up with that, both of them.

And it's -- it's fairly obvious that Stephanie somehow has tainted her own mom's testimony, her own mother's testimony about this. Where would her mother come up with the idea that it was three weeks unless they've been talking and Stephanie has been talking about it and saying, yeah, it was

like a month? That's what happens. That's how memory gets tainted and contaminated before these witnesses come into trial and testify.

And there's some reason to think that, you know, some of the testifying defendants had access to discovery. They can read other people's reports, see what other people have said, other witnesses. And to what extent has their testimony been affected by that, either purposefully or in an effort to make their testimony as consistent as possible, that's a legitimate question that you can ask yourselves.

So the counts that pertain to the Lombard house, which are Counts 7 and 8 and 9, these counts again, you know, they come down to the credibility of Diana and Stephanie, who are, as I've discussed, just not to be believed because of all of their inconsistent statements and because of their motivations to lie and so on and so on.

One of the counts here is, again, sex trafficking by force, fraud or coercion. I believe the Government's theory here primarily is the idea that she was raped by the occupant of that house, a guy by the name of Carlos Canul, who to this day has not been arrested for this or any other offense related to having minors regularly come into his house for sexual purposes.

So was she raped? And again, it's kind of weird that he hasn't been arrested, but let's just put that aside. Was

Diana -- was Diana in the house? So this is -- you know, Stephanie claims that she was not, that Stephanie -- they both went in, Stephanie had sexual relations with the first guy, and then Diana leaves when Stephanie is summoned upstairs. That was Diana's testimony in direct examination, but when I cross-examined her, I reminded her that she previously had said that she stayed in the house the whole time. And again, I believe she kind of expressed some doubt about that, exactly how that happened. But in any event, Diana testified that when she did -- when Stephanie came out of Carlos's room and returned to the car, whatever, there was nothing about her demeanor, her clothing was not disheveled, nothing about her demeanor that told Diana that she had been -- that Stephanie had just been raped.

And really, you know, Diana had been going to this house for dozens of times, probably a lot more than that. She had been a frequent, you know, prostitute at that home and had known Carlos Canul for quite some time, and she testified there was no reason to think this guy would rape somebody. It's a terrible situation, don't get me wrong. But there was no reason to think that this guy would forcibly rape one of these gals.

So that goes to the issue of -- and again, we don't claim that it happened, we don't believe it happened, but that goes to the issue of recklessness. If he has no past history

at all of raping anybody, how could it be that this defendant, who denies even being there, but how can this defendant be shown to be reckless with regard to whether force, fraud -- force would be used to compel Stephanie into a commercial sex act? So that's a significant issue on Count 8, I believe.

So I'm going to wrap up soon. I haven't necessarily touched on every element of every offense. Just remember that really all of these elements except for perhaps the interstate element really come down to witness credibility, the reliability of unreliable witnesses, and testimony that hasn't been corroborated. And by that I mean hasn't been corroborated by reliable evidence or reliable testimony. And there's been some corroboration to prove there is such a place as the Lombard house and there was such a place as the Battle Ground property, and the phone records are pretty consistent with what Diana has said as far as where they went and when they went there. But again, these things don't prove what happened, and moreover they don't prove what Mr. Jackson did or what he knew.

And that afternoon when we heard from all those guys who were out at the Battle Ground property, they certainly don't corroborate anything about the defendant participating in the sex trafficking enterprise. They can't even identify him really. The one guy who says he sees a guy with a gun pointing somewhere, not intentionally, he describes that person as a guy with short hair, a black guy with short hair, not the way

anyone else describes him.

So -- and the one guy who really talks to him is Mr. Freund, and that conversation was basically to Mr. Freund, "Yeah, go ahead, that's cool, take Maddie with you." So that's it. So there's nothing from them that corroborates any sex trafficking activities by the defendant as opposed to Ms. Petrovic, where they are -- there is confirmation that she's doing certain things.

So, again, you know, if you're looking at that evidence and the lack of corroborating evidence through the lens of reasonable doubt, what you have to conclude is that the government has failed to prove its case. If you look it through the lens of this guy is a pimp -- and of course they're not going to interact with him -- then that's not the right way to look at it. That's not the right way to look at it. You have to look at it from the perspective of a blank slate and not have those sort of preconceived templates that you're following.

Just to conclude, this is obviously a very emotional case. No one in this room really wants to be here. It's a difficult case with a lot of difficult testimony with, you know, a number of witnesses who are, frankly, very sympathetic. But your duty as jurors is to put all that aside and just look at these instructions and follow these instructions and look at your notes and talk about the testimony you heard and the

impressions that you got from witnesses, but do it in such a way that you're not swayed by emotion. And I know that this sounds kind of hard and callous, but that's kind of what our institution depends on, our justice system depends on is that citizens such as yourself come in and look at this evidence in a very dispassionate way so that we don't have arbitrary results. Okay? And so that everyone is treated fairly, both on the government's side and the defense side.

So I know it's difficult. I don't envy your task. Let me just say in closing that, again, on behalf of myself and Mr. Jackson, I appreciate the attention you've given to this matter. Thank you.

THE COURT: Thank you.

We'll take a short break, maybe eight minutes or so, and then hear rebuttal argument from the United States.

THE COURTROOM DEPUTY: All rise.

(A recess is then taken.)

(Open court; the jury is present.)

THE COURT: Folks, because the United States bears the burden of proof in a case like this, there will be a brief rebuttal argument. We'll now hear that argument from Ms. Cadotte.

MS. CADOTTE: Members of the jury, I want to bring you back to the core of this case, which is that there are two children whose bodies were traded for drugs and for money.

They were children. The defendant did what I anticipated he would do: He highlighted all of the inconsistencies. The government has never tried to hide from that. We told you in our opening statement there are details that are blurry. And why is that? Obviously, the passage of time, but what was consistent throughout is the drugs. Where did those drugs come from? The defendant. He used those drugs to victimize these children, and now turning it around to say that well, the drugs now makes them not credible.

I would submit to you that the consistencies are overwhelming. Trauma is an interesting thing. Details, peripheral details, they're not going to match. This isn't TV, this isn't a movie. This is real life. Each person that testified had a different lived experience throughout this.

So what is it that everybody remembers? The traumatic experiences, the big events. And that is what has remained consistent this entire time.

There has been absolutely no evidence that any of these witnesses spoke about their testimony beforehand. They flatly denied ever reviewing reports about statements of other witnesses so that they could what? All collude together? So this is a big conspiracy against the defendant, a 14-year-old, a 15-year-old, a then 19-year-old, his best friend? I would submit to you that that just does not make sense.

The evidence is clear that the connection between all

of these locations, the person who facilitated it, the person who benefited from it is the defendant.

So what is consistent here? We have -- well, actually, let's hit on one of the other points that we made in our opening. There are people that have motive to lie. We never hid from that either. Okay? Diana, Keonte. Yes, of course they have motive to lie.

So what do we look at when somebody has a motive to lie? How do you assess whether or not to believe this person? And I'm glad that Mr. Olson drew your attention to Instruction 8, credibility of witnesses. Interestingly enough, he did not highlight the two that would favor the government's witnesses, whether other evidence contradicted the witness's testimony, and the reasonableness of the witness's testimony in light of all the evidence.

In assessing the credibility of a witness, is their story reasonable? Is their story and testimony corroborated? Every single person's testimony has been corroborated by each other. Does it make sense that Keonte Scott came up with this story that him and the defendant ended up together in jail, talked about their charges? And defense wanted to highlight that MV5, which is Stephanie Franz, hadn't even been spoken to yet. That supports the government's case. In their charging documents, it was brought out by Mr. Olson, the names of the victims are not included. It's just MV5 and minor victim. So

there's just a lot of MV and then numbers in those documents. Right?

So, of course, they're trying to figure out which girls could be telling on you. Which girls could be telling on you? And Madelynn and Stephanie's name just happened to come out of the defendant's mouth when she hadn't been spoken to yet. That's because that's what happened. He knew these are some of the girls that he had trafficked, and he's getting called out on it.

And Keonte Scott tries to be the good little brother. He figures out, makes sure it's the same Stephanie he knows, and he tries to discourage her. You have that jail call. Code of the streets he said it kind of nicely, but everybody knows what he meant: Don't snitch.

And I would also like to highlight what defense drew out on cross with Mr. Scott is -- in his closing today, which I will say our arguments are not evidence. You need to rely on your own recollection and your notes if it is different from either of our arguments.

Defense counsel represented at Keonte Scott's first interview he denied defendant had any involvement. He was just a bystander. Yet on cross, he had him look at his first interview, where Mr. Scott actually listed defendant as being criminally liable in this overarching enterprise. He mitigated his involvement, but he listed his name, and that was drawn out

by defense.

And Diana, you can assess her demeanor on the stand. You can assess whether she had comprehension issues, language issues. She was asked open-ended questions by the government, given an opportunity to explain context and herself, as opposed to on cross, close-ended, compounded, complex questions. I couldn't even understand them at times. Diana admitted she was confused by them.

You can take what you want from some of the answers on cross, but what remains consistent yet again is the intent that these girls engage in commercial sex for the benefit of the defendant.

Looking at the pole barn, the auto shop, when we're talking about a coercive environment, and we have a 15-year-old, a 14-year-old -- and mind you, I've highlighted, we have not alleged that Madelynn was coerced. Hers are simply age-based offenses. Stephanie is who we're looking at in the coercion element. And this is from the auto shop. Fourteen years old, not just 100 miles away from home. They run away, you heard that, but they're at an isolated, desolate location at nighttime with strangers. They're with the defendant, who has been flashing his gun. Stephanie saw that, and when she said, "I don't want to do this anymore, I'm done, I'm tired," she immediately gets slapped. She had no choice but to continue engaging and to continue abiding by the directives

that she was given.

And she was traded that night. She did get money. A grown man engaged in sex with her. Billy Wilcox took that stand and he admitted, I was so drunk, I was in a trailer with her, I gave her money. Don't know what happened. A grown man doesn't go into a trailer with a 14-year-old girl and just hand her money. He knew exactly what was going on when he went in that trailer, and now his memory is failing. He corroborates her testimony.

And there was a lot of discussion about this is just sweet talking, they're just going there to sweet talk, nobody thought anything else was happening, that wasn't Diana's intent, let alone the defendant's intent.

If you're just sweet talking men, why would you direct the girls to say they were 19 and no younger? You can converse with minors. You can chat. You can't engage in sexual conduct with them, which is exactly why they were told, do not state your true age, because they both knew the girls' true age, 14 and 15. There were discussions about it. Madelynn and Stephanie both testified they told both of the defendants their ages.

Now, Mr. Olson and I have separate recollections of Diana's testimony. She testified that she knew their ages. She testified that her and the defendant had conversations about their ages. They were actually concerned about the

police getting involved. And defense counsel kind of framed this whole shop incident with Mr. Freund as kind of like a polite Madelynn walking up, "I need a ride, can I leave with you," and him saying, "Hey, can we leave with me?"

That wasn't coercive at all, right? If you recall the testimony and the evidence was that Madelynn was hysterical, saying that they were going to kill her, and Mr. Freund made a decision, she is not leaving with these people. And, of course, the defendant did not coerce Mr. Freund. He said okay when Mr. Freund said, yep, we're leaving, because the defendant cannot coerce a grown man. He only does that to children.

Diana Petrovic was only 19 years old at the time, and when you want to talk about the intent, when did the intent form that these girls were going to be prostituted out by the defendant and Ms. Petrovic? Again, this case began with the defendant, and it began back in 2016 when he taught Keonte Scott and Diana Petrovic everything there was to know about prostituting and sex trafficking. He cannot now claim ignorance as to Diana Petrovic's actions, as if he did not know what she was doing when she reached out to two minor females.

Her testimony on direct was that that was actually their plan, and defense counsel, he's correct on cross, she changed, she didn't know, she said yes at one time, no to another, but what she ended with was the intent was definitely

made before they got to Washington. They didn't need to verbalize it between each other when they talked about it. We don't need to prove when they talked about it. When was the intent made? It was made when they were going down to pick up the girls. This is where reasonableness comes in. Going down to Eugene, what, two-hour, two-, three-hour drive, so five hours round trip quick to make a hundred dollars? That does not make sense.

And then you bring them back with you and continue to give them drugs that cost a lot of money, so now you've lost money. And, mind you, it was actually only Diana Petrovic that testified to the fact that that was the plan, that the $100, when she was pushed on cross, a hundred dollars to go down and sell some coke.

Well, Madelynn and Stephanie adamantly denied that that was the purpose of meeting up. Their testimony was that they came down to get them so they could come up and party. What motive does Stephanie and Madelynn have to lie? That is a question that I really want you to think about. Where is the motive for these two girls to lie about what happened, about who was there, about where they saw the money going? It's been clear and consistent the whole time.

And the defendant was there for all of it, and he received all of the benefit from it. And now he wants to plead ignorance. However, none of this would have happened but for

him.

Who was the connection to the drug house? The defendant. Who was the connection to the auto shop? The defendant. Who was the connection to the Lombard house? The defendant. Who benefited from selling their bodies? The defendant.

He taught Diana and Keonte the ropes, and I would submit to you that their own witness corroborates the government's case completely. Rori Dicker, I believe her name was, she refused to acknowledge her house was a trap house, but it was where there were drugs, parties, people coming and going. Keonte would be there, Mr. Jackson would be there, and Diana would come around with underage girls. That's exactly what was laid out in the government's case and exactly why the defendant can't now say didn't know what Diana was doing when they drove down there to pick up these girls. Why else would a 30-something-year-old man go pick up 14-and 15-year-olds and supply them with drugs?

He used the bodies of these two children for his personal currency, and he thought he could get away with it. He did not think that Madelynn and Stephanie would have a voice. They had a voice. You heard it. And I'm urging you that the evidence supports them, which is why we're asking that you find him guilty for his actions.

Thank you.

THE COURT: That concludes oral arguments in this case. I'll now finish the instructions on matters relating to your deliberations.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court. You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous. Each of you must decide the case for yourself, but you should do so only after you've considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors. Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear or public opinion to influence you. You also should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances. Also, do not allow yourself to be

influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious awareness, control or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdicts only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging or any internet chat room, blog, website or other feature. This applies to communication with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you've been

ordered not to discuss the matter and to report the contact to the Court. Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to assure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of the proceedings. If any juror is exposed to any outside information, please identify the Court immediately.

Some of you have taken notes during the trial. Whether or not you took your notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for a crime is for the Court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you. No member of the jury should

ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on any questions submitted to you, including the question of the guilt of the defendant until after you have reached a unanimous verdict or have been discharged.

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

I'll swear in four people as bailiffs in this case. These are the four people who will deal with you while you're deliberating.

(The bailiffs are duly sworn.)

THE COURT: Thank you very much. Ms. Scheele will take you to the jury room. The materials such as the exhibits and that sort of thing will be following shortly.

Thank you all. Please rise for the jury.

(The jury retires to deliberate.)

THE COURT: Please be seated.

I'm going to have the jury deliberate, but today I'll not be able to let them deliberate any later than 4:30. Sometime between 4:15 and 4:30, I'll have to leave, and I don't want them to keep deliberating if I'm out of the building. And then I'll have them return if they need to, of course, at 9:00 tomorrow morning.

So from 4:30 to 9:00, you can be out of pocket, but not during the time they're deliberating. Before you leave this room, make sure Ms. Scheele has your personal -- that is your cell phone contact information so that you can be either contacted by phone or get back to the courtroom quickly.

Anything further from the United States today?

MS. PAASO: No, Your Honor. Thank you.

THE COURT: From the defense?

MR. OLSON: Your Honor, I neglected to renew my motion for judgment of acquittal at the close of all evidence, which was about three minutes after the government had rested. I should have done that. I would ask that I be able to renew that -- the JOA motion at this time.

THE COURT: I accept your motion at this time. Thank you.

We'll be in recess.

(A recess is then taken.)

(A telephone conference with counsel is held as

follows:)

THE COURTROOM DEPUTY: Here is Judge Mosman.

THE COURT: We have a note you have already received by email. I'm going to read it into the record. It reads as follows: "There is need for clarification about Count 4. The instruction document requires us to consider two parts of the first element. The verdict form doesn't account for the second, third, and fourth elements. Do we need to agree on these separately or are these part of the first element?"

Here's my proposed answer, sort of in narrative form, not written out yet. I think there are two problems here. One is that they don't fully comprehend perhaps that the verdict form is not going to recite every element of every offense, and so they shouldn't be looking for the verdict form to match up with the instructions that do lay out every element.

And then secondly, they -- if you look at Count 4 on the verdict form, they possibly may misunderstand that when it says "guilty" and "not guilty," it's asking a very broad question, whether the government has proved beyond a reasonable doubt all of the elements of the offense as to two different theories.

So I want to make sure they understand that Count 4 on the verdict form is not simply asking them to answer yes or no to the text on the verdict form that's just above the words "not guilty" and "guilty," it's asking them to answer the

question as to all the elements of Count 4.

So what I want to -- what I want to tell them is first that the verdict form does not lay out all the elements of every count of the indictment, only the jury instructions do that, and then to answer their precise question, that for Count 4 they do have to decide and agree separately on each and every element of Count 4 as set out in Instruction 27, and they are not just part of the first element.

Any objection to that answer from the United States?

MS. PAASO: No, Your Honor.

THE COURT: From the defense?

MR. OLSON: No, Your Honor.

THE COURT: Any objection to me just going in and orally explaining this to them as opposed to writing it all up?

From the United States?

MS. PAASO: No, Your Honor.

THE COURT: From the defense?

MR. OLSON: No, Judge.

THE COURT: Thank you. We'll be in recess.

(Proceedings are adjourned at 4:29 and reconvened on March 11, 2022.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause. A transcript without an original signature or conformed signature is not certified.

*/s/Bonita J. Shumway* *April 5, 2022*

BONITA J. SHUMWAY, CSR, RMR, CRR DATE
Official Court Reporter