IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA, )
)
Plaintiff, ) Case No. 3:19-cr-00458-MO-1
)
v. )
)
JOHNL JACKSON, ) July 25, 2022
)
Defendant. ) Portland, Oregon
______________________________)

**Sentencing Hearing**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT SENIOR JUDGE

APPEARANCES

FOR THE PLAINTIFF: Ms. Pamela Paaso
Ms. Ashley Cadotte
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

FOR THE DEFENDANT: Mr. Per C. Olson
Hoevet Olson, PC
1000 S.W. Broadway, Suite 1740
Portland, OR 97205

U.S. PROBATION: Ms. Jessica Lehmann

COURT REPORTER: Bonita J. Shumway, CSR, RMR, CRR
United States District Courthouse
1000 S.W. Third Ave., Room 301
Portland, OR 97204
(503) 326-8188
bonita_shumway@ord.uscourts.gov

(P R O C E E D I N G S)

(July 25, 2022; 10:35 a.m.)

* * * * *

MS. CADOTTE: Good morning, Your Honor. Ashley Cadotte and Pamela Paaso on behalf of the government in the matter of the United States versus Johnl Jackson, Case No. 3:19-cr-458.

We are before the Court today for sentencing in this matter. The defendant is present. He is in custody with the assistance of his counsel, Mr. Per Olson. And Officer Jessica Lehmann on behalf of Probation is present.

Your Honor, also present on the line listening to today's proceedings is MV5. The government also has a victim impact statement submitted by MV5 that she would like put into the record when appropriate.

Additionally, the government does have argument to supplement regarding enhancements when appropriate.

And finally, as a preliminary matter, the government would move to dismiss Counts 3, 6, and 7 at this time.

THE COURT: For duplicity?

MS. CADOTTE: Yes, Your Honor.

THE COURT: Those will be dismissed.

What would you like to do with the victim impact statement?

MS. PAASO: Your Honor, I'd just like to read that

into the record whenever the Court would like to hear that. I can do that now.

THE COURT: Go ahead.

MS. PAASO: And this is from MV5, who is also listening.

You did the most unspeakable thing to me that once broke me and stripped me of everything. I learned not to let it break me and make me stronger. I'm glad you'll never be able to hurt another young child again. I am no longer afraid, and I can gladly say I'm at peace knowing you can't harm me. I'm going to be a mother this year to a daughter of my own, but I'm going to protect her from what happened to me to the best of my ability.

THE COURT: Thank you very much.

You suggested you wanted to speak about enhancements also.

MS. PAASO: Yes, Your Honor. Just briefly we wanted to revisit, since the defense raised the issue of double counting related to the unduly influence enhancement. Just because undue influence laid the groundwork for the coercion that occurred in this case, it doesn't mean that it's subsumed by that coercion. We believe that undue influence was foundational conduct. And we also just wanted to note that the commission did not explicitly exclude this, and in fact the third paragraph of the application notes make clear that there

is a presumption, a rebuttable presumption of that subsection enhancement in a case where the participant is at least ten years older than the minor.

THE COURT: So if I hear Mr. Olson's argument correctly, the idea is that if the count of conviction requires proof of the same thing that's required to be shown for an enhancement, that you shouldn't apply the enhancement, basically, right?

MS. PAASO: I believe that's his argument, yes.

THE COURT: And do you agree or disagree that the count of conviction requires proof of something very much like undue influence in the guidelines?

MS. PAASO: We would argue that undue influence may be a component of coercion, but it doesn't get you all the way to coercion, and that they can be distinct. And I would also note that this Court found that both force and coercion were present on the counts in question.

THE COURT: So that's the core of your argument why you can have a guideline enhancement for undue influence even on a count of conviction where a significant part of your presentation for conviction involved undue influence, right?

MS. PAASO: Yes, Your Honor.

THE COURT: There is that distinction between technically what the count of conviction requires and what the guideline requires?

MS. PAASO: Well, we think that the Court found that there were similar -- I guess some of the conduct was undue influence that helped create the coercive environment. What our argument is, is when we were looking at other cases that are related to similar things, we looked at something -- *United States v. Stoterau*. The cite is 524 Federal Third 988. Applying two enhancements to the same conduct is permissible because each accounted for a very different aspect of the harms.

There is also *United States v. Thornton*. Applying two enhancements to the same conduct is permissible because they stem from separate concerns. *Thornton* specifically talks about an argument about double counting and saying there's nothing wrong with this idea of double counting when it's necessary to make the defendant's sentence reflect the full extent of the wrongfulness of the conduct.

So, again, our core position is that even though some of that unduly influenced behavior contributed to the coercion, it's not subsumed by the coercion.

THE COURT: So a couple questions about that. First of all, are those Ninth Circuit cases?

MS. PAASO: Yes, Your Honor. The first one, the -- the last name is Stoterau. It's S-t-o-t-e-r-a-u, and that's Ninth Circuit out of 2008.

And then the *Thornton* case is also Ninth Circuit

2008, and that's 511 Federal Third 1221.

THE COURT: Thank you.

And while you've stated these for a general principle that's applicable here, I take it you don't have a case on this guideline itself and double counting?

MS. PAASO: No, Your Honor, but we would refer back to the advisory comment about the rebuttable presumption because of the age difference, and the fact that this guideline applies to this specific conduct. So I would assume that the commission contemplated that with the coercion count, you could still apply this enhancement.

THE COURT: I'm trying to understand what you think the governing principle is here. It sounds like the governing principle is that there's not improper double counting if the count of conviction involves the same facts as a guideline enhancement, but that when looked at carefully, they each punish something different. Is that the principle?

MS. PAASO: Correct.

THE COURT: So how does that work here? What is the enhancement in this case punishing that the count of conviction doesn't capture?

MS. PAASO: In terms of undue influence, I think there's the mechanics of what the undue influence were, in terms of the providing of clothing or the drugs or keeping someone away. The coercion itself led more to the conduct that

eventually occurred in terms of the sex trafficking. In fact, one of the cases that defense pointed to, *Smith*, there was not any actual sex trafficking that occurred, it was just based on the premise that sex trafficking was going to occur as part of the conspiracy. In this case, the coercion led to the actual commercial sex act involving these victims.

THE COURT: Thank you very much.

Is that the only enhancement you wanted to argue about?

MS. PAASO: Unless the Court has any questions about the use of a computer enhancement.

THE COURT: No, I don't. I'll come back to you if there are more questions.

Mr. Olson, I don't want to make you start with this enhancement if you wanted to start with something else, but we will get to it eventually.

MR. OLSON: I'm happy to start with it now because we're on topic.

Before I forget, the defendant's mother Nancy Rhodes is present, and she'd like to address the Court before we finish today.

Your Honor, just picking up on what the prosecutor just stated -- You trained me to sit.

THE COURT: It's okay, if any of you want to, to remain seated, except for allocution for the defendant, since

I'll hear you better through the microphones.

MR. OLSON: Thank you. I'll go ahead and be seated, then.

What was just stated by the government is that the undue influence doesn't necessarily relate to causing the person to commit a sex act, but actually the language of the provision itself is, "the participant otherwise unduly influenced a minor to engage in prohibited sexual conduct."

So the -- from the beginning, when we began litigating this -- the judgment of acquittal, what we have argued, and really essentially what the government has agreed with is what they have put forth as being acts of coercion equate 100 percent with what they rely on as being undue influence: the buying of things, the provision of lodging, the provision of drugs, those sorts of things. And so they are one and the same thing. And I have to go back to the *Smith* case because it -- I believe the *Smith* case establishes that it's not really kind of a categorical test, as in if it's absolutely impossible to do undue influence, then that must be coercion in some theoretical sense, that it's more of a fact-based analysis. And that's what *Smith* did, because it looked at certain aspects of the defendant's conduct in that case, similar provision of various things as a means to induce, to compromise a person's ability to make voluntary choices. And the Court said -- the district court could have and probably

did rely on those sorts of facts as establishing undue influence. And the Court said that that was not coercion. And certainly there were other things in that case that supported the force analysis because there was actual physical force.

And so here we have kind of a different scenario, where the government has said in response to the motions for judgment of acquittal, that these things are coercive under a totality of circumstances type analysis. So it's kind of a different scenario here.

Now, the other thing I want to say is I did not address the rebuttable presumption. That was not in the PSR, so I didn't address it. But I would like to address that now. There is a provision in the guidelines commentary that says that there is -- if there's ten years of difference between the two, there shall be a rebuttable presumption that the undue influence provision applies.

Your Honor, let me address that this way. There is a line of cases that have come out over the last few years that have limited the concept of discretion or deference that courts have to provide to government agencies. There's a decision in *Kisor v. Wilkie*, 139 Supreme Court 2400. It's a 2019 case. This is not a world that I often delve into, but essentially what that case did is that when a court is asked to give deference to an agency interpretation of its own rules, it has to find that the rule, the legislative rule that the agency

established was ambiguous, genuinely ambiguous, that the interpretation that the agency gave to it was reasonable. And there's a third requirement, essentially that the character and the context of the interpretation entitles it to controlling weight.

Now, the question with respect to the guidelines, then, the guideline provision is the legislative rule, and the commentary is the interpretation. And there's a Third Circuit case, *U.S. v. Perez*, 5 F.4th 390, where they applied this *Kisor* analysis to the sentencing guidelines.

So my point is that in order to give deference to this provision, this rebuttable presumption provision in the commentary, the Court has to find that the phrase "undue influence" is genuinely ambiguous and that their definition is reasonable.

So my argument, as you can probably tell, is that the phrase is not ambiguous, and if it is, that their interpretation is somewhat arbitrary and therefore not reasonable. So I wanted to get that on the table because this could potentially be part of the appellate process, and I want to make sure that I'm making that argument.

THE COURT: Thank you very much.

MR. OLSON: Yes.

So again, Your Honor, it's -- there is double counting in the unique and specific facts of this case and the

way that it's developed, and ultimately if you find that technically the provision does apply, of course there are ways for the Court to discount that in imposing the ultimate sentence if the Court finds that there's undue influence but not perhaps as great as some of these other cases that we're relying upon.

THE COURT: I understand your argument. Thank you very much.

I've reviewed your other sentencing materials with some care. Is there anything you wish to add to what you've already given me?

MR. OLSON: Your Honor, I think when it comes to the biggest message I have here is really it comes down to a comparison, a comparison of Mr. Jackson's conduct as it came in through the witness stand and other sources of information as compared to the conduct of so many other cases that have come before the Court, this Court and other courts under this statute, this sex trafficking statute, 1591, which is very broadly stated. It's very broadly stated in terms of the sorts of acts, the duration of the acts, the nature of the relationships that might occur between a defendant and a minor. There's so many varieties of -- so many ways that a person can commit this offense.

And what we have here is an event, a series of events that occurred over, at most, a five-day period, a little less

than five days with respect to MV5, and she was away from the defendant for a period of time. MV4 was with him for less than two days. And so if we were to add up the number of commercial sex acts that both of them testified to, I think the number is four.

All right. And I'm not discounting the seriousness of the offense, but what I am asking the Court to do is to look at this, the facts of this case, and compare it. The government provided some cases, we provided some cases in our Exhibit 7 from reported decisions, and these -- typically what's involved in these cases is just longstanding months of captivity. I'm looking at the *Brown* case in particular that we cited to, where there was two victims, both minors. One of the minors was held for four years, just assaulted numerous times, assaulted with a belt, punching in the head, pouring bleach on her. When another victim tried to leave, he sent two other of the victims to go get her, and she was assaulted. The second victim was raped and kidnapped originally. So that individual got 30 months, which is when the government is asking for in this case.

THE COURT: Thirty years, you mean?

MR. OLSON: Thirty years, correct. Sorry.

And not all these cases that we cite are sex trafficking by force, fraud, or coercion or sex trafficking of a minor, but still there's information there that just

demonstrates that the short duration of this case calls for a shorter sentence.

And so -- and a lot of times, as I say, not everyone is charged with the same offense. Not everyone is charged with sex trafficking by force, fraud, or coercion. But in the *Maxwell* case, Ghislaine Maxwell was not charged with sex trafficking by force, fraud, or coercion, but in the facts statements provided by the government's sentencing memorandum discloses that two of the young women claim that they were, in fact, raped by Jeffrey Epstein. So -- and she colluded in getting those minors to him. So even where it's not pled, even where it's not a count of conviction, so many of these cases do involve force, fraud, or coercion of some sort, or certainly undue influence of some sort of minors.

And I venture to say that here in this case, the issue of force, fraud, or coercion, as we litigated in our post-verdict motion, was somewhat of a -- I don't know if I'd call it a close call, but it was an issue of merit that it took the Court some time to consider and hear argument over. So it's not -- it was not -- the evidence of force, fraud, or coercion was not as compelling as it is in so many other cases, in terms of duration, in terms of the number of instances of sex, commercial sex acts, the amount of harm caused to the victims, and the degree of violence and abuse and those sorts of things. And so when it comes to that, really this case

compares in comparison -- pales in comparison to those other sort of factual scenarios.

Your Honor, I feel like I've addressed the issues of the other enhancement -- well, with respect to the computer enhancement, so I'll just rely on my briefing on that point.

The other thing -- point to make with regard to the offense conduct is that Petrovic stated in a proffer, which is part of our exhibits, that this was the first time that she did this with the defendant. And so there's hints that there's some prior history, and there was testimony from Mr. Scott that he was shown how to do this -- post ads -- by Mr. Jackson, but there really isn't any reliable evidence before the Court, and certainly Petrovic did not testify about what happened before, that this was the first time that she had really dealt with him in a situation where the two of them went out and brought two females back to the Vancouver area to traffic them. And there was nothing that occurred thereafter. So this was in September of 2018, and it was -- there was nothing that occurs thereafter in terms of the two of them. It was some time before they actually got arrested.

THE COURT: If I understand what you're saying, you're trying to make it a narrower window of time, and there's no evidence I'm aware of of anything afterwards, but there's some evidence of what happened before. That, of course, has no impact on the guidelines themselves, but you're suggesting that

I ought to discount it for any other purpose under Section 3553?

MR. OLSON: Correct. And that's actually what I've been talking about for the last ten minutes, if I'm not making myself clear. I'm not just referring to the undue influence enhancement, I'm referring to the big picture here of Mr. Jackson's offense conduct.

THE COURT: I understood that from your argument.

MR. OLSON: So, Your Honor, again Mr. Jackson, he's had a tough childhood, unlike Ghislaine Maxwell. I know she's not the only person I'm comparing him to, but he has had a difficult childhood, and he's had cognitive deficits that have been diagnosed and determined. This has led to lack of opportunities for him and the substance abuse issue that he has overcome for the most part.

And so -- the other thing I would really stress, there's a criminal history here but not a very serious criminal history in terms of just fairly minor traffic crimes, two DUIs that really speak to his substance abuse problem. So he does not have any kind of history of violence. And I think that's also important to consider here, that weighed against the issue of the slap that Your Honor heard about, there really is no other evidence in his past that suggests any sort of history of violence that really needs to be punished to a greater degree.

So at this time, Your Honor, if appropriate, I would

ask that Nancy Rhodes address the Court.

You can come up here.

THE COURT: Ms. Rhodes, please come forward. You can sit there next to Mr. Olson.

Mr. Olson, if you'll move that microphone towards her.

Go ahead and take a chair. If you'll tell us your full name before you speak.

MS. RHODES: Nancy Rhodes.

THE COURT: Go ahead, ma'am.

MS. RHODES: Well, Your Honor, I wanted to come to you today to let you know -- Jesus, help me, Lord -- a little bit about myself and my son. I had to work three jobs. I'm a single mom. He had to grow up early so he can do childcare when he was 12 or 13. I didn't have a choice because I didn't trust anyone in the state other than him to watch my children. I know it wasn't fair, but what else could I do? I had to work. I had bills to pay.

Your Honor, he's a good boy. I heard some horrible things. That's not the son I raised.

My father in heaven, most high God, Jesus Christ, that's not the same God that's in this courtroom. Yes.

Thank you, Your Honor. He commanded me to come to court today to let you know in the beginning, the trial, I prayed for you, Your Honor, because I know your position. It's

a stressful position. I know you have decisions to make. I prayed for the prosecutors because I know they have a job. I prayed -- Help me, Jesus. I prayed for the jury. I prayed for the witnesses. I prayed for Mr. Olson.

Thank you, Jesus.

I was commanded to come here and let you know my feelings and to beg you, Your Honor, to please have mercy on my son. Please have mercy on my son. I am 54. Please don't -- please don't let me die without hugging him again. Please don't take that away from me. Please have mercy on my son.

THE COURT: Ms. Rhodes, thank you for coming in.

MS. RHODES: I beg you. I will get down on my knees. I follow Christ, the right hand of God. I just pray that you keep that in mind, Your Honor.

THE COURT: Thank you for coming in today. I know it must be a very difficult day for you.

MS. RHODES: Thank you.

I love you, Son.

THE COURT: I'm going to give your client his allocution in just a moment. Is there anything else you're presenting, Mr. Olson?

MR. OLSON: No, Your Honor.

THE COURT: Do you wish to respond in any way?

MS. CADOTTE: Just briefly, Your Honor.

Defense counsel's argument essentially tries to

quantify trauma and harm, which is just impossible to do. It is not an element that multiple incidents have to be proven to prove sex trafficking of a minor or that the duration was for an extended period of time. Congress and the Sentencing Commission decided -- and the government agrees -- that one time is enough for this to be a crime that is deserving of punishment. His conduct is deserving of a punishment that reflects the severity of the harm. There was a 14-year-old child that was forcibly raped. That would not have happened but for the defendant's connections in the sex trafficking community. He positioned himself amongst a group of teenagers themselves, 19 years old, when he was a grown man, and mentored these people on how to traffic females and how to traffic minors.

Defense counsel wants to highlight the comparison between Ms. Maxwell's case and the case before the Court, and it's just simply not comparable. There is force, fraud, and coercion in this case that was not in Ms. Maxwell's case. There was the use of a firearm throughout in this case, not present in that case. They're just two separate cases, as they usually are, and we highlighted the aggravating factors in our motion, so I won't belabor unless Your Honor has any additional questions in regards to that, but a significant sentence is important to deter future traffickers, and that's the basis of the government's request.

THE COURT: Thank you very much.

Does your client wish to say anything?

THE DEFENDANT: Yeah.

THE COURT: If you could lean forward and speak into the microphone.

THE DEFENDANT: Oh, man. I don't know what to tell you. Honestly, I don't feel like I got a fair trial. I thought a lot of, like, the evidence was held out that could help me a lot. I cannot really, like, tell somebody something that I don't know. Just, like, stuck. I mean, I know, like, you got a hard position, Your Honor. You got to sentence me. I just want you to know, I expect 54 days good time that you get a year.

And another thing is, like, I don't understand how -- I don't understand a lot of the stuff, honestly, but I don't understand how, like, the detective could stay in here during the whole trial and go up there and, like -- go up there and testify against something that he put all together. He got to stay here the whole time.

And, like, a lot of the witnesses, like, statements and things like that -- I don't know. I guess this is it. I don't know. That's it. I don't know.

THE COURT: Thank you very much.

So I have a couple of jobs to do today. First is that I have to correctly calculate the sentencing guidelines

range. It's just advisory and it doesn't determine, you know, in stone your sentence, but it's an important first task.

The parties have several disagreements about the guidelines. I agree with the guidelines in every aspect except one, and which I want to pick up now, and that's this enhancement for undue influence and the double-counting problem. And so this double-counting relationship between crimes of conviction and sentencing enhancements is tricky. I do believe the core concept in play, in terms of what's just, is that we don't punish the same conduct twice, once in a count of conviction and then again in a sentencing enhancement. And I can certainly imagine hypothetical cases in which one could be convicted under this count and that conviction doesn't pick up undue influence in any way, and so you could then also get a sentencing enhancement for it. If, for example, the case was really tried on a theory of force and convicted on a theory of force, then the count of conviction might not pick up another harm, undue influence, that the sentencings guidelines would pick up.

In my view, on the particular facts of this case, it is double counting. It's double counting because the government's theory of the case rested to a great extent -- not entirely or they would have lost the motion for a new trial, but to a great extent on the same facts that have to be the facts that go into undue influence. I just can't see a way in

which this jury, on the trial they heard and the arguments they heard, didn't have to take into account as a part of the totality of facts the same facts that are found for undue influence. And so in my view, the defendant is being punished twice in that way, once by being convicted for facts that amount to undue influence, and a second time under the guidelines themselves.

So I require the amendment of the presentence report to that limited degree.

So then the second question is what is a fair and just sentence in a case like this one under Section 1591, which is the driving count for sentencing purposes. And, of course, that sentence has a floor that's outside of my control. The floor is 15 years. The law requires absolutely -- no exception -- a 15-year sentence in a case like that. And a judge in my position is not at liberty to impose any sentence lower than 15 years. That's the law when you're convicted of a count under this statute with these facts.

And the ceiling is very high. The government has reached up high into that ceiling for a 30-year sentence, so I'm going to view this as a case in which the floor is 15 years and the ceiling is 30 years.

Here I disagree with the United States' response to Mr. Olson's arguments. I don't think the point Mr. Olson is making is that he's trying to quantify harm in some

illegitimate way, because it's, of course, true that, as Ms. Cadotte has said, you know, one instance of this is enough for conviction, but we're past the point of figuring out what counts for a conviction. That's already happened. We have a conviction. Now we're trying to figure out, in this pretty significant range of 15 years, where does the defendant fit. And that range can include a broad variety of cases, some of them meriting 15 years, and some of them meriting 30 or more years, and what separates the one from the other are the facts of the case, what happened. All of them, all of these cases, whether 15 years, 180 months or 400 months, all of them involve horrible facts, terrible things done to innocent victims. So that's a given. But my difficult task is to say of all of these terrible cases, where does the case in front of me on a given day rest on a sort of continuum: cases kind of in the middle, cases at the extreme end, and cases closer to the mandatory minimum sentence.

And one way to think about that is to compare this case to other cases. I guess I don't know what to do with the *Maxwell* case. It's a unique case in another part of the country on a different statute, and I don't know what to do with that. But we have cases here. The United States has, for example, cited one of my own, Mr. James Albert Jackson, a case I vividly remember. And that's up there closer to the sentence the United States is requesting in this case. And it's a

useful point of comparison because it gives the sort of facts that net a defendant convicted under this statute a sentence very high up into this range. And again, with all regard for the trauma and horror that this case represents to the victims, this case doesn't come within a country mile of a case like James Albert Jackson, where the victim is trafficked to hundreds of men across a long span of time, and where the force and coercion is to be beaten to a pulp, bashed with metal objects, bitten, et cetera.

So that's my unavoidable task. I can't avoid the task of saying, in the universe of cases of people who get convicted, where does this Mr. Jackson fit? And in my view, because the set of cases I'm forced to consider here includes some of the most horrific crimes one can imagine, then I'm -- it is my view that Mr. Jackson rests far to the lower end of the scale compared to those that are at the high end at least.

The United States has suggested in its writing that Mr. Jackson's efforts not only are horrific -- which they were -- but that they represent a sort of a sophisticated criminal enterprise. Here I think we just differ on what I heard, my take on what I heard at trial. I view this enterprise to be short-lived, haphazard, and somewhat episodic and opportunistic, and not anything like a true prostitution criminal enterprise of any sophistication. And if I had to pick in this criminal enterprise who was sophisticated and

smart, able to run things, it would be Ms. Petrovic, not Mr. Jackson.

So as I think about not just Mr. James Albert Jackson but other cases I'm familiar with, either through briefing or in my own experience, I know cases that fit at the 360- or 400-month range. I know them and this isn't one of those cases.

There's also some concern about disparity as I look at cases, so I have to take into account some rough guess at this point at what the likely guideline range will be for Ms. Petrovic, Mr. Scott, this range, et cetera. And those ranges, if I'm not wrong about what's about to happen in those cases or has, are also going to be a far distance from this case. I expect the United States to be recommending sentences a long, long way from 360 months in those cases. While there are significant differences, I still have to take that into account to avoid what is thought of as unwarranted disparity.

How far to the sort of left side of a bell curve is this case? Mr. Olson was reluctant to call it a close call on force or coercion, but I don't think it's any great secret that we held challenging hearings and it took a while to figure all this out, and it was a close call. I stand by what I've written, that I feel that the evidence presented to the jury absolutely presented evidence of force and coercion, but it wasn't abundant evidence. It's evidence that I think just got

over the line, and it means that things like a slap, which is a violent way to do this business, a handful of facts take this case, you know, a long distance down the sentencing curve.

So, in my own personal view, as I look at this case and try to compare it with other cases, while I want to emphasize that this case and all cases under this statute deserve very serious punishment for being terrible crimes, and while I want to emphasize that victims like the victims in this case can be deeply traumatized by a few days in the business, and it doesn't take a year for them to be deeply harmed, still I am obligated to stack these cases along some sort of chain, 15 to 30, and in doing that, I view Mr. Jackson at the lower end of this scale.

I've considered the advisory sentencing guideline range and factors under Section 3553(a). I've tried to articulate what I believe is a fair and just sentence, comparing this case to other cases, and focusing on the core facts of this case.

The defendant shall pay restitution -- Do you have a specific amount? Is there going to be restitution sought?

MS. PAASO: We haven't received any request for restitution at this time, Your Honor.

THE COURT: All right. So that's still an open possibility for a while after sentencing, but for today's purposes, I won't order any restitution.

The defendant is committed to the Bureau of Prisons for confinement for a period of 200 months, with the sentences an all counts to be served concurrently with each other. Upon release, the defendant shall serve a five-year term of supervised release on each count, subject to mandatory conditions, standard conditions, and then multiple special conditions.

There are, in fact, 30 of them, Mr. Olson. Have you had a chance to go over those with your client?

MR. OLSON: Yes, Your Honor. We've reviewed those and we don't have any objections to those, and we waive reading of them.

THE COURT: I'll impose all of those special conditions as part of the conditions of his supervised release in this case.

I'm not ordering any fine. You do owe a fee assessment of $100 on each count.

The grand total is then what? Remind me.

MS. PAASO: Six counts of conviction, Your Honor.

THE COURT: So a grand total of $600.

Payment of these penalties -- if there's restitution, we'll see, but even the fee assessment, which is due immediately and in full, is at half of wages earned if participating in a prison industries, $25 per quarter if not. Any unpaid balance upon release shall be paid in monthly

installments of not less than $100 per month.

Mr. Jackson, you do have a right to appeal from the sentence I've just imposed. A notice of appeal must be filed within 14 days of the entry of judgment. If you can't pay the cost, you can ask for permission to appeal without paying the cost. If you request, the clerk will prepare and file a notice on your behalf.

Mr. Olson is very familiar with all these appeal issues, so you can get advice from him on what to do next. Some of the issues you've raised, like having a case agent in the room or not getting in all the evidence you wanted, those are questions you'll be able to argue about with the Court of Appeals on appeal.

The defendant is currently in custody, not viewed as suitable for voluntary surrender.

Are you requesting the RDAP program?

MR. OLSON: Yes, sure, Your Honor.

THE COURT: I will recommend the defendant be allowed to participate in the Residential Drug and Alcohol Program. While he's had periods of sobriety, his life story is one that includes significant drug and alcohol issues, and so I think the program will do him good and may result in some time off if he's successful in the program.

He has numerous well-wishers here today. Are you requesting Sheridan?

MR. OLSON: Yes, Your Honor.

THE COURT: I'll note that the defendant's mother, who testified, is here along with others who care about him, and they're here. I strongly recommend, given his strong ties to this community, that he be allowed to serve his time at Sheridan.

Anything further from the defense?

MR. OLSON: No, Your Honor. Thank you.

THE COURT: From the United States?

MS. CADOTTE: No, Your Honor. Thank you.

THE COURT: Thank you. We'll be in recess.

THE COURTROOM DEPUTY: This court is in recess.

(Proceedings concluded at 11:21 a.m.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause. A transcript without an original signature or conformed signature is not certified.

*/s/Bonita J. Shumway* *August 25, 2022*

BONITA J. SHUMWAY, CSR, RMR, CRR DATE
Official Court Reporter