IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,

v.

**JOHNL JACKSON,**

        Defendant.

No. 3:19-cr-00458-MO-1

OPINION AND ORDER

**MOSMAN, J.,**

This matter is before me on Defendant Johnl Jackson's[1] 28 U.S.C § 2255 Motion. Mot. Under 28 U.S.C § 2255 to Vacate, Set Aside, or Correct a Sentence by Person in Federal Custody [ECF 498]. Defendant asserts six grounds for relief in his § 2255 Motion, four of which are based on ineffective assistance of counsel under the Sixth Amendment to the United States Constitution. *Id.* His other two grounds for relief are based on (1) cumulative error under the Fifth and Fourteenth Amendments to the United States Constitution, and (2) actual innocence under the Eighth and Fourteenth Amendments to the United States Constitution. *Id.* As explained below, I DENY Defendant's § 2255 Motion[2] and DENY issuance of a certificate of appealability.

---

[1] For consistency with the case caption, I refer to Mr. Jackson as Defendant instead of Petitioner in this Opinion and Order.

[2] Because an evidentiary hearing will not aid me in resolving this matter, I decide this Motion on the briefing.

1 – Opinion and Order

## BACKGROUND

**I.     Trial**

After a five-day trial in March 2022, a jury found Defendant guilty on nine separate counts related to sex trafficking of minors. *See generally*, Jury Verdict [ECF 400]; Second Superseding Indictment [ECF 269]. Defendant is a Black man, and Defendant's co-defendant Diana Petrovic is a white woman. Def.'s Br. [ECF 502] at 2. Defendant is approximately ten years older than Ms. Petrovic. *See* Tr. 3/7/2022 [ECF 464] at 26–27. At the time of the sex-trafficking crimes Defendant was 31, and Ms. Petrovic was 19. *See id.* The prosecution's theory at trial was that Defendant masterminded a sex-trafficking organization in which Ms. Petrovic was his victim. *See* Tr. ECF 464 at 27–28. The defense's theory was that Defendant was infatuated with Ms. Petrovic and she, not Defendant, ran the sex-trafficking enterprise. *See id.* at 40–42. The Government's first three witnesses were Sergeant John Sydow, a supervisor in the Investigations Bureau of the Sacramento County Sheriff's Office, and two of the minor victims, Minor Victim 4 (MV4) and Minor Victim 5 (MV5). [ECF 464] at 52–53, 83; Tr. 3/8/2022 [ECF 465] at 190.

**A.     Sergeant Sydow's Testimony**

Sergeant Sydow testified as an expert on sex trafficking and victimology. *Id.* Based on his experience interviewing sex traffickers and victims, Sergeant Sydow testified about the "rough definition of victimology" and character traits common to "victims" of sex trafficking. *Id.* at 53–60. Sergeant Sydow said that he might "occasionally say she or he" because victims are "primarily women and girls" and suspects are "primarily men and boys," although "that's not absolutely exclusive in any way." *Id.* at 61.

Sergeant Sydow explained the sex-trafficking subculture. He testified that the relationships between traffickers and victims fell "into two main camps." *Id.* at 63. "[P]ositive side"

2 – Opinion and Order

relationships that "tend to be more romance based or finesse or boyfriend, sometimes called "[a] 'Romeo.'" *Id.* Sergeant Sydow described the other main type of relationship as "violent" and explained that "in the vernacular of the prostitution world" violent pimps "would be called a gorilla pimp." *Id.* He explained that traffickers are never "absolutely one or the other" and even individual traffickers "may move back and forth on the same spectrum." *Id.* at 63–64. Finally, Sergeant Sydow testified about the "rules of the game." *Id.* at 71. He explained that some significant rules "could even be race-related" and specifically discussed "a rule within that subculture which involves victims not even interacting or looking at African American men with this belief that African American men could also be potential traffickers." *Id.* at 72. "[I]t is a common rule, a very common rule that victims are not allowed to look at African American men for that reason." *Id.*

Defendant's trial counsel did not object to Sergeant Sydow's testimony about victims generally being female and traffickers generally being male, the term "gorilla pimp," or race-related rules of the game. *See id.* at 61–66. Defendant's trial counsel clarified on cross-examination that Sergeant Sydow testified about generalities or patterns, not absolutes. *See id.* at 73.

### B. MV4's Testimony

The jury next heard MV4's testimony. *Id.* at 83. She testified that she was fifteen and "going through a hard time" when she met Defendant and Ms. Petrovic at a mall. *Id.* at 84–85. Shortly after meeting Defendant, MV4 went with him and Ms. Petrovic to a house that she believed was Defendant's. *Id.* at 87. Ms. Petrovic said they were going to a party, so after getting ready, MV4 "got into the car and . . . ended up at a house with five men, and [she] started to understand that [she] was expected to have sex with men for money." *Id.* at 88. MV4 ended up having sex with a man for $110. *Id.* at 91. Ms. Petrovic told MV4 that if she did not give Ms. Petrovic the

3 – Opinion and Order

money, Defendant and another man, Keonte Scott, would take it from MV4. *Id.* at 91–92. Concerned for her safety, MV4 handed over the money. *Id.* at 92.

About a year later, MV4 reached out to Ms. Petrovic on Facebook, and Defendant and Ms. Petrovic came and picked up MV4 and MV5 from a gas station in downtown Eugene and drove them to Washington. *Id.* at 93–95. During the car ride, everyone consumed lots of drugs, which Defendant provided. *Id.* at 95. MV4 testified that the four of them went to a man's house in Vancouver where they stayed up all night, partied, and had sex with each other. *Id.* at 97–98. Defendant provided the drugs and bought MV4 some other toiletries. *Id.* The next day, Defendant took MV4 and MV5 to a house to get more cocaine, and MV4 "had to have sex with the man there." *Id.* at 101. MV4 testified that she "wouldn't say she felt forced, but I wouldn't say I felt like I had a choice." *Id.* at 102. MV4 did not feel she could leave the situation because she had been "provided with so much free things and I felt like it was leading up to something." *Id.* MV4 also felt like she owed Ms. Petrovic something because MV4 felt closer to Ms. Petrovic than to Defendant. *Id.* at 102–03.

MV4 testified that the group went to the Pole Barn property that night, and she was told to approach men and "try and get sex from them." *Id.* at 107–08. MV4 believes that Ms. Petrovic told her that in the car on the way to the Pole Barn and that Defendant heard Ms. Petrovic. *Id.* The group's mood when they went to the property was tense and there was lots of talk about needing money. *Id.* at 109. Once at the property, MV4 choose a man and drove away with him in his car. *Id.* MV4 broke down crying and told the man that she wanted to leave but did not feel like she could. *Id.* She told the man she believed Defendant and Ms. Petrovic planned to kill her. *Id.* at 111. The man gave her sixty dollars and told her to catch a bus in the morning. *Id.* at 112.

4 – Opinion and Order

MV4 ultimately returned to the Pole Barn where Ms. Petrovic "harass[ed] [her] for money." *Id.* at 112–13. MV4 refused and told Ms. Petrovic that she was leaving. *Id.* at 113. This led to a long discussion between MV4 and Ms. Petrovic, during which Ms. Petrovic frequently left the discussion to talk to Defendant and then returned. *Id.* at 113–14. MV4 eventually spent the night with the man she had talked with in the car, and her parents came and got her the next day. [ECF 465] at 153.

### C.  MV5's Testimony

On the second day of trial, after MV4's testimony concluded, the jury heard from MV 5. Her description of the trip from Eugene to Vancouver largely echoed MV4's. *Id.* at 194–203. Then, MV5 described what happened at the Pole Barn property. *Id.* at 203–04. MV5 testified that when the group arrived at the property, "[t]here were men lined up all outside, so anywhere – like in their 60s. There were like, 30 men, 30 guys there." *Id.* at 204. She explained that "[i]t seemed as if they were bidding on something outside." *Id.* MV5 felt "very tired" and "hadn't slept in days." *Id.* at 205. When she tried to sit down, Ms. Petrovic "slapped [her] in the face," leaving MV5 feeling "gross." *Id.* at 205–06. After the slap, MV5 felt afraid and "like she was trapped." *Id.*

MV5 testified that she eventually had sex with one of the men in a trailer, and he gave her $250, which Defendant took. *Id.* at 208. When MV5 went into a trailer with another man, she started crying, confessed that she was a minor, and that she "needed help." *Id.* at 209. The man gave her money and let her go. *Id.* Defendant and Ms. Petrovic again took the money. *Id.*

After MV4 left, MV5 "felt betrayed and confused" and "very scared." *Id.* at 210. MV5 felt that her best option for protection was Ms. Petrovic. *Id.* After leaving the Pole Barn, Defendant and Ms. Petrovic took MV5 to a house "filled with nothing but Mexican men." *Id.* at 211–12. MV5 knew that she was expected to have sex with the men for money because she was told to "get pretty

5 – Opinion and Order

before I went there." *Id.* at 212. MV5 had sex with two men in the house. *Id.* at 213–14. MV5 testified that she found the second man "creepy" but "gave in." *Id.* at 213. MV5 cried as she testified about her sexual interaction with the second man, which she described as rape. *Id.* at 214–215. MV5 testified that her interaction with the man made her feel "disgusting" and that after she managed to get away from him, she "ran out of the house" without her "pants fully pulled up," and "without getting paid." *Id.* At that point in the testimony, the Court recessed for a morning break. *Id.* at 216.

### D.     Juror Number 11

After MV5 finished testifying, the Court recessed for lunch. Before excusing the lawyers, the Court "put on record a conversation" with Juror 11 that occurred during the morning break. *Id.* at 251–52. The Court relayed that the Juror said, "he didn't feel he could continue serving" and his reasons "run in two not totally compatible directions." *Id.* at 252. First, the testimony that Juror 11 had heard "upset him quite a bit" and "he had really sort of firmly decided the defendant's guilt." *Id.* Second, "in a little way, he also said 'and I don't want to be part of an all-white jury that sits in judgment on a black man, and sort of tried to wrap that together by saying 'and I know they're going to have to condemn him because if they do their job, that's what they'll do.'" *Id.*

## II.     Conviction and Sentencing

The jury convicted Defendant on all counts. [ECF 400]. The Court dismissed overlapping counts and sentenced Defendant on the remaining counts. [ECF 433]. During the sentencing the Court explained that it was a "close call" to determine if the Government's proof was sufficient to establish force or coercion and stated that "if I had to pick in this criminal enterprise who was sophisticated and smart, able to run things, it would be Ms. Petrovic, not Mr. Jackson." Sentencing

6 – Opinion and Order

Hrg. Tr. [ECF 436] at 24–25. The Ninth Circuit affirmed Defendant's conviction on appeal. Mem. Op. [ECF 480]. The United States Supreme Court denied certiorari. Denial of Cert. [ECF 494].

## DISCUSSION

In his 28 U.S.C § 2255 Motion, Defendant contends, among other things, that he was denied constitutionally effective assistance of trial counsel because his attorney did not object to Sergeant Sydow's testimony about "racist stereotypes and a racist slur" and "impermissibl[e]" profiles of sex traffickers. [ECF 498] at 4–7. Trial counsel filed a declaration stating that his failure to object was a mistake, not a strategic decision. [ECF 101]. Defendant's supporting brief discusses only this claim, but he does not withdraw his other grounds for relief. [ECF 502] at 3.

**I.     Standards**

  **A.     Ineffective Assistance of Counsel**

"[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*'s two-factor test for ineffective assistance of counsel claims, a convicted defendant must establish (1) constitutionally deficient performance by counsel that (2) prejudiced defendant. *Id.* at 687. "The essence" of such a claim "is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). The *Strickland* standard is highly demanding; "[o]nly those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ . . . ." *Id.* at 382; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task."). "Even if inadvertence (not tactical reasoning) results in non-pursuit of a particular issue 'relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy

7 – Opinion and Order

judged with the benefit of hindsight.'" *Washington v. Shinn*, 46 F.4th 915, 927 (9th Cir. 2022) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)).

### B. Cumulative Error

The combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973) (combined effect of errors "denied [the defendant] a trial in accord with traditional and fundamental standards of due process"). "[C]umlative error warrants habeas relief only where errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Due process is violated where the cumulative effect of "individually harmless errors" makes the Defendant's case "'far less persuasive than it might [otherwise] have been.'" *Id.* (quoting *Chambers*, 410 U.S. at 302–03). Accordingly, a court must consider the strength of the prosecution's case to determine whether combined errors affected the verdict. *Id.* at 928.

### C. Actual Innocence

For relief on an actual innocence claim, a habeas petitioner must establish that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (cleaned up).

## II. Counsel's Failure to Object to Portions of Sergeant Sydow's Testimony (Ground One)

### A. Reasonableness

I find that Defendant has not met his burden under *Strickland*'s first factor of showing that his trial counsel provided constitutionally deficient performance by failing to object to Sergeant Sydow's testimony. "Every defendant has a right to be tried based on the evidence against him or

8 – Opinion and Order

her, not on the techniques utilized by law enforcement officials in investigating criminal activity." *United States v. Wells*, 879 F.3d 900, 921 (9th Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Lui*, 941 F.2d 844, 847 (9th Cir. 1991). Courts, therefore, should admit criminal profile evidence only in "narrow and limited circumstances." *Id.* On the other hand, the Ninth Circuit has held that expert evidence about the sex-trafficking subculture is admissible in sex-trafficking cases. *United States v. Brooks*, 610 F.3d 1186, 1196 (9th Cir. 2010) (concluding that expert testimony from qualified detectives about the sex trade subculture is relevant to child sex-trafficking charges).

The record here shows that Sergeant Sydow did not testify about the character traits of sex traffickers. *See Wells*, 879 Fed.3d at 920–21 (the government's purpose for offering testimony was to establish "the characteristics" of those who commit workplace violence); *see also United States v. Espinoza-Valdez*, 889 F.3d 654, 658 n.6 (9th Cir. 2018) (explaining that drug courier profile evidence is a "'somewhat informal complication of characteristics believed to be typical of persons unlawfully carrying narcotics'" (quoting *Reid v. Georgia*, 448 U.S. 438, 440 (1980)). Instead, Sergeant Sydow testified about means and methods in the sex-trafficking subculture—traffickers may exploit a victim's vulnerabilities, including runaway status, distance from home, poverty, or lack of ready support; traffickers often use drugs and alcohol, financial support, and either romantic manipulation, violence, or some combination of both to exert control and instill fear; violent pimps are called "gorilla pimps" and pimps who manipulate romantically are called "Romeo pimps;" one of the rules in the world of prostitution is that victims are not allowed to look at African American men based on a belief within the subculture that African American men could be sex traffickers. [ECF 464] at 59–63, 72; *see also United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984) (means and method evidence "helps the jury to understand complex criminal activities, and alerts

it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior."). While Sergeant Sydow's testimony touched on racial issues—including a term that could be construed as a racist slur—it is an important distinction that his testimony went towards explaining the means and methods of the sex-trafficking subculture and not towards character traits that law enforcement considers when profiling sex traffickers. *See Espinoza-Valdez*, 889 F.3d at 658 n.6. Even if a trial attorney at the top of his game might well have objected to a portion of this testimony, I find that trial counsel's failure to object—even if he now considers it a mistake—was not unreasonable "under prevailing professional norms," *Strickland*, 466 U.S. at 688, and certainly did not constitute "gross incompetence," *Kimmelman*, 477 U.S. at 382; *see also Shinn*, 46 F.4th at 927 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Accordingly, Defendant has not met his burden of showing that his trial counsel's performance fell below an objective standard of reasonableness. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom" (quoting *Strickland,* 466 U.S., at 690)).

    **B.**    **Prejudice**

Even if Defendant could establish that his counsel's failure to object was constitutionally deficient, I find that he cannot establish *Strickland*'s prejudice factor. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To prove prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

10 – Opinion and Order

outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. 86 (cleaned up) (quoting Strickland, 466 U.S. at 687).

Defendant asserts that the prejudice factor is evidenced by Juror 11's comments to the Court and by the Court's statement's during sentencing. [ECF 502] at 15–17. I am not persuaded by this argument. As the Government points out, Juror 11 became convinced of defendant's guilt and asked to be excused immediately after MV5 broke down in tears during her testimony on the second day of trial, not after Sergeant Sydow's testimony concluded on day one. *See* Gov't Resp. [ECF 503] at 14; *see also* [ECF 465] at 251–52 ("[T]he testimony he heard upset him quite a bit, and he felt he could not be fair anymore."). The statements made during sentencing similarly are not probative of whether Defendant's trial produced a just result. Those statements were made in the context of considering the appropriate sentence for Defendant, not the sufficiency of proof for his conviction. [ECF 436] at 23 ("[W]e're past the point of figuring out what counts for a conviction. That's already happened. We have a conviction. Now we're trying to figure out, in this pretty significant range of 15 years, where does the defendant fit."). A fair evaluation of the evidence offered at trial establishes that there is not a substantial likelihood of a different result had trial counsel objected to Sergeant Sydow's testimony. *See Harrington*, 562 U.S. 112. The jury heard evidence—testimony from a younger man that Defendant guided in the sex trafficking industry, trafficking customers, Ms. Petrovic, and the minor victims—and saw forensic evidence that supported the Government's case. *See* [ECF 464] at 27–29 (discussing witness testimony and exhibits supporting the charges against Defendant); *see also generally* Trial Tr. [ECF Nos. 464–

11 – Opinion and Order

67]. Accordingly, I find that Defendant has not affirmatively proved prejudice regarding trial counsel's failure to object to Sergeant Sydow's testimony. *Strickland*, 466 U.S. at 693.

### III. Defendant's Other Grounds for Relief (Grounds Two–Six)

Neither the Defendant nor the Government addressed Defendant's additional grounds for relief in their briefing. *See generally*, [ECF Nos. 502, 503, 507]. Defendant did, however, provide some argument in support of Grounds Two and Three in his Motion. [ECF 498] at 7–10. As discussed below, I find that Defendant is not entitled to relief on any of these additional grounds.

#### A. Counsel's Failure to Introduce Evidence of Defendant's Disability or other Evidence Rebutting the Government's Theory that Defendant Masterminded the Sex-Trafficking Conspiracy (Gound Two).

Defendant argues that his trial counsel was ineffective by failing to introduce evidence regarding his intellectual disability and/or his intellectual disability at trial because that evidence would have rebutted the Government's theory that he was the mastermind of the criminal sex-trafficking conspiracy, and it would have impeached Ms. Petrovic's testimony that she acted under Defendant's direction. [ECF 498] at 8. Even if trial counsel's failure to introduce this evidence was unreasonable under prevailing professional standards, Defendant cannot show that he was prejudiced. *See Strickland*, 466 U.S. at 686. Whether Defendant was the mastermind or simply the infatuated follower as he asserts, the elements that the Government had to prove to secure a guilty verdict were the same. *See* Second Superseding Indictment [ECF 269]; *see also e.g.*, Final Jury Instructions [ECF 395] at 33 ("To find defendant guilty of conspiring to commit Count 5 the government must prove . . . an agreement between two or more persons to transport a minor with the intent that they engage in prostitution" and "defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it."). Accordingly, I find that

Defendant has not affirmatively established prejudice based on counsel's failure to introduce evidence of his intellectual disability and/or difficult childhood. *See Harrington*, 562 U.S. at 86.

### B. Counsel's Failure to Request a Special Verdict Form, Jury Instructions, or an Election Specifying the Government's Theory (Ground Three)

Defendant argues that Counsel was ineffective by failing to request a special verdict form, jury instructions, or an election specifying the Government's theory of fraud, force, or coercion on Counts 1, 4, and 8. [ECF 498] at 9. Defendant asserts that this failure created the "possibility that the jury did not agree regarding the factual instance underlying each offense" and prevented him from raising claims "regarding the lack of concurrence and improper 'bundling' of theories on appeal." *Id.* Count 1 of the Second Superseding Indictment is conspiracy to engage in sex trafficking under 18 U.S.C. § 1594(c). [ECF 269] at 1. Counts 4 and 8 of the Second Superseding Indictment allege sex trafficking by force, fraud, and coercion under 18 U.S.C. § 1591(a)(1), (2), and (b)(1). *Id.* at 3, 5. Counts 4 and 8 only pertain to MV5 as the Government did not allege that MV4 was trafficked by force, fraud, or coercion. Count 4 concerns sex trafficking at the Pole Barn property and count 8 involves sex trafficking at the house where MV5 was raped.

Even if he could establish that his counsel performed unreasonably by failing to request a special verdict form, jury instructions, or an election specifying the Government's theory of fraud, force, or coercion on Counts 1, 4, and 8, Defendant could not establish prejudice. *Shinn*, 46 F.4th at 928, 930. The jury did not need to unanimously agree on what means or combination of means Defendant used regarding Counts 1, 4, and 8. *See United States v. Mickey*, 897 F.3d 1173, 1181–82 (9th Cir. 2018) (rejecting the argument that "force, threats of force, fraud, and coercion are separate elements of [18 U.S.C § 1591]" because these are means, not elements"); *see also Renson v. Holder*, 764 F.3d 1077, 1086 (9th Cir. 2014) ("elements [are] the circumstances on which the jury must unanimously agree, while . . . means [are] those circumstances on which the jury may

13 – Opinion and Order

disagree yet still convict"). Accordingly, because the jury may disagree on means and still convict, Defendant cannot establish that trial counsel's performance was constitutionally deficient under *Strickland*. *See Mickey*, 897 F.3d at 1181; *Shinn*, 46 F.4th at 930 (to show prejudice under *Strikland* requires a showing that trial counsel's errors deprived the defendant of a fair trial).

### C. Counsel's Failure to Raise Errors on Appeal (Ground Four)

Defendant's final ineffective assistance of counsel argument is that appellate counsel was constitutionally deficient by failing to raise the following errors on appeal: (1) the Court's denial of Defendant's motion for a *Daubert* hearing regarding the admissibility of Sergeant Sydow's expert testimony, (2) the Court's denial of Defendant's motion to exclude Sydow's testimony regarding character traits of vulnerable victims without an evidentiary determination that Defendant knew about those vulnerabilities, and (3) the Court's denial of Defendant's motion to dismiss three duplicitous counts before trial and the Court's instructions to the jury regarding those counts. [ECF 498] at 10. Defendant's conclusory statements of his appellate counsel's deficient performance and the resulting prejudice do not satisfy Defendant's burden as to either *Strickland* factor. *See Shinn*, 46 F.4th at 926 (it is a convicted defendant's burden to show ineffective assistance of counsel); *see also Pool Water Prods. V. Olin Corp.*, 258 F.3d 1024, 1033 (9th Cir. 2001) (a court need not "hunt and peck" to find evidence supporting a defendant's arguments). Accordingly, I deny relief on Ground Four.

### D. Cumulative Error (Ground Five)

Defendant asserts that he was denied due process based on cumulative errors during his trial. [ECF 498]. Neither Defendant's conclusory statement nor the record support a finding that "individually harmless errors" made his defense "'far less persuasive than it might have been.'" *Parle*, 505 F.3d at 927 (quoting *Chambers*, 410 U.S. at 302–03). As discussed above, the

Government's presented substantial evidence that Defendant conspired to sex traffic minors. *See id.* at 928 (the strength of the prosecution's case is a factor in a cumulative error claim); [ECF 464] at 27–29 (discussing witness testimony and exhibits supporting the charges against Defendant); *see also generally* [ECF Nos. 464–67]. Accordingly, I deny relief on Ground Five.

### E. Actual Innocence (Ground Six)

Finally, Defendant makes the conclusory assertion that he is entitled to relief because he is innocent. [ECF 498]. For relief on this claim, Defendant must show that, given the evidence against him, "it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (cleaned up). Based on the record here, I find that Defendant has not made the required showing. *See* [ECF 464] at 27–29 (discussing witness testimony and exhibits supporting the charges against Defendant); *see also generally* [ECF Nos. 464–67]. Accordingly, I deny relief on Ground Six.

## III. Certificate of Appealability

A court should issue a certificate of appealability (COA) only if a defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C § 2253(c)(2). For the reasons set forth above, I find that Defendant has not made such a showing, and DENY issuance of a COA.

### CONCLUSION

For the reasons above, I DENY Defendant's Motion under 28 U.S.C § 2255 [ECF 498], and I DENY issuance of a COA.

IT IS SO ORDERED.

DATED this 29th day of September, 2025.

MICHAEL W. MOSMAN
United States District Judge

15 – Opinion and Order